# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

              Plaintiffs,

              v.

FEDERAL ELECTION COMMISSION,

              Defendant,

and

CROSSROADS GRASSROOTS POLICY
STRATEGIES,

              Defendant–Intervenor

Civil Action No. 16-259 (BAH)

Chief Judge Beryl A. Howell

## Table of Contents

I. BACKGROUND ................................................................................................................. 5
   A. PLAINTIFFS' ADMINISTRATIVE COMPLAINT TO THE FEC ............................... 5
   B. FEC'S DISMISSAL OF PLAINTIFFS' ADMINISTRATIVE COMPLAINT............ 10
   C. THE INSTANT LITIGATION ..................................................................................... 16

II. LEGAL STANDARDS ..................................................................................................... 17
   A. SUMMARY JUDGMENT UNDER THE APA ............................................................ 17
   B. SUMMARY JUDGMENT UNDER THE FECA......................................................... 20

III. DISCUSSION.................................................................................................................... 21
   A. STATUTORY AND REGULATORY FRAMEWORK ............................................... 22
     1. Statutory Disclosure Requirements for Not-Political Committees Making
       Independent Expenditures ..................................................................................... 23
     2. The Challenged FEC Regulation .......................................................................... 38
   B. THE PLAINTIFFS' CHALLENGE TO THE REGULATION IS JUSTICIABLE ...... 43
     1. Count II Is Not Time-Barred ................................................................................ 44
     2. Plaintiffs Have Standing to Bring Count II ......................................................... 47
     3. Plaintiffs Have Exhausted Administrative Remedies for Counts II and III ............. 48
   C. FEC'S CHALLENGED REGULATION IS INVALID AND VACATED ................. 51
     1. 52 U.S.C. §§ 30104(c)(1) and (c)(2)(C) Are Unambiguous..................................... 53
     2. The Defendants' Alternative Construction of § 30104(c) Is Unsupported................. 65
     3. Vacatur Is Appropriate Remedy for Invalid Regulation............................................. 93

    D.    FEC'S DISMISSAL OF THE PLAINTIFFS' AMENDED ADMINISTRATIVE
          COMPLAINT WAS CONTRARY TO LAW AND WARRANTS REMAND .......... 99
        1.    Legal Standard Applicable to Review of FEC Enforcement Actions ..................... 100
        2.    OGC's First Recommendation at Issue in Counts I and II ...................................... 102
        3.    OGC's Second Recommendation at Issue in Count III .......................................... 104
IV.  CONCLUSION ............................................................................................................. 110

## **MEMORANDUM OPINION**

Campaign finance law has long recognized the value of disclosure as a means of enabling the electorate to make informed decisions about candidates, to evaluate political messaging, to deter actual, or the appearance of, corruption, and to aid in enforcement of the ban on foreign contributions, which may result in undue influence on American politicians. *See Citizens United v. FEC*, 558 U.S. 310, 366–71 (2010); *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976); *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 698 (D.C. Cir. 2010). As the protection of speech is also a fundamental value safeguarded under the First Amendment, disclosure has been upheld as "the least restrictive means of curbing the evils of campaign ignorance and corruption." *Buckley*, 424 U.S. at 68; *see also Citizens United*, 558 U.S. at 369 (explaining "that disclosure is a less restrictive alternative to more comprehensive regulations of speech").

This case concerns the requisite disclosures about contributors that organizations making independent expenditures, in support of or opposition to particular candidates for federal office, must make, when those organizations are not political committees controlled by, or operating in coordination with, candidates or national political parties. These statutorily mandated disclosures are squarely "part of Congress'[s] effort to achieve 'total disclosure' by reaching 'every kind of political activity' in order to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Buckley*, 424 U.S. at 76 (quoting S. REP. NO. 229, 92d Cong., 2d Sess. at 57 (1971)). Moreover,

an important aspect of this statutory disclosure regime is to further "the government's interest []

in preventing foreign influence over U.S. elections." *Bluman v. FEC*, 800 F. Supp. 2d 281, 283,

288 n.3 (D.D.C. 2011) (Kavanaugh, J., for a three-judge District Court) (holding "readily . . .

constitutional" federal statute "banning foreign nationals . . . from making expenditures" on

elections), *aff'd*, 565 U.S. 1104 (2012); *see also SpeechNow.org*, 599 F.3d at 698 (D.C. Cir.

2010) (noting that "requiring disclosure of such information deters and helps expose violations

of other campaign finance restrictions, such as those barring contributions from foreign

corporations or individuals"). Congress has heard the warning that "holes in campaign finance

disclosure rules allow dark money organizations to spend on politics without revealing their

donors, potentially hiding foreign sources of funds." *Oversight of Federal Political

Advertisement Laws and Regulations: Hearing Before the Subcomm. on Information Technology

of the H. Comm. on Oversight and Gov't Reform*, 115th Cong. 55 (2017) (statement of Ian

Vandewalker, Senior Counsel, Democracy Program, Brennan Center for Justice at NYU School

of Law); *see also* R. SAM GARRETT, CONG. RESEARCH SERV., RPT. NO. R42042, SUPER PACS IN

FEDERAL ELECTIONS: OVERVIEW AND ISSUES FOR CONGRESS, Summary page (Sept. 16, 2016)

[hereinafter 2016 CRS REPORT], *available at* https://fas.org/sgp/crs/misc/R42042.pdf, (noting

that, although "[s]uper PACs must report their donors to the FEC . . . the original source of

contributed funds—for super PACs and other entities—is not necessarily disclosed.").

The plaintiffs, Citizens for Responsibility and Ethics in Washington ("CREW") and

Nicholas Mezlak, a registered voter in Ohio, initiated this action under the Federal Election

Campaign Act of 1971 ("FECA"), 52 U.S.C. § 30109(a)(8)(C), and the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706, against the Federal Election Commission ("FEC"),

challenging: (1) the FEC's regulation, codified at 11 C.F.R. § 109.10(e)(1)(vi), as "inconsistent

with" FECA's statutory disclosure requirements in 52 U.S.C. § 30104(c); and (2) the FEC's allegedly improper dismissal of the plaintiffs' administrative complaint alleging that Crossroads Grassroots Policy Strategies ("Crossroads GPS" or "CGPS"), and its agents, failed "to comply with the FECA's disclosure requirements" when making independent expenditures ("IEs") in multiple 2012 U.S. Senate races.  Compl. ¶¶ 1, 2, 4, 17, ECF No. 1.[1]  The plaintiffs seek both injunctive and declaratory relief against the defendant FEC in three counts, one of which survived in full and two of which survived in part, prior motions to dismiss by the FEC and the defendant-intervenor Crossroads GPS.  *See Citizens for Responsibility & Ethics in Wash., v. FEC* ("*CREW*"), 243 F. Supp. 3d 91, 105 (D.D.C. 2017).

Now pending before the Court are the parties' cross-motions for summary judgment.  *See generally* Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 27; CGPS's Cross-Mot. Summ. J. ("CGPS's Cross-Mot."), ECF No. 28; FEC's Cross-Mot. Summ. J. ("FEC's Cross-Mot."), ECF No. 30.  For the reasons set forth below, the plaintiffs' motion is granted, and the FEC's and Crossroads GPS's cross-motions are denied.  Accordingly, subsection (vi) of 11 C.F.R. § 109.10(e)(1) is declared invalid and therefore vacated, with the vacatur stayed for 45 days to provide time for the FEC to issue interim regulations that comport with the statutory disclosure requirements of 52 U.S.C. § 30104(c), and the FEC's dismissal decision is declared "contrary to law," with the matter remanded to the FEC, which must conform with this Court's ruling within 30 days, pursuant to 52 U.S.C. § 30109(a)(8)(C).[2]

---

[1]    Crossroads GPS is a tax-exempt organization, which funds independent expenditures and is organized under Section 501(c)(4) of the Internal Revenue Code ("IRC").  CGPS's Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. ("CGPS's Opp'n") at 6, ECF No. 28.
[2]    The plaintiffs and Crossroads GPS have each requested oral argument on the pending motions, Pls.' Mot. at ii; CGPS's Cross-Mot. at i, but given the sufficiency of the parties' written submissions to resolve the pending motions, this request is denied.  *See* LCvR 7(f) (allowance of oral hearing is "within the discretion of the Court").

# I.    BACKGROUND

Much of the factual and procedural background for this case is set out in this Court's prior Memorandum Opinion resolving the FEC's Partial Motion to Dismiss and Crossroads GPS's Supplemental Motion to Dismiss, *CREW*, 243 F. Supp. 3d at 93–97, and has been supplemented below with information provided in the Administrative Record ("AR"), ECF Nos. 38, 38-1.[3]

## A.    PLAINTIFFS' ADMINISTRATIVE COMPLAINT TO THE FEC

CREW is a non-profit watchdog organization "committed to protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics." Compl. ¶¶ 7–8. In furtherance of this mission, "CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election." *Id.* ¶ 10. Nicholas Mezlak is a U.S. citizen registered to vote in Ohio. *Id.* ¶ 17.

On November 14, 2012, CREW and two individual plaintiffs, other than Mezlak, filed an administrative complaint with the FEC, claiming that Crossroads GPS and its agents failed properly to report contributions for independent expenditures. *Id.* ¶ 55; AR 1–17 (Admin. Compl. 1–17).[4] This claim was triggered by press reports that, on August 30, 2012, American

---

[3]    The AR totals over 700 pages and contains documents from both (1) the administrative proceeding initiated by the plaintiffs before the FEC, designated as Matter Under Review ("MUR") 6696, and (2) the FEC's rulemaking for the challenged regulation as part of the agency's implementation the 1979 FECA Amendments. FEC's Not. Filing Cert. List of AR at 1, ECF No. 25. The portions of the AR cited or otherwise relied upon in the parties' briefing have been docketed in a two-part Joint Appendix, with consecutive pagination. *See* Jt. App'x, Part 1, ECF No. 38 (AR pages 1–199, 1001–1084); Jt. App'x Part 2, ECF No. 38-1 (AR pages 1085–1554). The administrative record for MUR 6696 appears at AR 1–199, and the rulemaking record makes up the remainder of the AR. For clarity, citations are to pages of the AR, without distinguishing Parts I and II of the Joint Appendix. Not all portions of the AR contained in the Joint Appendix are cited herein, but they have been reviewed in resolving the pending motions.

[4]    The administrative complaint was amended, on April 24, 2013, to substitute Nicholas Mezlak for one of the originally named complainants. *See* AR 98–117 (Am. Admin. Compl. 1–20).

Crossroads, a "super PAC" affiliated with Crossroads GPS, hosted an event in Tampa, Florida, with approximately 70 attendees. AR 122–25 (Am. Admin. Compl., Ex. B, Sheelah Kolhatkar, *Exclusive: Inside Karl Rove's Billionaire Fundraiser*, BLOOMBERG BUSINESSWEEK, Aug. 31, 2012 ("Kolhatkar, *Rove's Fundraiser*"); AR 103 (Am. Admin. Compl. ¶ 20) (citing *id.*, Ex. C, Democracy Now, *Interview with Sheelah Kolhatkar* (Sept. 5, 2012), https://www.youtube.com/watch?v=EVyWZkzCUm8).[5] The plaintiffs call the event a "fundraiser," AR 103 (Am. Admin. Compl. ¶ 20), while Crossroads GPS says the event was a "meeting," AR 79 (CGPS's Admin. Resp. at 7); *see also* CGPS's Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. ("CGPS's Opp'n") at 15, ECF No. 28 (describing event as "informational meeting"). No matter the characterization, the parties do not dispute that, at the Tampa event, a multimillion-dollar "matching challenge" contribution was revealed and donations to Crossroads GPS were solicited, as detailed below.

Karl Rove, an unpaid advisor to Crossroads GPS and American Crossroads, *see* AR 94 (CGPS's Admin. Resp., Attach. 1, Karl Rove Affidavit, dated Jan. 17, 2013 ("Rove Aff.") ¶ 2), briefed the Tampa event attendees on a call he received in the spring of 2012 "from an unnamed out-of-state donor," regarding the 2012 Ohio Senate race between the incumbent Democratic Senator Sherrod Brown and his Republican challenger, Josh Mandel, the Ohio State Treasurer. AR 103–04 (Am. Admin. Compl. ¶¶ 22–23) (citing *id.*, Ex. D, Sheelah Kolhatkar, *Exclusive: How Karl Rove's Super PAC Plays the Senate*, BLOOMBERG BUSINESSWEEK, Sept. 4, 2012

---

[5]     Crossroads GPS and American Crossroads are "legally distinct affiliated entit[ies]," and only American Crossroads is "registered with the FEC as a 'super PAC.'" CGPS's Opp'n at 6–7; *see also McCutcheon v. FEC*, 134 S. Ct. 1434, 1442 n.2 (2014) (explaining "[a] so-called 'Super PAC'" as "a PAC that makes only independent expenditures and cannot contribute to candidates"); 2016 CRS REPORT at 14 (reporting that super PAC American Crossroads "spent more than $100 million in 2012"). The plaintiffs and Crossroads GPS differ on the extent to which Crossroads GPS hosted the Tampa event with American Crossroads, *compare* AR 103 (Am. Admin. Compl. ¶ 20) (stating American Crossroads hosted the event "in conjunction" with Crossroads GPS), *with* AR 94 (CGPS's Admin. Resp., Attach. 1, Karl Rove Affidavit, dated Jan. 17, 2013 ("Rove Aff.") ¶ 2) (stating American Crossroads hosted the event), but this debate is irrelevant to resolution of the instant motions.

("Kolhatkar, *Rove's Super PAC*")); AR 94 (Rove Aff. ¶¶ 1, 3–4). During the conversation, as Rove recalled, the donor, who remains unidentified, stated, "I really like Josh Mandel," and "I'll give ya 3 million, matching challenge" to use toward Crossroads GPS's $6 million budget in the State of Ohio. AR 103–104 (Am. Admin. Compl. ¶¶ 23–24) (quoting Kolhatkar, *Rove's Super PAC*); AR 94 (Rove Aff. ¶ 3) (stating Rove's "recollection of a conversation . . . with a donor . . . that is recounted by Sheelah Kolhatkar . . . is substantially accurate"). Rove maintains that the conversation did not entail any discussion of spending the pledged funds "in any particular manner or on any particular or specific efforts or projects," but Rove understood that the contributions were intended "to be used in some manner that would aid the election of Josh Mandel." AR 95 (Rove Aff. ¶ 10). Approximately $1.3 million was raised in connection with the "matching" challenge, which Rove understood to be solicited for "general use in Ohio." AR 95 (Rove Aff. ¶ 13).

The unnamed donor "subsequently contributed a larger amount to Crossroads GPS that was not in any way earmarked for any particular use." *Id*. (Rove Aff. ¶ 14). Crossroads GPS ultimately reported spending $6,363,711 in independent expenditures in the 2012 Ohio race opposing Senator Brown, and none of the ten reports detailing these independent expenditures identified the anonymous donor who pledged "a larger amount" than $3 million or the individuals who contributed "matching" funds. AR 104 (Am. Admin. Compl. ¶¶ 24–25); *see also* Compl. ¶ 53 (citing Compl., Ex. A, CGPS, FEC Form 5, 2012 Year-End Report, dated Jan. 31, 2013 ("CGPS, FEC Form 5, 2012 Year-End Rept."), ECF No. 1-1).

In addition, at the Tampa event, fourteen television advertisements were shown, eleven of which advertisements were produced by Crossroads GPS. AR 104–05 (Am. Admin. Compl. ¶ 27) (citing Kolhatkar, *Rove's Fundraiser*); AR 77–78 (CGPS's Admin. Resp. at 5–6). The

advertisements apparently targeted Democratic Senate candidates in at least four states (Ohio, Virginia, Montana, and Nevada), where Crossroads GPS ran broadcast advertisements that were later included in reports filed with the FEC by Crossroads GPS disclosing independent expenditures after August 30, 2012. AR 112–13 (Am. Admin. Compl. ¶¶ 58–60). Event attendees were also solicited for contributions to Crossroads GPS, after being shown these advertisements—thirteen of which had been paid for and aired, and the fourteenth of which never aired—as a demonstration of "the quality and range of the two entities' activities." CGPS's Opp'n at 16–17; *see also* AR 103–05 (Am. Admin. Compl. ¶¶ 20, 27); AR 77–78 (CGPS's Admin. Resp. 5–6).

The plaintiffs indicate, without dispute from Crossroads GPS, that Crossroads GPS reported spending over $17 million in independent expenditures reflected in reports filed in 2012, without identifying the names of donors providing those funds. AR 106 (Am. Admin. Compl. ¶ 31); Compl. ¶ 53 (citing CGPS, FEC Form 5, 2012 Year-End Rept.; Compl., Ex. B, CGPS, FEC Form 5, 2012 October Quarterly Report, dated Oct. 15, 2012, ECF No. 1-2); CGPS's Answ. ¶ 53, ECF No. 14 (denying only "that Crossroads GPS's independent expenditure reports filed with the FEC failed to disclose the names of any donors that were required to be disclosed by relevant FEC regulations and precedent," and stating "Crossroads GPS'[s] independent expenditure reports filed with the FEC speak for themselves and require no response").

The FEC sent two letters to Crossroads GPS on October 25, 2012, and April 9, 2013, citing deficiencies in Crossroads GPS's reporting of its independent expenditures in 2012, including failing to disclose the required identification information for the individuals making donations used to fund the independent expenditures, as required by 11 C.F.R. §

109.10(e)(1)(vi), the challenged regulation in this litigation. AR 150 (Am. Admin. Compl., Ex. K, FEC's Requests for Additional Information ("RFAI"), dated Oct. 25, 2012, Re: CGPS's Oct. Quarterly Report (07/01/2012–09/30/2012)) ("Each contributor who made a donation in excess of $200 used to fund the independent expenditure(s) must be itemized . . . including their identification information."); AR 156 (Am. Admin. Compl., Ex. M, FEC's RFAI, dated Apr. 9, 2013, Re: CGPS's Year-End Report (10/01/2012–12/31/2012)) (same); *see also* AR 106–08 (Am. Admin. Compl. ¶¶ 32–39). These letters requested that Crossroads GPS amend its reports to provide the missing information. AR 150, 156. These were not the first letters that the FEC had sent to Crossroads GPS about deficient reporting. The FEC had previously sent similar letters about deficiencies in reports filed by the organization in earlier years expressly citing deficiencies in its identification of donors used to fund independent expenditures. *See, e.g.*, AR 141 (Am. Admin. Compl., Ex. I, FEC's RFAI, dated June 14, 2011, Re: CGPS's Oct. Quarterly Report (7/1/10–9/30/10)) ("Commission regulations require that you disclose identification information for each individual who made a donation used to fund the independent expenditure."); AR 143 (Am. Admin. Compl., Ex. I, FEC's RFAI, dated June 14, 2011, Re: CGPS's Year-End Report (10/1/10–12/31/10)) (same).

In response to the FEC's deficiency letters, Crossroads GPS asserted that the FEC had "misstate[d]" the requirements of the regulation, and that disclosure was only required if those contributions were "given 'for the purpose of furthering the reported independent expenditure.'" AR 146 (Am. Admin. Compl., Ex. J, CGPS Counsel's Resp., dated July 19, 2011 ("CGPS July 2011 Resp.")); AR 154 (Am. Admin. Compl., Ex. L, CGPS Treasurer's Resp., dated Nov. 29, 2012) (same)). In the view of Crossroads GPS, "[t]he question is *not* how an organization subsequently chooses to use a contribution, but whether the donor's contribution was given 'for

the purpose of furthering the reported independent expenditure'" and, under this reasoning, since "[n]o contributions accepted by [CGPS] were solicited or received 'for the purpose of furthering the reported independent expenditure' . . . no contributions were required to be reported under the regulations." AR 146–47 (CGPS's July 2011 Resp.) (emphasis in original) (citing "Statement of Reasons of Chairman Matthew S. Peterson and Commissioners Caroline C. Hunter and Donald F. McGahn in MUR 6002 (Freedom's Watch, Inc.) at 5 ('In other words, a donation must be itemized on a non-political committee's independent expenditure report only if such donation is made for the purpose of paying for the communication *that is the subject of the report*' (emphasis in original)).").

## B. FEC'S DISMISSAL OF PLAINTIFFS' ADMINISTRATIVE COMPLAINT

The plaintiffs' administrative complaint alleged that Crossroads GPS's failure to disclose the names of (1) the anonymous donor who promised a $3 million contribution in the spring of 2012, (2) the other contributors to the "matching challenge" triggered by the anonymous donor, and (3) the contributors solicited at the Tampa, Florida event, constituted "direct and serious violations of the [FECA]," citing "2 U.S.C. § 434," which was subsequently re-codified at 52 U.S.C. § 30104, and 11 C.F.R. § 109.10(e)(1)(vi). AR 98, 110–16 (Am. Admin. Compl. ¶¶ 1, 41–51, 57–61).[6] In response, Crossroads GPS asserted that the applicable regulation, 11 C.F.R. § 109.10(e)(1)(vi), required disclosure "only if the donor made the contribution '*for the purpose of furthering the reported independent expenditure*,'" AR 87 (CGPS's Admin. Resp. at 15) (emphasis in original), and none of three categories of donors challenged by plaintiffs, to the

---

[6] The plaintiffs also alleged that four individuals associated with Crossroads GPS violated the federal criminal conspiracy statute, 18 U.S.C. § 371, by conspiring to prevent disclosure of the identities of the three categories of donors. AR 111–12, 114–15 (Am. Admin. Compl. ¶¶ 52–56, 62–67). The FEC has no jurisdiction over such criminal allegations and, consequently, the FEC's Office of General Counsel's ("OGC") made "no recommendation concerning [the] alleged violations of federal criminal law" and only recommended that the FEC close the file as to the four individuals. AR 165 n.3 (First General Counsel's Report, dated Mar. 7, 2014 ("FGCR") at 2 n.3). The dismissal of this part of the plaintiffs' administrative complaint is not at issue here.

extent they made contributions to Crossroads GPS, had the requisite intent to further any specific reported independent expenditure, AR 85–86 (CGPS's Admin. Resp. at 13–14). Crossroads GPS also asserted that the plaintiffs' reading of § 109.10(e)(1)(vi) "would apply a very different substantive standard" and "[t]he FEC cannot . . . disregard the language of a duly-enacted, longstanding regulation" in the enforcement context. AR 83 (CGPS's Admin. Resp. at 11).

The FEC's Office of General Counsel's ("OGC"), after review of the plaintiffs' administrative complaint in MUR 6696, recommended, in pertinent part, that (1) the FEC "find no reason to believe that Crossroads [GPS] violated 2 U.S.C. § 434(c)(2) and 11 C.F.R. § 109.10(e)(1)(vi)," AR 165, 176 (First General Counsel's Report, dated Mar. 7, 2014 ("FGCR") at 2, 13); and (2) "to the extent the question is presented . . . the Commission dismiss in the exercise of prosecutorial discretion the allegation that Crossroads violated 2 U.S.C. § 434(c)(1)," AR 165–66 (FGCR at 2–3), with the resulting recommendation that the Commission "[c]lose the file," AR 177 (FGCR at 14).

In making these recommendations, OGC relied on the challenged regulation, 11 C.F.R. § 109.10(e)(1)(vi). OGC acknowledged that "an unnamed individual contributed to Crossroads [GPS] in furtherance of [Crossroads GPS's] effort to support a clearly identified federal candidate." AR 165 (FGCR at 2); *see also* AR 174 (FGCR at 11) ("[T]he initial discussion concerning the proposed contribution—'I really like Josh Mandel . . . I'll give ya 3 million . . .' – was at least specific enough that Rove understood that the donor proposed to make a contribution to Crossroads [GPS] for it to use to support the election of Josh Mandel."). Nevertheless, OGC concluded that "because the relevant information does not reasonably suggest that the donor made a contribution 'for the purpose of furthering the reported independent expenditure,' it does not appear that Crossroads [GPS] was required to identify that contributor on its relevant

independent expenditure report or reports under the applicable Commission regulation."  AR 165

(FGCR at 2) (quoting 11 C.F.R. § 109.10(e)(1)(vi)).  This finding that the donor did not donate

funds directly tied to a specific reported expenditure, as the FEC interpreted 11 C.F.R. §

109.10(e)(1)(vi) to require, was the basis for OGC's recommendation that the FEC find "no

reason to believe" that Crossroads GPS violated the challenged regulation or "2 U.S.C. §

434(c)(2)."  *Id*.  OGC further determined, based on the same interpretation of 11 C.F.R. §

109.10(e)(1)(vi), "with respect to the other reported independent expenditures in question, the

facts alleged" do not demonstrate that the "regulation imposed an obligation on Crossroads

[GPS] to identify contributors in connection with those reports."  *Id.*

At the same time, however, OGC addressed two separate issues about the sufficiency of

the FEC's challenged regulation in capturing fully the disclosure obligations mandated by the

statute, in both subsections (c)(1) and (c)(2) of 2 U.S.C. § 434(c), now codified at 52 U.S.C. §

30104(c).  First, OGC expressly noted that subsection (c)(2), now codified at 52 U.S.C. §

30104(c)(2), which "specifically mandates disclosure of the identity of those who contribute for

the purpose of furthering 'an independent expenditure,'" may take "an arguably more expansive

approach" to disclosure than the challenged regulation.  AR 175 n.57 (FGCR at 12 n.57).  While

the statute requires independent expenditure reports to identify each person contributing over

$200 to the filer of "such statement which was made for the purpose of furthering *an*

independent expenditure," AR 172 (FGCR at 9) (emphasis in original) (quoting 2 U.S.C. §

434(c)(2)(C) (2014)), the challenged implementing regulation requires the filer to include "[t]he

identification of each person who made a contribution in excess of $200 to the person filing such

a report which contribution was made for the purpose of furthering *the reported* independent

expenditure," *id*. (emphasis in original) (quoting 11 C.F.R. § 109.10(e)(l)(vi)).

In other words, the challenged implementing regulation narrows the statutory disclosure requirement in § 30104(c)(2) by substituting the phrase "*the reported* independent expenditure," for the statutory term "*an* independent expenditure." *Id.* With this substitution, "the regulatory language of section 109.10(e)(1)(vi) 'appears to require an express link between the receipt and independent expenditure,'" even though "Section 434(c) [§ 30104(c)] may reasonably be construed to require disclosure of the identity of certain contributors regardless of whether the contributor made a contribution to further a specific independent expenditure." AR 173 (FGCR at 10).[7] By contrast to the "reasonably . . . construed" statutory language, "a donor's general purpose to support an organization in its efforts to further the election of a particular federal candidate does not itself indicate that the donor's purpose was to further 'the reported independent expenditure'—the requisite regulatory test." AR 173–74 (FGCR at 10–11).

OGC observed that this discrepancy between the scope of disclosure required by the statute and the implementing regulation had previously been identified in a prior FEC matter, as well as in a 2011 rulemaking petition by then-Congressman Chris Van Hollen. AR 172 & n.48 (FGCR at 9 & n.48). The rulemaking petition asked the FEC to revise the regulation, 11 C.F.R. § 109.10(e)(1)(vi), "arguing that it 'requires disclosure only of those contributors who state a specific intent to fund a specific ("the reported") independent expenditure.'" *Id.* In response to this petition, OGC submitted a draft notice of proposed rulemaking to amend § 109.10(e)(1)(vi) to require "disclosure of all contributors who make a contribution for the purpose of furthering

---

[7]      In making these observations, OGC referenced an earlier FEC decision to take no action in another matter, for which identifying information was redacted, where the difference in the scope of disclosure under "Section 434(c) [§ 30104(c)] of the Act and Section 109.10(e)(1)(vi) of the Commission's implementing regulation" was also at issue. AR 172–73 (FGCR at 9–10).

13

'an' independent expenditure." *Id.* The FEC, however, "did not approve the proposal for publication in the *Federal Register*." *Id.*[8]

The second issue identified by OGC about the sufficiency of the FEC's challenged regulation in capturing fully the disclosure obligations mandated by the statute, concerned yet another subsection of the statute, 52 U.S.C. § 30104(c)(1). This subsection, in OGC's view, "may impose additional reporting obligations for certain contributions made for the purpose of influencing a federal election generally," but the FEC's challenged regulation was "silent concerning any such additional reporting requirement." AR 175–76 (FGCR at 12–13). As OGC explains, the "additional reporting obligations" under subsection (c)(1) are "namely, that every person (other than a political committee) who makes independent expenditures in excess of $250 must file a report identifying each person who, for the purpose of influencing a federal election made a contribution to that person in excess of $200 in a calendar year, regardless of whether the contribution was made for the purpose of furthering an independent expenditure." AR 173 n.51 (FGCR at 10 n.51). For this construction, OGC cited the analysis provided in an earlier FEC matter and by the Supreme Court in *FEC v. Mass. Citizens for Life, Inc.* ("*MCFL*"), 479 U.S. 238, 262 (1986). AR 173 n.51 (FGCR at 10 n.51); *see MCFL*, 479 U.S. at 262 ("[A]n independent expenditure of as little as $250 by MCFL will trigger the disclosure provisions of §

---

[8] The Draft Notice of Proposed Rulemaking submitted by OGC to the Commission on December 14, 2011, states that "[i]n its current form, 2 U.S.C. 434(c) contains two provisions that require persons other than political committees to disclose the identification of persons from whom they received contributions," citing (c)(1) and (c)(2)(C), noting that "[t]he text of the statute does not specify how, if at all, this requirement [referring to (c)(2)(C)] interacts with the requirement in 2 U.S.C. 434(c)(1)." Draft Notice of Proposed Rulemaking for Independent Expenditure Reporting (dated Dec. 14, 2011) at 4–5 & n. 5. The FEC's vote to publish a notice of proposed rulemaking to correct and bring the challenged regulation, § 109.10(e)(1)(vi), in accord with the statutory provision, as requested in the rulemaking petition, was evenly divided, three-to-three, and therefore failed. *See* Certification In Matter of Draft Notice of Proposed Rulemaking for Independent Expenditure Reporting by Persons Other Than Political Committees (dated Dec. 16, 2011) ("Certification in Draft Rulemaking Dec. 16, 2011") ("Commissioners Bauerly, Walther and Weintraub voted affirmatively for the motion. Commissioners Hunter, McGahn II and Petersen dissented.").

434(c) [§ 30104(c)].  As a result, MCFL will be required to identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections . . . and will be bound to identify all persons making contributions over $200 who request that the money be used for independent expenditures.").  Despite the Supreme Court's statement regarding the meaning of § 434(c), OGC reasoned that "[b]ecause the record here does not suggest a basis to find a violation of the regulatory standard at 11 C.F.R. § 109.10(e)(1)(vi) under its plain terms, a Respondent could raise equitable concerns about whether a filer has fair notice of the requisite level of disclosure required by law if the Commission attempted to impose liability under Section 434(c)(1) [§ 30104(c)]."  AR 176 (FGCR at 13).  Due to this perceived lack of "fair notice" of a regulatory, rather than statutory, standard, OGC recommended that "the Commission dismiss the allegation [of a violation of subsection (c)(1)] as a prudential matter in the exercise of prosecutorial discretion."  *Id.*

The FEC Commissioners deadlocked three-to-three on OGC's recommendations, AR 193 (Certification of FEC Votes in MUR 6696 (dated Nov. 19, 2015)), which resulted in a six-to-zero vote to dismiss the plaintiffs' administrative complaint, AR 195 (Certification of FEC Votes in MUR 6696 (dated Dec. 18, 2015)).  While four Commissioners, including the three who voted against opening an investigation, issued no explanation of their vote, two Commissioners, who voted to find reason to believe Crossroads GPS failed to disclose contributors as required by law, issued a Statement of Reasons.  *See* AR 198–99 (Stmt. of Reasons, FEC Comm'rs Ann M. Ravel & Ellen L. Weintraub at 1 (dated Jan. 22, 2016)) (focusing on FEC's prior inaction in failing to find that Crossroads GPS was a "political committee" subject to "making full disclosures on *every* expenditure and of *every* contributor of $200 or more") (emphasis in original).

## C.    THE INSTANT LITIGATION

Three months after the FEC dismissed the administrative complaint, the plaintiffs initiated the instant action, on March 16, 2016, asserting three claims under both the APA and the FECA, alleging that the FEC's finding of no "reason to believe" a violation had occurred was "arbitrary, capricious, an abuse of discretion, and contrary to law" because: (1) the FEC ignored undisputed evidence that Crossroads GPS had violated 11 C.F.R. § 109.10(e)(1)(vi) by failing to disclose the identities of individuals whose donations to Crossroads GPS were used to fund independent expenditures (Count I), Compl. ¶¶ 110–16; (2) the FEC predicated dismissal of the plaintiffs' administrative complaint on 11 C.F.R. § 109.10(e)(1)(vi), which conflicts with the FECA's disclosure provision, 52 U.S.C. § 30104(c)(2) (Count II), *id.* ¶¶ 117–24; and, finally, (3) despite acknowledging that 52 U.S.C. § 30104(c)(1) may impose a separate disclosure obligation for independent expenditures intended to "influenc[e] a federal election generally," *id.* ¶ 127, the FEC nonetheless failed to apply any such standard in evaluating the plaintiffs' administrative complaint against Crossroads GPS (Count III), *id.* ¶¶ 125–31.

The FEC moved to dismiss Count II under Rule 12(b)(1) on the ground that the plaintiffs' challenge to § 109.10(e)(1)(vi) was untimely because the regulation was promulgated in 1980, and the lawsuit was therefore brought outside the applicable statute of limitations of six years, under 28 U.S.C. § 2401(a).  FEC's Partial Mot. Dismiss at 1, ECF No. 12; FEC's Mem. Supp. Partial Mot. Dismiss at 7, ECF No. 12.  Crossroads GPS, whose motion to intervene had been previously granted, *see* Minute Order (dated Apr. 26, 2016), joined in the FEC's motion and also moved, under Rule 12(b)(6), to dismiss all portions of Counts I, II, and III seeking relief under the APA, since, according to Crossroads GPS, the FECA "provides the exclusive avenue for review of the FEC's dismissal of [an] administrative complaint."  CGPS's Not. Joinder & Suppl. FEC's Partial Mot. Dismiss & Mem. Supp. at 1–2, ECF No. 17.

The FEC's partial motion to dismiss was denied, *CREW*, 243 F. Supp. 3d at 93, because "when an agency applies a regulation to dismiss an administrative complaint, the party whose complaint was dismissed may challenge the regulation after the statute of limitations has expired on the ground that the regulation conflicts with the statute from which it derives," *id.* at 101 (relying on *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142 (D.C. Cir. 2014); *AT&T Co. v. FCC*, 978 F.2d 727 (D.C. Cir. 1992)). The FEC's additional argument that "the plaintiffs' injury in the instant case is so attenuated that they lack standing," was not persuasive since "'the denial of information [a plaintiff] believes the law entitles him to' constitutes an injury in fact." *Id.* at 101–02 (alteration in original) (quoting *Shays v. FEC* ("*Shays II*"), 528 F.3d 914, 923 (D.C. Cir. 2008)). Crossroads GPS's motion was granted as to the APA claims in Counts I and III, since "the APA is not intended to 'duplicate existing procedures for review of agency action,'" *id.* at 104 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)), and "the FECA provides an 'adequate remedy,'" *id.* at 104–05. This motion was otherwise denied as to Count II, because "the D.C. Circuit has clearly instructed that, to the extent that Count II challenges the legal validity of 11 C.F.R. § 109.10(e)(1)(vi), FECA's remedy is not 'adequate,' and review under the APA is proper." *Id.* at 105. Following compilation of the administrative record, the parties filed the pending cross-motions for summary judgment, which are now ripe for review.

## II.    LEGAL STANDARDS

### A.    SUMMARY JUDGMENT UNDER THE APA

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based on the pleadings, depositions, affidavits, and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In resolving cross-motions for summary judgment in a case challenging an agency action under the APA, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted) (collecting cases). As the APA expressly provides in describing the scope of review, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Thus, a complaint under the APA, "properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting in an APA case that "determining the facts is generally the agency's responsibility, not ours").

The reviewing court is required to "hold unlawful and set aside agency action" that is "found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C). Where, as here, the challenge is to "an agency's interpretation of a statute Congress has authorized it to implement," the court employs the familiar two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* ("*Chevron*"), 467 U.S. 837 (1984). *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell* ("*Confederated Tribes*"), 830 F.3d 552, 558 (D.C. Cir. 2016); *see Shays v. FEC* ("*Shays I*"), 414 F.3d 76, 96 (D.C. Cir. 2005). At the first step of the inquiry, the court must "ask whether Congress has 'directly addressed the precise question at issue.'" *Mayo Found. for Med.*

*Educ. & Research v. United States*, 562 U.S. 44, 52 (2011) (quoting *Chevron*, 467 U.S. at 842–43). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington v. Fed. Commc'n Comm'n*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842–43); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124–25 (2016). A statute that is unambiguous "means that there is 'no gap for the agency to fill' and thus 'no room for agency discretion.'" *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487 (2012) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005)).

"[I]f the statute is silent or ambiguous with respect to the specific issue" under consideration, the analysis shifts to *Chevron* step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute," *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*, 467 U.S. at 843), and "if so, defer to it," *Confederated Tribes*, 830 F.3d at 558. In assessing whether the agency's statutory interpretation is a "'permissible' and 'reasonable' view of the Congress's intent," the court "look[s] to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations." *Council for Urological Interests v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015). The court "owe[s] an agency's interpretation of the law no deference unless, after 'employing traditional tools of statutory construction,' [the Court finds itself] unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9). Indeed, "the Court need not resort to *Chevron* deference" where "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).

Further, "[o]f course, agency action is always subject to arbitrary and capricious review under the APA, even when it survives *Chevron* Step Two . . . ." *Confederated Tribes*, 830 F.3d at 559.  "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue* ("*ALDF*"), 872 F.3d 602, 611 (D.C. Cir. 2017) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983)); *see also Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("An agency action is arbitrary and capricious when, *inter alia*, the agency has 'entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" (quoting *State Farm*, 463 U.S. at 43)).

## B.      SUMMARY JUDGMENT UNDER THE FECA

Summary judgment is granted to a party challenging an FEC dismissal decision, under 52 U.S.C. § 30109(a)(8)(A), when the decision is "contrary to law."  *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986).  "The FEC's decision is 'contrary to law' if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act, . . . or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion."  *Id.* (citing *FEC v. Democratic Senatorial Campaign Comm.* ("*DSCC*"), 454 U.S. 27, 31, 37 (1981); *In re Carter-Mondale Reelection Comm.*, 642 F.2d 538, 542 (D.C. Cir. 1980)).

Whether the FEC's decision is unanimous or deadlocks in an evenly divided vote, the same standard for judicial review applies.  *See FEC v. Nat'l Republican Senatorial Comm.* ("*NRSC*"), 966 F.2d 1471, 1476 (D.C. Cir. 1992); *see also In re Sealed Case*, 223 F.3d 775, 779

(D.C. Cir. 2000).  In cases where the Commission has deadlocked, "to make judicial review a meaningful exercise, the three Commissioners who voted to dismiss must provide a statement of their reasons for so voting."  *NRSC*, 966 F.2d at 1476; *see also CREW v. FEC*, 892 F.3d 434, 437 (D.C. Cir. 2018) (citing *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988)).  Absent such a statement of reasons, the court may review the relevant OGC Report.  *See DSCC*, 454 U.S. at 38 n.19.  In determining whether an FEC dismissal decision is "contrary to law," the court employs the *Chevron* framework, and considers whether the dismissal was "arbitrary or capricious, or an abuse of discretion."  *Orloski*, 795 F.2d at 161.

## III.  DISCUSSION

Each party has moved for summary judgment on two issues: (1) whether the FEC's regulation, 11 C.F.R. § 109.10(e)(1)(vi), is valid as a proper interpretation and implementation of the FECA provision, 52 U.S.C. § 30104(c); and (2) whether the FEC's dismissal of the plaintiffs' administrative complaint, which dismissal was primarily predicated on the challenged regulation, was "contrary to law," under 52 U.S.C. § 30109(a)(8)(C).  The plaintiffs' over-arching complaint is that the challenged regulation, 11 C.F.R. § 109.10(e)(1)(vi), is "[u]nexplained, [i]nexplicable, and [i]nvalid," Pls.' Mem. Supp. Summ. J. ("Pls.' Mem.") at 28, ECF No. 27, because it requires covered entities making independent expenditures to report only contributors who gave to further 'the reported' expenditure, . . . conflicting with the dual mandates of 52 U.S.C. § 30104(c)(1) and (c)(2)(C)."  Pls.' Reply Mem. Opp'n Cross-Mots. Summ. J. & Supp. Mot. Summ. J. ("Pls.' Reply") at 1, ECF No. 33.  As such, the FEC's reliance on this regulation to dismiss the plaintiffs' administrative complaint against Crossroads GPS, a "sophisticated group" that "can read a statute," in the plaintiffs' view, must be set aside.  Pls.' Mem. at 2.

For its part, Crossroads GPS contends that the plaintiffs' action "comes 30 years too late" and, if the plaintiffs were to prevail, "CGPS's statutory and constitutional right to rely on a long-accepted regulation" would be violated, and the plaintiffs would be permitted "to subvert congressional intent and the FEC's considered judgment on this regulatory issue." CGPS's Reply Mem. Supp. Cross-Mot. ("CGPS's Reply") at 1, ECF No. 36. Finally, the FEC echoes Crossroad GPS's argument that the agency properly dismissed the plaintiffs' administrative complaint because the agency's "interpretation of the statute is permissible, particularly given the highly deferential standard of review that applies to agency decisions like this." FEC's Reply Mem. Supp. Mot. Summ. J. ("FEC's Reply") at 1, ECF No. 37.

The statutory and regulatory provisions at issue may be properly construed only in the context of the FECA's disclosure regime, which is described below, followed by analysis of the parties' arguments regarding the challenged regulation and the FEC's dismissal decision. As more fully discussed below, the unambiguous language of 52 U.S.C. § 30104(c) renders the challenged regulation invalid. Since the FEC's dismissal of the amended administrative complaint was primarily predicated on an invalid regulation, that decision is "contrary to law" under 52 U.S.C. § 30109(a)(8)(C). As a result, the regulation is vacated, and the administrative case is remanded to the FEC.

A.    STATUTORY AND REGULATORY FRAMEWORK

The FECA was originally enacted in 1972 and, as amended over time, continues to regulate federal political campaign financing, *inter alia*, by imposing limitations on contributions and requiring disclosure of persons contributing money for expenditures to influence federal elections. *See, e.g.*, 52 U.S.C. § 30116 (imposing limitations on contributions and on certain coordinated expenditures); *id.* § 30103 (requiring registration of political committees); *id.* § 30104 (imposing reporting requirements). As already noted, these regulatory mechanisms are

22

designed to deter corruption, prevent particular individuals or organizations from having an

undue influence on federal elections, and assist in enforcement of laws prohibiting foreign

contributions in federal elections, while also protecting the exercise of political speech so crucial

to the functioning of this country's vibrant democracy.  *See Citizens United*, 558 U.S. at 366–67;

*Buckley*, 424 U.S. at 66–68.[9]  Resolution of the parties' dispute over the sufficiency of the

challenged regulation to fulfill the statutory disclosure mandates is aided by review of the

relevant FECA provisions governing disclosure before turning to the regulation itself.

### 1.    *Statutory Disclosure Requirements for Not-Political Committees Making Independent Expenditures*

At issue in this case are the disclosure requirements imposed on persons "other than

political committees" ("not-political committees") that make independent expenditures.[10]  An

entity is designated as a "political committee" when it meets certain monetary thresholds for

receiving or making contributions or expenditures, *see* 52 U.S.C. § 30101(4), and the FEC

determines that the entity is "under the control of a candidate or the major purpose of which is

the nomination or election of a candidate," *Buckley*, 424 U.S. at 79; *see also Unity08 v. FEC*,

596 F.3d 861, 863 (D.C. Cir. 2010) (explaining "gloss that *Buckley* . . . put on the Act's

definition of a political committee in the interest of partially saving the statute's

---

[9]    The laws barring foreign contributions, including 36 U.S.C. § 510(c) (prohibiting Presidential Inaugural Committee from "accept[ing] any donation from a foreign national") and 52 U.S.C. § 30121(a) (making "unlawful for [] a foreign national, directly or indirectly, to make [] a contribution or donation of money or other thing of value . . . in connection with a Federal, State, or local election; [] a contribution or donation to a committee of a political party; or [] an expenditure, independent expenditure, or disbursement for an electioneering communication . . . ."), carry penalties of a fine or imprisonment, or both.  *See* 36 U.S.C. § 509 ("A person violating a regulation prescribed under this chapter shall be fined under title 18 or imprisoned for not more than 30 days."); 52 U.S.C. § 30109(d)(1)(A) ("Any person who knowingly and willfully commits a violation of [the FECA] which involves the making, receiving, or reporting of any contribution, donation, or expenditure—(i) aggregating $25,000 or more during a calendar year shall be fined under Title 18, or imprisoned for not more than 5 years, or both; or (ii) aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.").

[10]    "The term 'person' includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government."  52 U.S.C. § 30101(11).

constitutionality"). Under the FECA, political committees, which include political action committees ("PACs"), national party committees, and candidate committees, are subject to prescriptive requirements regarding their organizational structure, recordkeeping, and financial reporting. *See, e.g.*, 52 U.S.C. § 30102(a)–(c) (requiring a political committee to have a treasurer, maintain a segregated bank account, and keep records of contributions and disbursements). Political committees must also disclose to the FEC the identification of each person contributing "in excess of $200 within the calendar year," together with "the date and amount of any such contribution." *Id.* § 30104(b)(3)(A). A "contribution" is defined to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." *Id.* § 30101(8)(A)(i).[11]

The FECA also regulates federal campaign activities of persons "other than political committees," *see* 52 U.S.C. § 30104(c), referred to herein as "not-political committees," which include entities, such as Crossroads GPS, organized under 501(c) of the Internal Revenue Code ("IRC") that are supposed to have "major purposes" other than political advocacy, *see, e.g.*, 26 U.S.C. § 501(c)(4) (describing tax-exempt non-profit organizations "operated exclusively for the promotion of social welfare"). While not subject to the same organizational and record keeping requirements as political committees, not-political committees making independent expenditures over the low threshold of $250 in a calendar year must comply with disclosure obligations that are closely analogous to those imposed on political committees. *See SpeechNow.org*, 599 F.3d at 697 (D.C. Cir. 2010) (explaining that additional reporting requirements imposed on a political committee in comparison to a not-political committee making independent expenditures "are

---

[11] The definition of "contribution" also includes "payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose," 52 U.S.C. § 30101(8)(A)(ii), as well as specified exclusions, *id.* § 30101(8)(B), none of which are relevant here.

minimal").  An "[i]ndependent expenditure" is defined as "an expenditure by a person . . . expressly advocating the election or defeat of a clearly identified candidate" but "that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents."  52 U.S.C. § 30101(17); *see also Citizens United v. FEC*, 558 U.S. at 360 (2010) ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate.").[12]  In contrast to "independent expenditure," the term "expenditure" is statutorily defined more broadly as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal Office."  *Id.* § 30101(9).[13]  Notably, both the definition of "contribution" and "expenditure" incorporate the identical purpose clause.  Only the making of "independent expenditures," as opposed to the making of "expenditures," currently triggers the disclosure requirements for not-political committees under § 30104(c).

<em>a)        Legislative History of § 30104(c)</em>

When enacted, the FECA required political committees and candidates for federal office to report, in relevant part, "the full name and mailing address (occupation and the principal place of business, if any) of each person who has made one or more contributions to or for such

---

[12]        The phrase "clearly identified" used in the FECA definition of "independent expenditure" is defined to mean "the name of the candidate involved appears; [] a photograph or drawing of the candidate appears; or [] the identity of the candidate is apparent by unambiguous reference."  52 U.S.C. § 30101(18).  Another phrase, "expressly advocating," used in the definition of "independent expenditure," has no statutory definition but is defined in FEC regulations to mean "any communication that . . . [u]ses phrases" calling for the election or defeat of a specific candidate (*e.g.*, "vote for the President," "re-elect your Congressman," or "'defeat' accompanied by a picture of one or more candidate(s)"), or "[w]hen taken as a whole and with limited reference to external events . . . [t]he electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and . . . [r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action."  11 C.F.R. § 100.22.

[13]        Like the definition of "contribution," the definition of "expenditure" includes an additional category of spending, *see* 52 U.S.C. § 30101(8)(A)(ii) (including "a written contract, promise, or agreement to make an expenditure"), as well as specified exclusions, *id.* § 30101(9)(B), none of which are relevant here.

25

committee . . . within the calendar year in an aggregate amount or value in excess of $100, together with the amount and date of such contributions." 2 U.S.C. § 434(b)(2) (1972). Another section set out disclosure requirements for individual contributors and not-political committees, describing who was covered as follows: "[e]very person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate," of over $100 annually. 2 U.S.C. § 435 (1972).[14] As to what these individuals and not-political committees were required to report, section 435 mandated disclosure of the same information about contributions that political committees and candidates were required to disclose in reporting statements. *Id.* By its terms, section 435 imposed a reporting requirement on both not-political committees and individual contributors making either "expenditures" or "contributions" to influence federal elections, with the result that both sources of funding in political campaigns were identified and disclosed. *Id.* (emphasis added).[15] Both "contribution' and "expenditure" were defined with the identical purpose clause, as including "anything of value, made for the purpose of influencing the nomination for election, or election, of any person to Federal office . . . ." *Id.* § 431(e)(1) (1972) (defining "contribution"); *id.* § 431(f)(1) (1972) (defining "expenditure"). Over the next decade, the provision pertaining to not-political committees was substantively amended twice, in 1976 and 1979, as described below.

---

[14] When the FECA was first enacted, 2 U.S.C. § 435, titled "Reports by others than political committees," provided, in pertinent part: "Every person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 within a calendar year shall file . . . a statement containing the information required by section 434 of this title. Statements required by this section shall be filed on the dates on which reports by political committees are filed, but need not be cumulative." 2 U.S.C. § 435 (1972).

[15] FECA originally required that the reports "shall [be] file[d] with the supervisory officer," which officer varied, depending on whether the report was connected to Senate, House of Representatives, or other federal elections. 2 U.S.C. § 435 (1972). The first amendments to the FEC, in 1974, created the FEC and amended this provision, as recodified, to require the filing of reports with the FEC. *See* 2 U.S.C. § 434(e) (1974).

*(i) 1974 and 1976 Amendments*

Congress first amended the FECA in 1974, largely in response to the election abuses that surfaced in 1972. FECA Amendments of 1974, Pub. L. No. 93-443, 88 Stat. 1263 (1974). Section 435 pertaining to not-political committees was recodified at 2 U.S.C. § 434(e), but otherwise the disclosure obligations remained the same, along with the definitions of "contribution' and "expenditure" in relevant part. *Compare* 2 U.S.C. § 435 (1972), *with* 2 U.S.C. § 434(e) (1974); *compare* 2 U.S.C. § 431(e)(1), (f)(1) (1972), *with* 2 U.S.C. § 431(e)(1), (f)(1) (1974).

Two years later, in *Buckley v. Valeo*, the Supreme Court upheld § 434(e) against an overbreadth challenge, but clarified the meaning of the phrase "for the purpose of . . . influencing" contained in the definitions of "contribution" and "expenditure," to ensure the provision was "within constitutional bounds." 424 U.S. at 60–63.[16] Recognizing that § 434(e) was "part of Congress'[s] effort to achieve 'total disclosure' by reaching 'every kind of political activity,'" *id.* at 76 (quoting S. REP. NO. 229, 92d Cong., 2d Sess. at 57), the Supreme Court explained this goal was rooted in three "substantial governmental interests": (1) to "provide[] the

---

[16]     The *Buckley* Court held that limitations on contributions to candidates and political campaigns "are constitutionally valid," 424 U.S. at 58, but invalidated as unconstitutional certain expenditure ceilings, including restrictions on "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office," *id.* at 44, 58; *see also generally id.* 12–59. In so holding, the Court distinguished the government interests in regulating contributions as opposed to regulating independent expenditures. With respect to contribution limits, the Court explained that such "limitations, along with the disclosure provisions, constitute the [FECA's] primary weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions," and "[t]he contribution ceilings thus serve the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." *Id.* at 58. "By contrast," the Court explained, expenditure limitations "place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the *First Amendment* cannot tolerate." *Id.* at 58–59. In sum, the Court found that the substantial governmental interest in preventing corruption and the appearance of corruption justified restrictions on contributions, but not the ceiling on independent expenditures, which "heavily burdens core *First Amendment* expression." *Id.* at 44–48.

electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office"; (2) to "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity," which "[p]ublicity is justly commended as a remedy for social and industrial disease," as "[s]unlight is said to be the best of disinfectants; electric light the most efficient policeman"; and (3) to provide "an essential means of gathering the data necessary to detect violations of the contribution limitations . . . ." *Id.* at 66–68. The Court acknowledged that "public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute," and, further, that "[i]n some instances, disclosure may even expose contributors to harassment or retaliation," which "are not insignificant burdens." *Id.* at 68. Nevertheless, "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress [has] found to exist." *Id.*

At the same time, noting a vagueness within § 434(e), the Court stated that, because "'[c]ontributions' and 'expenditures' are defined in parallel provisions in terms of the use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office," *id.* at 77 (second alteration in original) (citing 2 U.S.C. § 431(e), (f) (1974)), the Court's "task" was to "construe 'for the purpose of . . . influencing,' incorporated in § 434(e) through the definitions of 'contributions' and 'expenditures,' in a manner that precisely furthers [Congress's] goal." *Id.* at 78 (first alteration in original). The Court construed "contribution" to include "contributions made to other organizations or individuals but earmarked for political purposes" as well as "contributions made directly or indirectly to a candidate, political party, or campaign committee" and "all expenditures placed in cooperation

with or with the consent of a candidate, his agents, or an authorized committee of the candidate." *Id.*; *see also id.* at 23 n.24. With respect to "expenditure," the Court noted "line-drawing problems" as applied to not-political committees, and ultimately construed the term "for purposes of [§ 434(e)] . . . to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. Words of express advocacy include terms "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n.52.

The Court summarized that the provision then-codified at § 434(e) was "constitutional," as long as it was construed to impose "independent reporting requirements on individuals and groups that are not candidates or political committees" in only two circumstances: "(1) when they make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. This construction, the Court explained, "goes beyond the general disclosure requirements to shed the light of publicity on spending that is unambiguously campaign related but would not otherwise be reported because it takes the form of independent expenditures *or* of contributions to an individual or group not itself required to report the names of its contributors." *Id.* at 81 (emphasis added). With this clarifying construction of § 434(e), reporting not-political committees (which must report due to their making expenditures of over $100 annually) were required to report expenditures that "expressly advocate the election or defeat of a clearly identified candidate," and donors making non-trivial contributions to not-political committees, including per the request of a candidate or political committee, were required to report those contributions "earmarked for political purposes" in

connection with a federal election. *See id.* at 80. The Court offered no further clarification of the meaning of "for political purposes," except to suggest that "'contributions' have a sufficiently close relationship to the goals of the [FECA], for they are connected with a candidate or his campaign." *Id.* at 78.

After *Buckley,* in 1976, Congress amended § 434(e) in an effort to conform to the constitutional boundaries set by the Supreme Court. *See* FECA Amendments of 1976, Pub. L. 94-283, § 104(e), 90 Stat. 475, 481 (1976).[17] The amended § 434(e) maintained the dual reporting obligations on individual contributors and not-political committees, describing, in subsection (e)(1), who must report as follows: "[e]very person (other than a political committee or candidate) who makes *contributions* or *independent expenditures expressly advocating the election or defeat of a clearly identified candidate*, other than by contribution to a political

---

[17] The 1976 FECA amendment applicable to not-political committees and individual donors, 2 U.S.C. § 434(e) (1976), titled "(e) Statements by other than political committees; filing; certification; indices of expenditures," provided, in full:

> (1) Every person (other than a political committee or candidate) who makes contributions or independent expenditures expressly advocating the election or defeat of a clearly identified candidate, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 during a calendar year shall file with the Commission, on a form prepared by the Commission, a statement containing the information required of a person who makes a contribution in excess of $100 to a candidate or political committee and the information required of a candidate or political committee receiving such a contribution.

> (2) Statements required by this subsection shall be filed on the dates on which reports by political committees are filed. Such statements shall include (A) the information required by subsection (b)(9) of this section, stated in a manner indicating whether the contribution or independent expenditure is in support of, or opposition to, the candidate; and (B) under penalty of perjury, a certification whether such independent expenditure is made in cooperation, consultation, or concert with, or at the request or suggestion of, any candidate or any authorized committee or agent of such candidate. Any independent expenditure, including those described in subsection (b)(13) of this section, of $1,000 or more made after the fifteenth day, but more than 24 hours, before any election shall be reported within 24 hours of such independent expenditure.

> (3) The Commission shall be responsible for expeditiously preparing indices which set forth, on a candidate-by-candidate basis, all expenditures separately, including those reported under subsection (b)(13) of this section, made with respect to each candidate, as reported under this subsection, and for periodically issuing such indices on a timely preelection basis.

2 U.S.C. § 434(e) (1976).

committee or candidate, in an aggregate amount in excess of $100 during a calendar year . . . ."

2 U.S.C. § 434(e)(1) (1976).[18]  This description of who was covered by the FECA reporting

obligation incorporated the Supreme Court's narrowing of the term "expenditure," as applied to

not-political committees, by using the newly defined term "independent expenditure," plus part

of the new definition, despite the resulting redundancy. *See* 2 U.S.C. § 431(p) (1976) (defining

"independent expenditure" as an expenditure "expressly advocating the election or defeat of a

clearly identified candidate . . . without cooperation or consultation with any candidate or any

authorized committee or agent of such candidate and which is not made in concert with, or at the

request or the suggestion of, any candidate or any authorized committee or agent of such

candidate").  As to what must be reported, § 434(e) required covered persons to file disclosure

statements "on a form prepared by the [FEC]" containing the same information that direct

contributors of over $100 to candidates and political committees were required to disclose, as

well as the same information that candidates and political committees receiving such

contributions were required to disclose. *Id.*[19]  In other words, the reporting not-political

committees were obliged to disclose their non-trivial donors, just as political committees were

required to do.

The FEC's implementing regulations for the 1976 version of § 434(e) required "[e]very

other person [than a political committee] who makes independent expenditures" over $100

annually to file a report with the FEC, disclosing, among other things, "the person's

identification, occupation, principal place of business."  11 C.F.R. §109.2(b)(1) (1977).  A

---

[18]     Other changes to 2 U.S.C. § 434(e) (1976) included the addition of subsections (e)(2)(A)–(B) and (e)(3), which are not at issue here and have largely been preserved in the current version of the statute, as discussed *infra*. *Compare* 2 U.S.C. § 434(e)(2)(A)–(B), (e)(3) (1976), *with* 52 U.S.C. § 30104(c)(2)(A)–(B), (c)(3).
[19]     The information "required" to be disclosed about contributors, for example, by political committees, under 2 U.S.C. § 434(b)(2) (1976), included the "full name and mailing address . . . together with the amount and date of such contributions," which requirement had not changed since the FECA's enactment.  *Compare* 2 U.S.C. § 434(b)(2) (1972), *with* 2 U.S.C. § 434(b)(2) (1976).

separate regulation required every person, other than a political committee or candidate, making a contribution of over $100 annually "for the purpose of expressly advocating the election or defeat of a clearly identified candidate,"—thereby covering individual contributors as well as reporting not-political committees contributing for this purpose—to disclose in reports to the FEC the same information required of reporting not-political committees. *Id.* § 109.5 (1977).[20] Thus, under the FEC regulations implementing the 1976 amendments, both reporting not-political committees and individual donors of over $100 annually to such organizations were required, under both the statute and FEC regulations, to disclose to the FEC their contributions and expenditures made for expressly advocating the election or defeat of candidate for federal office, with individual contributors for this purpose expressly directed to file a report identifying themselves "in the same manner as is required with respect to independent expenditures under §109.2." *Id.*

### *(ii) 1979 Amendments*

Three years later, the text of the statutory provision pertaining to the disclosure requirements for not-political committees was amended for the last time in the 1979 FECA Amendments, which recodified § 434(e) at § 434(c). 2 U.S.C. § 434(c) (1980); *see* FECA Amendments of 1979, Pub. L. 96-187, § 104(c), 93 Stat. 1339, 1354 (1980). The 1979 Amendments were intended to "enhance[]" the "laudable goals of disclosure and limitations on the influence of money in Federal campaigns," while simultaneously "easing the bureaucratic obstacles for individuals and committees to participate in political campaigns." *Hearing Before*

---

[20]     11 C.F.R. §109.5 (1977), titled "Reporting of independent contributions," provided, in full: "Every person (other than a political committee or candidate) who makes a contribution for the purpose of expressly advocating the election or defeat of a clearly identified candidate, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 during a calendar year shall file reports in the same manner as is required with respect to independent expenditures under §109.2."

*the S. Comm. on Rules & Admin. to Amend the Federal Election Campaign Act of 1971, as Amended, & for Other Purposes*, 96th Cong. 1–2 (July 13, 1979) [hereinafter *S. Comm. Hearing* 1979] (statement of Sen. Claiborne Pell, Chairman, S. Comm. On Rules & Admin.). As part of easing regulatory burdens, the FEC recommended raising the threshold amount triggering disclosure of independent expenditures from $100 to $250 and, in lieu of reporting by individual contributors, requiring not-political committees filing independent expenditure reports "to report the sources of any contributions in excess of $100 which is donated with a view toward bringing about an independent expenditure." *S. Comm. Hearing* 1979, at 18–19 (statement of FEC).[21]

The FEC's recommendations were reflected in draft legislation considered at the Senate Committee's July 13, 1979 hearing, which draft also provided that, under new § 434(c)(2)(C), disclosure statements would include "an identification of each person who has made a contribution of more than $200 to the person filing such statement, which was made for the purpose of furthering an independent expenditure." *Id.* at 71–72 ("Discussion Draft," dated July 6, 1979). The proposed amendment to the new § 434(c) was described as "[s]implif[ying] reporting without affecting meaningful disclosure." *Id.* at 139 (STAFF OF S. COMM. ON RULES & ADMIN., 96TH CONG., SUMMARY OF COMMITTEE WORKING DRAFT NO. 2—FECA AMENDMENTS).

---

[21]     The FEC recommendations made at the Senate hearing were outlined in the FEC's 1978 Annual Report, which emphasized the need to "simplify reporting and maintain a high level of public disclosure" and proposed changes to the provision then-codified at 2 U.S.C. § 434(e) in line with these aims. 1978 FED. ELECTION COMM'N ANN. REP., at 37. Specifically, in this report, the FEC recommended raising the threshold for reporting independent expenditures from $100 to $250 to ease reporting burdens and provide "a more realistic figure as to when independent expenditures begin to have an impact on election campaigns," in consonance "with the purposes of the [FECA]." *Id.* at 40. Additionally, the FEC recommended that "independent contributors" to not-political committees making independent expenditures "not be required to report to the [FEC]," and "[i]nstead, persons who file independent expenditure reports should be required to report the sources of any contributions in excess of $100 which is donated with a view toward bringing about *an* independent expenditure." *Id.* at 40–41 (emphasis added). These "legislative recommendations from the [FEC's] 1978 annual report, which are intended to remedy statutory omissions and address other technical problems in the operations of the current law," were included in the FECA Amendments of 1979. S. REP. NO. 319, 96th Cong., 1st Sess. at 1.

The relevant committee report explaining the FECA Amendments of 1979, outlined two over-arching goals for the amendments: "(1) [t]o simplify reporting requirements for candidates and committees under the [FECA], and (2) to encourage grass roots participation in Federal election campaigns." S. Rep. No. 319, 96th Cong., 1st Sess. at 1 (1979).[22]  The amendments were intended to "reduce substantially the number of reports required to be filed with the Commission and appropriate State offices without diminishing public disclosure." *Id.* at 3.  This aim was accomplished, in part, by eliminating the dual reporting requirement in § 434(e) (1976) and requiring reporting not-political committees to assume the filing responsibility instead of their donors, as explained in the Senate committee report as follows: "those who make independent contributions would be relived of reporting, that responsibility being *transferred* to the recipient of such a contribution . . . ." *Id.* (emphasis added).

The FECA Amendments of 1979 applicable to not-political committees and their contributors, codified at 2 U.S.C. § 434(c) (1979), contained three parts, similarly to the predecessor provision, § 434(e) (1976).  As relevant here, textual changes were made in the first and second parts of this provision in describing who must report what: the new § 434(c)(1) defined the "person (other than a political committee)" required to file disclosure statements with the FEC as such persons "mak[ing] independent expenditures" over $250 annually, eliminating the reference to those making "contributions" as well as the redundancy in the predecessor statute, which had referenced both "independent expenditures" and part of the definition for that term.  As to what disclosures were required to be made by the covered entities, this subsection used a specific cross-reference to "the information required under subsection (b)(3)(A) of this

[22]      The Senate-passed version of the bill was substituted for, and passed by, the House in H.R. 5010, *see* 125 Cong. Rec. 36744, 37187, 37197 (1979), which bill was signed into law on January 8, 1980, Presidential Statement Upon Signing H.R. 5010, Office of the White House Press Secretary (Jan. 8, 1980).

section for all contributions received by such person," a more precise formulation than in the predecessor statute. *Compare* 2 U.S.C. § 434(c)(1) (1979), *with* 2 U.S.C. § 434(e)(1)(1976). The second part of the amended provision in subsection (c)(2), like its predecessor, described the contents of statements to be filed with FEC, but added a new paragraph (C) requiring the reporting not-political committee to disclose the identity of each person contributing over $200 annually "for the purpose of furthering an independent expenditure." 2 U.S.C. § 434(c)(2)(C)(1979).

The provisions codified at 2 U.S.C. § 434(c) (1979) were later recodified in Chapter 301 of Title 52, at § 30104(c), without significant change to the text of these subsections. *Compare* 2 U.S.C. § 434(c) (1979), *with* 52 U.S.C. § 30104(c) (2016).

> b)    *Summary of Current § 30104(c)*

Like the predecessor statutes dating back to the 1976 FECA amendments, the disclosure obligations under 52 U.S.C. § 30104(c) are set out in three parts. First, subsection (c)(1) describes who is required to disclose what, mandating that "[e]very person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250 during a calendar year shall file a statement containing the information required under [§ 30104](b)(3)(A) for all contributions received by such person." 52 U.S.C. § 30104(c)(1). The referenced subsection "(b)(3)(A)" requires political committees to identify each contributor, other than a political committee, of over $200 in a calendar year, or a lesser amount in the discretion of the reporting committee, along with the date and amount of any contribution reported. *See id.* § 30104(b)(3)(A).[23] By its terms, § 30104(c)(1) obligates reporting not-

---

[23]    The cross-referenced subsection, 52 U.S.C. § 30104(b)(3)(A), states: "Each report under this section shall disclose. . . the identification of each . . . person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a

political committees (which must file reports due to their making annual independent expenditures over $250) to provide identifying information for donors of more than $200 for "all contributions received," *id.* § 30104(c)(1), which contributions, by definition, are intended to "influenc[e] any election for Federal office," 52 U.S.C. § 30101(8)(A)(i); *see also Buckley*, 424 U.S. at 80 (construing "contribution" to refer to funds "earmarked for political purposes or authorized or requested by a candidate or his agent" to be donated to the not-political committee"). No parameters are set in § 30104(c)(1) that the contributions be earmarked for a specific or single political purpose so long as the purpose is in connection with a federal election and, thus, this disclosure requirement is analogous to the requirements applicable to political committees.

Next, subsection (c)(2) opens by directing that "[s]tatements required to be filed by this subsection . . . be filed in accordance with subsection (a)(2)," *id.* § 30104(c)(2), which cross-referenced subsection, in turn, details the timing of reporting by political committees, *see id* at § 30104(a)(2) (requiring political committees to file quarterly reports, as well as pre-election and post-election reports in calendar years with elections). Subsection (c)(2) then describes in three paragraphs the disclosures required to be made in the "[s]tatements," stating: "(A) the information required by subsection (b)(6)(B)(iii), indicating whether the independent expenditure is in support of, or in opposition to, the candidate involved," *id.* § 30104(c)(2)(A),[24] and (B) "a certification whether or not such independent expenditure is made in cooperation, consultation,

---

candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution." 52 U.S.C. § 30104(b)(3)(A). "[I]dentification" is defined as "(A) in the case of any individual, the name, the mailing address, and the occupation of such individual, as well as the name of his or her employer; and (B) in the case of any other person, the full name and address of such person." *Id.* § 30101(13).

[24] The cross-referenced subsection, 52 U.S.C. § 30104(b)(6)(B)(iii), requires, *inter alia*, the name and address of persons receiving disbursement from certain political committees "in excess of $200 within the calendar year . . . in connection with an independent expenditure by the reporting committee, together with the date, amount, and purpose of any such independent expenditure . . . ." 52 U.S.C. § 30104(b)(6)(B)(iii).

or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such candidate," *id.* § 30104(c)(2)(B).

The last paragraph (C) of subsection (c)(2), which is at issue here, requires "[s]tatements" to include "the identification of each person who made a contribution in excess of $200 to the person filing such statement which was made for the purpose of furthering *an* independent expenditure." *Id.* § 30104(c)(2)(C) (emphasis added). In other words, in addition to identifying donors of over $200, with the date and amount contributed, for "all contributions" intended to influence federal elections (with the *Buckley* gloss of "earmarked for political purposes"), the reporting not-political committee must also identify those donors contributing over $200 for the more targeted purpose of furthering an independent expenditure. The last paragraph of subsection (c)(2) does not require information about the date or amount of the contribution since that information is already provided as part of the disclosure requirement in (c)(1).

Finally, the third part of 52 U.S.C. § 30104(c) requires the FEC to prepare comprehensive and publicly available indices that collate independent expenditure information from all not-political committees for each federal candidate. As provided in subsection (c)(3): "The Commission shall be responsible for expeditiously preparing indices which set forth, on a candidate-by-candidate basis, all independent expenditures separately, including those reported under subsection (b)(6)(B)(iii), made by or for each candidate, as reported under this subsection, and for periodically publishing such indices on a timely pre-election basis." *Id.* § 30104(c)(3); *see supra* note 24. Obviously, the completeness of these published indices in showing, by candidate, the source of "*all* independent expenditures," *id.* (emphasis added), is dependent on the completeness of the information contained in statements filed by not-political committees under other subsections in 52 U.S.C. § 30104(c).

## 2. *The Challenged FEC Regulation*

As part of the FECA Amendments of 1979, Congress directed the FEC to "transmit to the Congress proposed rules and regulations necessary for the purpose of implementing the provisions of [the FECA Amendments of 1979], prior to February 29, 1980," Pub. L. 96-187, § 303(a), 93 Stat. 1339, 1368 (1980), giving the FEC less than two months to propose regulations. Recognizing the need for an expedited rulemaking process, the FEC's OGC recommended "maximum concentration on the immediate changes necessary to a smooth transition to the new law," with a focus on definitions, recordkeeping, reporting, and enforcement procedures, AR 1002–04 (Mem. to the Commission through Orlando B. Potter from Charles N. Steele, Patricia Ann Fiori, and Lyn Oliphant, (dated Jan. 4, 1980) at 1–3).

The FEC published proposed rules on January 23, 1980, and required that all comments be submitted by February 7, 1980, only fifteen days later. AR 1057–80 (Draft Regulations to Implement 1979 Amendments to FECA, 45 Fed. Reg. 5297, 5546–5569 (Jan. 23, 1980)). Among the proposed rules, and in relevant part, the draft text for 11 C.F.R. § 109.2 required that "[e]very other person [than a political committee] who makes independent expenditures aggregating in excess of $250 during a calendar year shall file a statement with the Commission," that includes "the identification of each person who made a contribution in excess of $200 to the person filing the statement which was made for the purpose of furthering *an* independent expenditure." AR 1075 (45 Fed. Reg. 5564) (emphasis added). Thus, the proposed regulation set out the purpose clause in language mirroring the text of the statutory provision then-codified at 2 U.S.C. § 434(c)(2)(C).[25]

---

[25] The proposed regulation largely retained the prior regulation, at 11 C.F.R. § 109.5 (1977), to require "[e]very person (other than a political committee or candidate) who makes a contribution for the purpose of expressly advocating the election or defeat of a clearly identified candidate, other than by contributing to a political committee or candidate, in an aggregate amount in excess of $200 during a calendar year [to] file reports in the same

The FEC's second draft of the proposed regulations, which was initially circulated internally on February 11, 1980, included a reworked version of proposed 11 C.F.R. § 109.2. AR 1330–31 (Mem. to the Commission through Orlando B. Potter from Charles N. Steele and Patricia Ann Fiori (dated Feb. 11, 1980) at 68–69). This new version of section 109.2(a)(1)(vi) required that "[e]very person other than a political committee who makes independent expenditures aggregating in excess of $250 during a calendar year shall file a signed statement or report with the Commission," which "statement shall include . . . the identification of each person who made a contribution in excess of $200 to the person filing such report which contribution was made for the purpose of furthering *the reported* independent expenditure." *Id.* (emphasis added). The proposed regulations were approved by the FEC on February 21, 1980. AR 1486–94 (Minutes of a Regular Meeting of the FEC (for meeting Feb. 21, 1980) at 8–16).

The FEC provided a single sentence explanation for new regulation § 109.2, stating that: "This section has been amended to incorporate the changes set forth at 2 U.S.C. [§] 434(c)(1) and (2) regarding reporting requirements for persons, other than a political committee, who make independent expenditures." AR 1503 (45 Fed. Reg. 14831, 15087) (Mar. 7, 1980)). Otherwise, the administrative record provides no explanation for the divergence between the statutory purpose clause and initial proposed regulation, which used "an," and the challenged regulation, which substitutes for "an," the words "the reported," nor any indication that the FEC focused any

---

manner as is required with respect to independent expenditures under [proposed] 11 CFR § 109.2." AR 1075 (45 Fed. Reg. 5564); *see supra* note 20. Requiring individual donors making independent contributions for the purpose of "expressly advocating" for or against a candidate, to file a separate independent expenditure report, would have led to redundancy in the required disclosures by reporting not-political committees of their donors who contributed "for the purpose of furthering an independent expenditure." 2 U.S.C. § 434(c)(2)(C) (1979). One of the sixteen comments submitted to the FEC addressed independent expenditures and reminded the FEC that Congress had eliminated the separate reporting requirement for contributors, with the recommendation to strike § 109.5 from the proposed regulations. AR 1227–28 (Letter from Ron Krouse, COPE Supervisor, CWA-COPE Political Contributions Committee, to Patricia Ann Fiori, Assistant General Counsel, FEC (dated Feb. 5, 1980)). The FEC adopted this recommendation without explanation. *See* AR 1331 (Mem. to the Commission through Orlando B. Potter from Charles N. Steele and Patricia Ann Fiori (dated Feb. 11, 1980) at 69) (deleting section 109.5).

attention on the discrepancy between the statutory text and the proposed regulation. *See id.* Additionally, the administrative record provides no explanation of how the new regulations addressed the separate requirement, under 2 U.S.C. § 434(c)(1), that reporting not-political committees identify donors over $200 for "*all contributions*" intended to influence an election for federal office, 52 U.S.C. § 30101(8)(A)(i), and "earmarked for political purposes" or requested or authorized by a candidate or candidate's agent, *Buckley*, 424 U.S. at 80, a broader scope than that covered by the not-political committees own independent expenditures.

On April 1, 1980, the rules implementing the FECA Amendments of 1979 went into effect, including 11 C.F.R. § 109.2, which was intended to implement the FECA's reporting requirements for not-political parties making non-trivial independent expenditures. AR 1553 (Amendments to Federal Election Campaign Act of 1971: Final rule: Announcement of effective date, 45 Fed. Reg. 21211 (Apr. 1, 1980)). In 2003, with the enactment of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), the regulation promulgated at 11 C.F.R. § 109.2 was recodified at 11 C.F.R. § 109.10, without substantive change to the relevant language. *See* 68 Fed. Reg. 404, 415 (Jan. 3, 2003) (explaining movement of "reporting requirements . . . from pre-BCRA 11 C.F.R. 109.2 to new 11 C.F.R. 109.10.").

The regulation now codified at 11 C.F.R. § 109.10 requires that "[e]very person that is not a political committee and that makes independent expenditures aggregating in excess of $250 with respect to a given election in a calendar year shall file a verified statement or report . . . containing the information required by paragraph (e) of this section." 11 C.F.R. § 109.10(b). This regulation then sets out six requirements for the "[c]ontents of verified reports and statements," to include, as the last requirement, "[t]he identification of each person who made a contribution in excess of $200 to the person filing such report, which contribution was made for

the purpose of furthering *the reported* independent expenditure." *Id.* § 109.10(e)(1)(vi) (emphasis added).[26]

As a straight-forward textual comparison reveals, the regulation differs from the statutory provision that the regulation was intended to implement in two ways. First, the statutory purpose clause, "for the purposes of furthering *an* independent expenditure," 52 U.S.C. § 30104(c)(2)(C) (emphasis added), is replaced in the challenged regulation, with "for the purposes of furthering *the reported* independent expenditure," 11 C.F.R. § 109.10(e)(1)(vi) (emphasis added). Second, section 109.10, overall, does not address 52 U.S.C. § 30104(c)(1)'s requirement to report identification information about donors of over $200 in a calendar year, with the dates and amounts of each contribution, "for all contributions," 52 U.S.C. § 30104(c)(1), as defined in 52 U.S.C. § 30101(8), with *Buckley's* gloss, 424 U.S. at 80. Indeed, the FEC concedes that, in the more than thirty years since promulgating the regulation, the agency has "never issued any additional guidance suggesting that it intend[s] to enforce 52 U.S.C. § 30104(c)(1) as a standalone reporting requirement." FEC's Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("FEC's Opp'n") at 29–30, ECF No. 30.

Reading subsection (c)(1) out of the statute makes a difference. By contrast to the donors covered in subsection (c)(2)(C), who contributed to support the not-political committee's independent expenditures (*e.g.*, paying for television commercials, pamphlets, documentaries, or other advertisements, expressly appealing for votes for or against a specific federal candidate), the donors covered in subsection (c)(1) contributed to not-political committees to support

---

[26] The other five required contents are: (1) "[t]he reporting person's name, mailing address, occupation, and the name of his or her employer," *id.* § 109.10(e)(1)(i); (2) "[t]he identification . . . of the person to whom the expenditure was made," *id.* § 109.10(e)(1)(ii); (3) "[t]he amount, date, and purpose of each expenditure," *id.* § 109.10(e)(1)(iii); (4) "[a] statement that indicates whether such expenditure was in support of, or in opposition to a candidate, together with the candidate's name and office sought," *id.* § 109.10(e)(1)(iv); and (5) "[a] verified certification . . . as to whether such expenditure was made in cooperation, consultation, or concert with . . . a candidate," *id.* § 109.10(e)(1)(v).

political efforts in connection with federal elections, which contributions may be used by the not-political committee, in some cases, to contribute directly to candidates or political committees, including to fund super PACs. For example, super PACs set up only to make independent expenditures, may receive unlimited contributions from donors, including not-political committees, to fund their independent expenditure activity. *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1442 n.2 (2014). (distinguishing super PACs from "traditional PACs," which are subject to restrictions on receiving contributions). While super PACs, as political committees, must disclose their contributors, *see* 52 U.S.C. § 30104(b)(3); 2016 CRS REPORT at 9–10 ("Super PACs must follow the same reporting requirements as traditional PACs," including by filing reports with "the name, address, occupation, and employer of those who contribute more than $200 in unique or aggregate contributions per year"), those disclosed contributors may serve merely as pass-through entities to route the funds to the super PAC. *See* 2016 CRS REPORT at 10 (observing that "the original source of some contributions to super PACs can be concealed (either intentionally or coincidentally) by routing the funds through an intermediary"); *id*. at 19–20 (noting that "super PACS must identify donors who contributed at least $200," and "[t]his requirement sheds light on contributions that go directly to super PACs, but not necessarily those that go indirectly to super PACs," such that "the original source of contributions to trade associations or other organizations that later fund IEs through super PACs could go unreported.").

Indeed, super PACs are often affiliated with not-political committees, such as 501(c)(4) organizations, because, as a political committee and not-political committee, respectively, each entity "abides by a particular set of rules, enjoys distinct opportunities, and is subject to different restraints." Richard Briffault, *Super PACS*, 96 MINN. L. REV. 1644, 1650 (2012) (noting the

pairing of American Crossroads and Crossroads GPS as an example of a super PAC and 501(c)(4) organization that are closely connected); *see also* 2016 CRS REPORT at 19 & n.58 (same). Allowing not-political committees to mask donors, who otherwise are subject to disclosure under subsection (c)(1), facilitates the role of these organizations as pass-throughs, enabling donors to contribute to super PACs without being identified by routing their contributions through affiliated 501(c)(4) organizations or other types of not-political committees. *See* 2016 CRS REPORT at 19 (citing as "source of concern" that "legally separate organizations (*e.g.*, 501(c) tax-exempt political organizations, which are generally not regulated by the FEC or federal election law) operate alongside some super PACs," and "[s]ome [] question whether large contributions—that would be prohibited if they went to candidate campaigns—were essentially routed through super PACs as IEs."). Absent enforcement of subsection (c)(1), super PACs disclose the identities of contributing not-political committees, but the latter do not disclose the original contributors, subverting the FECA's broad disclosure regime.

### B. THE PLAINTIFFS' CHALLENGE TO THE REGULATION IS JUSTICIABLE

Before turning to the substantive arguments presented by the parties regarding the validity of the challenged regulation, the threshold justiciability issues raised by the defendants are addressed. Crossroads GPS and the FEC contend that the plaintiffs' claims in Counts II and III are not justiciable for three reasons. First, with respect to the claim in Count II that 11 C.F.R. § 109.10(e)(1)(vi) "conflict[s]" with 52 U.S.C. § 30104(c)(2), Compl. ¶ 119, rendering "unlawful" the FEC's reliance on this invalid regulation to dismiss the administrative complaint, *id*. ¶¶ 121–23, both defendants revive the argument that any challenge to the regulation is time-barred, even though this statutory limitations issue was already resolved in this Court's previous

opinion, *CREW*, 243 F. Supp. 3d at 99–102.  FEC's Reply at 20–23; CGPS's Reply at 21–23; CGPS's Opp'n at 35–37.  Second, Crossroads GPS asserts with respect to the same claim in Count II, that the plaintiffs do not have standing for lack of a "redressable injury."  CGPS's Reply at 21; CGPS's Opp'n at 35–36.  Finally, both defendants contend that the plaintiffs' failure to exhaust administrative remedies bars the claims in Counts II and Count III.  FEC's Reply at 7–12; CGPS's Reply at 14–20; CGPS's Opp'n at 32–35.  These justiciability challenges are discussed *seriatim*.

### 1. *Count II Is Not Time-Barred*

According to the defendants, the claim in Count II that the challenged regulation is invalid because "[t]he FEC provided no explanation for drafting 11 C.F.R. § 109.10(e)(1)(vi) in a way that conflicts with 52 U.S.C. § 30104(c)(2)," Compl. ¶ 120, is time-barred.  *See* FEC's Reply at 20; CGPS's Reply at 21.  To bolster this justiciability argument, the defendants cherry-pick language from the plaintiffs' briefing to give the mistaken impression that the plaintiffs' observations about the insufficiency of the FEC's single-sentence explanation for the challenged regulation is the sole basis for their challenge.  FEC's Reply at 20 ("Plaintiffs argue that this explanation was insufficient and so the regulation is invalid on that basis alone.") (citing Pls.' Reply at 6); CGPS's Reply at 21 ("One of the principal points of contention CREW raises— nearly four decades after the actual rulemaking—is that the FEC should have written a lengthier explanation for the IE reporting rule.") (citing Pls.' Reply at 1, 5).  This is simply incorrect.  The plaintiffs do not claim that § 109.10(e)(1)(vi) is invalid due to the insufficiency of the FEC's explanation but instead contend that "the regulation is inconsistent with the plain language of the statute and clearly frustrates Congress's intent . . . ."  Compl. ¶ 119.  The incorrect predicate for the defendants' challenge to Count II fatally undermines its force.

In any event, the defendants' timeliness argument rests on extrapolated reasoning from *dicta* in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), that is inapplicable here. Although no statutory limitation period or other justiciability issue was addressed in *Encino*, *see* 136 S. Ct. at 2125 ("Respondents do not contest the manner in which petitioner has challenged the agency procedures here, and so this opinion assumes without deciding that the challenge was proper."), the defendants seize on *dicta* in *Encino* to distinguish "procedural" and "substantive" challenges and to argue that the plaintiffs' complaints about the insufficiency of the FEC's explanation for the challenged regulation is a "procedural" challenge, such that the challenge is foreclosed. FEC's Reply at 22 (quoting *Encino*, 136 S. Ct. at 2125); CGPS's Reply at 21 (same).

Specifically, the *Encino* Court observed that "[o]ne of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions," and "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino*, 136 S. Ct. at 2125; *see also id.* at 2126 ("An '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice,' . . . and [as such a]n arbitrary and capricious regulation . . . is itself unlawful and receives no *Chevron* deference." (first alteration in original) (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005))). At the same time, the Supreme Court recognized that, "[o]f course, a party might be foreclosed in some instances from challenging the procedures used to promulgate a given rule." *Id.* at 2125.[27]

---

[27] The Supreme Court cites two cases as reflecting instances where a procedural challenge to a regulation may be barred: *Auer v. Robbins*, 519 U.S. 452, 458–59 (1997), which held that a "party cannot challenge [an] agency's failure to amend its rule in light of changed circumstances without first seeking relief from the agency," and *JEM Broad. Co. v. FCC*, 22 F.3d 320, 324–36 (D.C. Cir. 1994), which held that a challenge to a regulation for failure to proceed through notice-and-comment rulemaking was subject to the applicable 60-day limitations period. *Encino*, 136 S. Ct. at 2125. Neither of these "instances" covers the plaintiffs' instant use of an inadequate agency explanation to show that a challenged regulation is substantively arbitrary, capricious, and contrary to law.

Set against this well-settled law, the *Encino* Court held that a Department of Labor regulation concerning overtime compensation was not entitled to *Chevron* deference because the agency "offered barely any explanation" for a regulation reflecting a "change in position." *Id.* at 2126; *see also id.* ("[T]he explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position."). Consequently, the Supreme Court remanded the case, with directions to the Ninth Circuit to construe the statute at issue "without placing controlling weight on the" agency's regulation. *Id.* at 2127. In other words, *Encino* made clear that an agency's inadequate explanation for a regulation purportedly implementing a statutory requirement is both relevant and probative of the deference owed to the agency's interpretation, reflected in a regulation, of that statutory requirement. Thus, contrary to the defendants' position that any inadequacy in the FEC's 1980 explanation for the challenged regulation may not be considered in evaluating this regulation's validity, the *Encino* Court appears to have held directly the opposite.

The defendants' effort to compress the plaintiffs' criticism of the challenged regulation into a procedural box is therefore unavailing. The plaintiffs are not using any procedural deficiency in the adoption of the challenged regulation to argue for its invalidity but rather are relying on a textual comparison of the statutory requirement with the language used in the regulation, which stands virtually barren of any substantive explanation that would provide a rationale for the difference.[28] Thus, as this Court previously held, the plaintiffs' claim is not time-barred.

---

[28]     The defendants also rely on a non-binding, out-of-circuit case, *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077–78 (9th Cir. 2016), which cited *Encino* to decline to "reach the merits . . . [as] untimely" of the plaintiff's argument that, at *Chevron* step two, deference should not be given to an agency regulation due to an inadequate explanation. FEC's Reply at 22–23; CGPS's Reply at 21–22. By contrast to *Perez-Guzman*, the instant case is resolved at *Chevron* step one, and the plaintiffs' argument here is that the agency regulation offers no explanation that can save the challenged regulation from its inconsistent text with the statutory provision the regulation purportedly implements.

## 2. *Plaintiffs Have Standing to Bring Count II*

Crossroads GPS argues that the plaintiffs do not have "a redressable injury in this matter" and therefore lack standing. CGPS's Reply at 21–22, 22 n.16.[29]  To the contrary, as previously held, the plaintiffs have standing to challenge the validity of the regulation relied upon to dismiss its administrative complaint because "'the denial of information [a plaintiff] believes the law entitles him to' constitutes an injury in fact." *CREW*, 243 F. Supp. 3d at 101–02 (quoting *Shays II*, 528 F.3d at 923) (alteration in original).  Nonetheless, Crossroads GPS asserts for the first time that since the plaintiffs seek "to retroactively impose a new reporting burden on CGPS," that remedy "is unavailable" in this as-applied challenge because Crossroads GPS was allowed to rely on the regulation in good faith.  CGPS's Reply at 21; *see also id.* at 6–14 (asserting that 52 U.S.C. § 30111(e) protects "persons who rely in good faith upon an FEC regulation").  Crossroads GPS is mistaken.

A party's good faith reliance on a regulation, which is later held invalid, may have a bearing on any accrued penalties to be imposed due to noncompliance with statutory requirements, but does not operate to bar a challenge to the validity of the regulation itself. Indeed, the law is clear that the plaintiffs may bring a facial challenge to the regulation as a component of an as-applied challenge by seeking relief to invalidate and vacate § 11 C.F.R. 109.10(e)(1)(vi).  *See Weaver*, 744 F.3d at 145 ("[W]hen an agency seeks to apply the rule, those affected may challenge that application on the grounds that it "conflicts with the statute from which its authority derives,' . . . at least where the statute does not expressly preclude such a

---

[29]     Crossroads GPS raises this standing argument for the first time.  During consideration of the defendants' motions to dismiss the complaint, Crossroads GPS sought dismissal only of the plaintiffs' APA claims and, "in the interest of efficiency," did "not duplicate the FEC's various arguments," CGPS's Reply Mem. Supp. Defs.' Partial Mots. Dismiss at 1, ECF No. 19, including the FEC's unsuccessful argument that the plaintiffs lack standing because they "have not been 'personally injured,'" FEC's Reply Supp. Partial Mot. Dismiss at 2–8, ECF No. 20.

challenge" (internal citations omitted)); *AT&T*, 978 F.2d at 737 (vacating rule in action challenging administrative decision); *see also CREW*, 243 F. Supp. 3d at 101 (relying on *AT&T* and *Weaver* to conclude the plaintiffs have standing). Moreover, as the plaintiffs point out, if this case is remanded, "the FEC can craft whatever remedy it chooses to impose in a way to alleviate any equitable concerns it has, including by allowing Crossroads GPS to remedy its violation by disclosing its contributors now." Compl. ¶ 129.

In short, regardless of whether enforcement against Crossroads GPS of "a new reporting burden" is available on remand, CGPS's Reply at 21, the plaintiffs have demonstrated a redressable injury and, as a result, Crossroads GPS's new standing argument fails.

### 3. *Plaintiffs Have Exhausted Administrative Remedies for Counts II and III*

Both defendants contend that the plaintiffs failed to exhaust administrative remedies because the administrative complaint did "not squarely challeng[e] the validity of 11 C.F.R. § 109.10(e)(1)(vi)," noting that the plaintiffs raised the alleged conflict between this regulation and 52 U.S.C. § 30104(c)(2) in a footnote, CGPS's Reply at 14, and did not "even argue in their administrative complaint that Crossroads GPS had violated section 30104(c)(1)," FEC's Reply at 7.[30] Even if the defendants' characterization of the administrative complaint were correct,

---

[30] Crossroads GPS also asserts that the plaintiffs should have raised their challenge in a rulemaking petition, CGPS's Reply at 19–20, by petitioning "the [FEC] directly for the relief [CREW] seek[s] in this lawsuit" since "the [FEC]'s discretion to issue [or amend or repeal] regulations is left in the first instance to the [FEC], not the federal courts," and thus "[CREW] must first challenge the [FEC]'s exercise of that discretion before the agency." CGPS's Reply at 20 (alterations in original) (quoting *Ass'n of Flight Attendants v. Chao-CWA*, 493 F.3d 155, 158–59 (D.C. Cir. 2007)). To the contrary, this Court has already determined that the plaintiffs did not need to petition the agency because the "caselaw makes clear that '[a]n agency's regulations may be attacked in *two ways* once the statutory limitations period has expired,'" *CREW*, 243 F. Supp. 3d at 102 n.6 (emphasis and alteration in original) (quoting *NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987)): either "directly on the ground that the issuing agency acted in excess of its statutory authority in promulgating them," *id.* (quoting *NLRB Union*, 834 F.2d at 195), or by "petition[ing] the agency for amendment or rescission of the regulations and then to appeal the agency's decision," *id.* (quoting *NLRB Union*, 834 F.2d at 196; *accord P&V Enters. v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 2d 134, 143 (D.D.C. 2006) (same), *aff'd*, 516 F.3d 1021 (D.C. Cir. 2008)). Moreover, the case relied upon by the defendants for this standing argument is inapposite. In *Chao*, the plaintiff unions sued directly in federal court "to force the government to increase its regulation of aircraft working conditions," 493 F.3d at 158,

however, the relevant question for administrative exhaustion is whether the agency had "an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Coburn v. McHugh*, 679 F.3d 924, 931 (D.C. Cir. 2012).

The defendants rely on *Coburn*, which Crossroads GPS argues is "[e]xactly like" this case, CGPS's Reply at 15, but this reliance is misplaced. In *Coburn*, the D.C. Circuit declined to review one of three agency decisions regarding a former soldier's involuntary separation, pursuant to the Army Qualitative Management Program ("QMP"), that was based on an unfavorable evaluation report for failure to meet Army standards. 679 F.3d at 926, 931. The QMP decision had been referenced only as background and "not specifically challenge[d]," *id.* at 925–26, nor cited "as a basis for error," *id.* at 930, in later administrative appeals. Since the former soldier "did not expressly raise . . . in the administrative proceedings under review" any challenge to the legality of the QMP decision, and those administrative "decisions did not address issues relating to the QMP," the D.C. Circuit found no error in the district court's dismissal of the claim challenging the QMP decision as unlawful. *Id.* The Court noted that the agency's "mere 'incorporation' of a prior case record in a pending dispute, without more, does not indicate that the agency intends to revisit the issues previously resolved in the prior case." *Id.* at 931.

essentially "seek[ing] regulation that only the agencies can provide," *id.* at 159. In these circumstances, where the plaintiffs "did not pursue—much less exhaust—any administrative remedies before bringing this case in federal court," *id.* at 158, the D.C. Circuit held that the federal courts could not be used to circumvent agency rule-making procedures, *id.* at 159 ("[E]xhaustion is especially important where allowing the litigants to proceed in federal court would deprive the agency of *any* opportunity to exercise its discretion or apply its expertise." (emphasis in original)). By contrast to *Chao*, the plaintiffs here are not seeking judicial review of *agency inaction* but instead *agency action* dismissing an administrative complaint based on an allegedly invalid regulation. In any event, the *Chao* Court recognized that "Courts have discretion to excuse the requirement [of administrative exhaustion] where the litigant's interest in an immediate judicial forum clearly outweighs the institutional interests underlying the exhaustion requirement," when, for example, "further pursuit of an administrative remedy would be futile," *id.*, which would arguably apply here, in light of the FEC's dismissal of the 2011 petition seeking to revise the challenged regulation to comport more closely with statutory requirements.

49

Here, by contrast, the plaintiffs challenged as part of the administrative proceedings the FEC's interpretation of both the first and second sections of 52 U.S.C. § 30104(c), pointing out that the FEC "fail[ed] to give full effect to *these provisions*." AR 101–02, 102 n.1 (Am. Admin. Compl. at ¶¶ 4–5, 5 n.1) (emphasis added). The administrative complaint further stated that, "[a]t a minimum, the statute requires identification of persons who made contributions 'for the purpose of furthering *an* independent expenditure,' 2 U.S.C. § 434(c)(2)(C) [52 U.S.C. § 30104(c)(2)(C)] . . . , but the regulation only requires identification of persons who made contributions 'for the purpose of furthering *the* reported independent expenditure,' 11 C.F.R. § 109.10(e)(1)(vi)." *Id.* (emphases in original). The challenge to the regulation was addressed by Crossroads GPS, *see* AR 83 (CGPS's Admin. Resp. at 11) (presenting argument that "CREW's Suggestion That The Regulation Does Not 'Give Full Effect' To The Act Is Irrelevant"), and then by OGC, *see* AR 175 n.57 (FGCR at 12 n.57) (acknowledging the discrepancy in the use of "an" and "the" in the statute and regulation, respectively, but explaining the regulation "constitutes the Commission's controlling interpretation of the statutory provision"); *see also* AR 172 n.48 (FGCR at 9 n.48) (discussing Commission's rejection of then-Congressman Christopher Van Hollen's earlier rulemaking petition to change "the reported" in the challenged regulation).

OGC also expressly addressed the provision now-codified at 52 U.S.C. § 30104(c)(1), explaining that this statutory subsection "may impose additional reporting obligations for certain contributions made for the purpose of influencing a federal election generally," and "11 C.F.R. § 109.10(e) is silent concerning any such additional reporting requirement." AR 175–76 (FGCR at 12–13); *see also* AR 176 & n.60 (FCGR 13 & n.60) (acknowledging that "the facts here may also give rise to a claim that Crossroads [GPS] allegedly violated 2 U.S.C. § 434(c)(1) [52

U.S.C. § 30104(c)(1)]," and citing the plaintiffs' recitation of "language of disclosure obligations under [subsections](c)(1) and (c)(2)" to assert that the FEC's "regulatory interpretation fails to give effect to these provisions" (internal quotation marks omitted)).

In short, unlike *Coburn,* where the plaintiff entirely failed to raise a challenge to a particular administrative decision during the administrative appeals leading to the court case, the plaintiffs here raised the issue of whether the FEC's regulation fully comported with the statutory text in its administrative complaint, prompting the opposing party and the agency to address the issue. Thus, *Coburn* simply does not mandate the result urged by Crossroads GPS. *See Denaples v. Office of the Comptroller of the Currency*, 706 F.3d 481, 492 n.6 (D.C. Cir. 2013) (finding no waiver of arguments, under *Coburn*, where plaintiff "raised the issue, and the agencies' orders clearly reflect their respective positions on the matter").[31] Consequently, the defendants' argument that the plaintiffs failed to exhaust administrative remedies is unconvincing.

## C.    FEC'S CHALLENGED REGULATION IS INVALID AND VACATED

The parties' dispute over the validity of the FEC's challenged regulation, 11 C.F.R. § 109.10(e)(1)(vi), focuses on whether this regulation implements the disclosures mandated by 52

---

[31]     The defendants contend that "simple fairness" does not allow the plaintiffs to challenge the regulation where the "specific arguments" and "not merely the same general legal issue[s]," were not raised in administrative proceedings. FEC's Reply at 8–9 (internal citations omitted); *see also* CGPS's Opp'n at 34. Yet, the cases cited by the defendants for this contention are distinguishable because the claims rejected in each of those cases had not been addressed at all during administrative proceedings by either the plaintiff or the agency. *See, e.g., Gill v. U.S. Dep't of Justice*, 875 F.3d 677, 682 (D.C. Cir. 2017) (finding plaintiff forfeited his equal protection claim where the plaintiff "failed to raise it before the [Department of Justice's Access Review Committee ("ARC")]," and "[i]n its decision, [ARC] thoroughly summarized [the plaintiff's] arguments against affirmance . . . and that summary mentions no equal protection challenge"); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (finding issue waived in review of rulemaking where "[n]othing in the record suggests that the Secretary considered the producers' specific argument"); *Hispanic Affairs Project v. Acosta*, 263 F. Supp. 3d 160, 188 (D.D.C. 2017) (finding argument waived where the plaintiffs had "not pointed to a single comment in the administrative record that raises the permanent work-visa argument now advanced in this lawsuit," and "[Department of Labor] did not itself raise the issue"). Here, the plaintiffs and the FEC addressed the inconsistencies between 11 C.F.R. § 109.10(e)(1)(vi) and the statutory subsections now codified at 52 U.S.C. § 30104(c)(1) and (c)(2).

U.S.C. § 30104(c) or, instead, as OGC suggests, is "silent" as to any disclosure required in subsection (c)(1), AR 175–76 (FGCR at 12–13), and improperly narrows the disclosure required in subsection (c)(2)(C).

Determining whether the challenged regulation "conflicts" with 52 U.S.C. § 30104(c), as the plaintiffs claim in Count II, requires analysis under the familiar two-step *Chevron* framework.[32]  As noted *supra* Part II.A, at step one, the Court must determine "whether Congress has directly addressed the precise question at issue." *Mayo Found.*, 562 U.S. at 52 (internal quotation marks and citation omitted).  If, after reviewing the plain language, structure, history, and purpose of the statute at issue, the court concludes that Congress has not directly addressed the precise issue, then the court proceeds to step two to determine "whether the agency's answer is based on a permissible construction of the statute." *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*, 467 U.S. at 843).  The FEC's interpretation of a statute is owed no deference under *Chevron* "unless, after 'employing traditional tools of statutory construction,'" the Court is "unable to discern Congress's meaning." *SAS Inst.*, 138 S. Ct. at 1358; *see also Pereira*, 138 S. Ct. at 2113–14 (declining to "resort to *Chevron* deference" where "[t]he statutory text alone is enough to resolve this case").[33]

---

[32]     Count II, which asserts the only remaining APA challenge, *see supra* Part I.C, alleges that 11 C.F.R. § 109.10(e)(1)(vi) is "unlawful and invalid" because the challenged regulation "imposes a reporting obligation that conflicts with the one imposed by statute under the FECA." Compl. ¶ 121.  Although Count II focuses on the challenged regulation as "inconsistent with" 52 U.S.C. § 30104(c)(2), *see* Compl. ¶ 119, analysis of the regulation's implementation of 52 U.S.C. § 30104(c)(1) is also critical to determining if the regulation conflicts with the statute. *See* AR 1503 (45 Fed. Reg. at 15087) (explaining promulgation of the challenged regulation incorporated changes to both subsections (c)(1) and (2)).  Count III no longer includes an APA challenge but the arguments made in connection with the APA challenge under Count II are properly considered with Count III, which claims that "52 U.S.C. § 30104(c)(1) imposes a separate obligation on those making independent expenditures to disclose 'contributions made for the purpose of influencing a federal election generally,'" Compl. ¶ 127, thereby raising the issue of whether "11 C.F.R. § 109.10(e)(1)(vi) is without force and conflicts with the FECA," Compl. ¶ 123, by failing to implement the "separate obligation" under 52 U.S.C. § 30104(c)(1).

[33]     Recent Supreme Court cases suggest a retreat from *Chevron*, but the Supreme Court has not abandoned the framework. *SAS Inst.*, 138 S. Ct. at 1358 ("[W]hether *Chevron* should remain is a question we may leave for another day."); *see also Pereira*, 138 S. Ct. at 2121 (Kennedy, J., concurring) ("[I]t seems necessary and appropriate to reconsider, in an appropriate case, the premises that underlie *Chevron* and how courts have implemented that

Here, the "precise issue" at stake concerns what must be disclosed in reports filed with the FEC by a not-political committee making independent expenditures in excess of $250 in a calendar year. As explained below, analysis at *Chevron* step one demonstrates that the challenged regulation conflicts with the unambiguous terms of both 52 U.S.C. § 30104(c)(1) and (c)(2)(C), a conclusion confirmed by review of the text, structure, purpose and history of the statutory provisions purportedly being implemented by the challenged regulation. Since this case is resolved at *Chevron* step one, no analysis under *Chevron* step two is necessary.

### 1. *52 U.S.C. §§ 30104(c)(1) and (c)(2)(C) Are Unambiguous*

To determine the plain meaning of a statute, the court must look not only to "the particular statutory language at issue," but also to "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citations omitted). Indeed, "[t]he Supreme Court has stressed time and time again that '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.'" *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, No. 16-1230, 2018 WL 3352894, at *4 (D.C. Cir. July 10, 2018) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, *Inc.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122 (1849))); *see also Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1014 (D.C. Cir. 1999). "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also King v. Burwell*, 135 S. Ct. 2480, 2489 (2015)

---

decision.").

("Our duty, after all, is 'to construe statutes, not isolated provisions.'" (quoting *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010))); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *Del. Dep't of Nat. Res. & Envtl. Control*, 2018 WL 3352894, at *5 ("[W]hen it comes to determining a term's unambiguous meaning, context is key."); *Shays I*, 414 F.3d at 105 ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.") quoting *Brown & Williamson*, 529 U.S. at 132)). To discern the meaning of a statute at issue, we "[s]tart where the statute does." *SAS Inst.*, 138 S. Ct. at 1355; *see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) ("We begin where all such inquiries must begin: with the language of the statute itself." (internal quotation marks and citation omitted)).

Subsection 30104(c)(1), which, as already noted, is the first of three parts in 52 U.S.C. § 30104(c), describes the reporting not-political committee's disclosure requirement for contributors by cross-referencing "the information required under subsection [52 U.S.C. § 30104](b)(3)(A)," a subsection requiring political committees to name contributors of $200 or more annually, "together with the date and amount of any such contribution." 52 U.S.C. § 30104(b)(3)(A).[34] Incorporating the same statutory disclosure requirement imposed on political committees into the statutory provision applicable to reporting not-political committees makes clear that these disclosure obligations for contributors are closely aligned. Indeed, the Supreme Court has recognized that § 30104(c)(1) operates in parallel to § 30104(b)(3)(A), by requiring a

---

[34]     As discussed *supra* Part III.A.1, 52 U.S.C. § 30104(c)(1) states, in full: "[e]very person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250 during a calendar year shall file a statement containing the information required under subsection (b)(3)(A) for all contributions received by such person." 52 U.S.C. § 30104(c)(1).

not-political committees spending in excess of $250 in a calendar year on independent expenditures to "identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections" to meet "[t]he state interest in disclosure" concerning the spending activity and receipt of contributions by a not-political committee, but "in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the [FECA]." *MCFL*, 479 U.S. at 262.[35]

While the plaintiffs are incorrect that the reporting of contributors under subsection (c)(1) is "unbounded," Pls.' Reply at 30 n.19, the defendants are likewise incorrect that this subsection imposes no separate reporting requirement from subsection (c)(2)(C), CGPS's Opp'n at 49–50; *see also* FEC's Reply at 33. Subsection (c)(1) plainly requires broader disclosure than just those donors making contributions for the purposes of funding the independent expenditures made by the reporting entity. Instead, subsection (c)(1) applies to "*all* contributions received by such" reporting not-political committee, 52 U.S.C. § 30104(c)(1) (emphasis added), and, as construed by the Supreme Court in *Buckley*, a decade earlier than *MCFL*, requires disclosure of donors of over $200 annually making contributions "earmarked for political purposes," *Buckley*, 424 U.S. at 80, which contributions are "intended to influence elections," *MCFL*, 479 U.S. at 262; *see also* 52 U.S.C. § 30101(8)(A)(i) (defining a "contribution" as "any gift, subscription, loan, advance,

---

[35] Indeed, since enactment and through various amendments, the FECA provision governing the disclosure obligations of reporting not-political committees has consistently imposed closely analogous requirements about identifying contributors as those imposed on political committees. *See, e.g.*, 2 U.S.C. § 435 (1972) (requiring filing by not-political committee of "a statement containing the information required by section 434 of this title," which section is applicable to political committees); 2 U.S.C. § 434(e) (1974) (requiring filing by not-political committee of "a statement containing the information required by this section," which section is titled "Reports by political committees and candidates" and is applicable to political committees); 2 U.S.C. § 434(e)(1) (1976) (requiring filing by not-political committee of "a statement containing the information required of a person who makes a contribution in excess of $100 to a candidate or political committee and the information required of a candidate or political committee receiving such a contribution."); 2 U.S.C. § 434(c)(1) (1979) (requiring filing by not-political committee of "a statement containing the information required under subsection (b)(3)(A) of this section for all contributions received by such person").

or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office").  In this way, the making of independent expenditures in excess of the annual $250 threshold by a not-political committee triggers the obligation to identify those donors funding the organization's political purposes of influencing federal elections that is similar to the donor identification obligation applicable to political committees.  *See MCFL*, 479 U.S. at 262.

This plain meaning of subsection (c)(1) is bolstered by the cross-references in the text of paragraphs in subsection (c)(2) that imposes on reporting not-political committees additional, similar disclosure requirements as imposed on political committees.  For example, subsection (c)(2), requires reporting not-political committees to file statements with the FEC "in accordance with subsection (a)(2)," which applies to political committees.  52 U.S.C. § 301014(c)(2); *id.* § 30104(a)(2).  Further, subsection (c)(2)(A), through a cross-reference to the reporting requirements for political committees under subsection (b)(6)(B)(iii), requires not-political committees to disclose identifying information about any person receiving "any disbursement . . . in connection with an independent expenditure."  *Id.* § 30104(c)(2)(A); *id.* § 30104(b)(6)(B)(iii).

Finally, subsection (c)(2)(C) requires reporting not-political committees to identify those donors of over $200 who contribute "for the purpose of furthering *an* independent expenditure."  *Id.* § 30104(c)(2)(C) (emphasis added).  These donors are a subset of those contributors required to be identified in subsection (c)(1).  Consequently, subsection (c)(2)(C) does not require that a reporting not-political committee disclose information about the date or amount of the contributions covered by this paragraph, as that information about the donors is already required to be reported under (c)(1).  *Id.* § 30104(c)(1) (referencing *id.* § 30104(b)(3)(A)).

Not only do the parties dispute whether subsections (c)(2)(C) and (c)(1) set out separate donor disclosure obligations, which they do, but also the scope of subsection (c)(2)(C). To interpret the scope of the purpose clause in subsection (c)(2)(C), the word "an" must be attributed its plain and ordinary meaning because Congress has not specified otherwise. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *United States v. Palmer*, 854 F.3d 39, 47 (D.C. Cir. 2017) ("Congress is presumed, absent indication to the contrary and there is none here, to use words in their ordinary meaning."); *ITT World Commc'ns, Inc. v. FCC*, 725 F.2d 732, 743 (D.C. Cir. 1984) ("The most basic rule of statutory construction requires that courts attribute to the words of a statute their plain meaning."). Dictionary definitions provide that ordinary meaning. *See SAS Inst.*, 138 S. Ct. at 1354 (relying on Oxford English Dictionary ("OED") to determine the ordinary meaning of "any"); *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407–08 (2011) (citing five dictionaries to determine the ordinary meaning of "report").

As relevant here, the term "an," like the term "a," is an "[i]ndefinite article" that ordinarily refers to "one, some, any" with "the oneness, or indefiniteness, being implied rather than asserted," OED 4 (2d ed. 1989). At the time the FECA Amendments of 1979 were enacted, "an" possessed just this meaning. *See, e.g.*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1 (New College ed. 1976) (providing "a" is an "[i]ndefinite article" "[u]sed before nouns and noun phrases that denote a single, but unspecified, person or thing"); THE RANDOM HOUSE COLLEGE DICTIONARY 1 (Rev. ed. 1980) (defining "a" as "any one of some class or group"); BLACK'S LAW DICTIONARY 77 (5th ed. 1979) (explaining "an" as "[t]he English indefinite article, equivalent to 'one' or 'any' . . ."); *see also* Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries,* 16 GREEN BAG 2D 419, 423, 427–28 (2013) (identifying, *inter*

*alia*, *American Heritage Dictionary of the English Language*, *The Random House Dictionary of the English Language*, *The Oxford English Dictionary*, and *Black's Law Dictionary* as amongst "the most useful and authoritative" English language dictionaries for the period 1951–2000 to understand "meanings current at a given time"). In short, "an independent expenditure" means—and has meant since before the enactment of the FECA Amendments of 1979—an unspecified one. *See* WEBSTER'S NEW COLLEGIATE DICTIONARY 1 (1977) (explaining the indefinite article is "used as a function word before singular nouns when the referent is unspecified"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1 (1976) (providing that "a" is used "before most singular nouns . . . when the individual in question is undetermined, unidentified, or unspecified").

This reading is further supported by the fact that, in subsection (c)(2)(C), "an" modifies a singular noun in an "affirmative context." *See* 52 U.S.C. § 30104(c)(2)(C) (requiring that statements filed by reporting not-political committees "*shall* include" identifying information in connection with contributions "made for the purpose of furthering *an* independent expenditure") (emphasis added). As the Supreme Court has explained with regard to the term "any," "[w]hen used . . . with a 'singular noun in affirmative contexts,' the word . . . ordinarily 'refer[s] to a member of a particular group or class without distinction or limitation' and in this way 'impl[ies] *every* member of the class or group.'" *See SAS Inst.*, 138 S. Ct. at 1354 (emphasis in original) (quoting OED (3d ed., Mar. 2016), www.oed.com/view/Entry/8973); *cf. Del. Dep't of Nat. Res. & Envtl. Control*, 2018 WL 3352894, at *5 (contrasting use of "any" at issue in *SAS Inst.* to use of "any" in a conditional context, the latter of which "unambiguously indicates that not every" member is implicated).

Consequently, subsection (c)(2)(C) requires reporting not-political committees to supplement the disclosure mandated in (c)(1) by identifying each donor who contributed over $200 for the purpose of furthering the entity's independent expenditures "expressly advocating the election or defeat of a clearly identified candidate" for federal office.  52 U.S.C. § 30101(17); *see also id.* § 30101(18) (defining "clearly identified"); *id.* § 30101(9)(A)(i) (defining "expenditure").  Use of the indefinite article "an" before "independent expenditure" indicates a broader coverage than a particular, specified independent expenditure and instead means that disclosure must be made as to each non-trivial donor contributing to fund "an independent expenditure" to a candidate, without regard to the actual reported form of the express advocacy funded by the expenditure.

This close examination of the text of subsections (c)(1) and (c)(2)(C) demonstrates that the plaintiffs are generally correct: these subsections "target two complimentary [sic] sets of contributors," which are important to ensuring that "contributor reporting is not underinclusive." Pls.' Reply at 29.[36]  These provisions must be read together, in accordance with "one of the most basic interpretive canons"—that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  Indeed, "[i]f there is 'only one statutory reading that gives full effect' to the entirety of" the relevant provisions, it will be adopted "so long as other tools of statutory interpretation do not overcome that interpretation."

---

[36]     As part of their argument for interpreting the provisions in 52 U.S.C. § 30104(c) to be complementary, the plaintiffs contend "[s]ubsection (c)(1) provides a temporal scope for contribution disclosures," while "[s]ubsection (c)(2)(C) provides a purposive scope."  Pls.' Mem. at 4 (citing *MCFL*, 479 U.S. at 262).  This description is not particularly helpful since, as described above, subsection (c)(1) contains both a disclosure requirement and, through the cross-reference to subsection (b)(3)(A), a time frame, since the latter subsection references a "reporting period," and subsection (c)(2)(C) also contains a disclosure requirement, with a purposive clause, 52 U.S.C. § 30104(c)(2)(C), and a timeframe for reporting, through the cross-reference to subsection (a)(2).

*Del. Dep't of Nat. Res. & Envtl. Control*, 2018 WL 3352894, at *5 (quoting *Friends of Blackwater v. Salazar*, 691 F.3d 428, 447 (D.C. Cir. 2012)). This statutory provision presents such a case, as made clear in *MCFL*.

In *MCFL*, the Supreme Court allayed fears that not-political committees, if not subject to the same expenditure limitations imposed on political committees, would engage in "massive undisclosed political spending." *MCFL*, 479 U.S. at 262. Observing "no such danger," the Supreme Court pointed to the disclosure provisions in the subsection then-codified at 2 U.S.C. § 434(c), which would be triggered by spending "as little as $250" on independent expenditures. *Id.* Specifically, the Supreme Court cited two donor identification requirements imposed on reporting not-political committees, including that a not-political committee must first "identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections," and, second, "identify all persons making contributions over $200 who request that the money be used for independent expenditures." *Id.*[37] According to the Supreme Court, "[t]hese reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions." *Id.*

Reading the provisions as complementary, as the *MCFL* Court presciently did, is essential to ensuring meaningful disclosure because not-political committees may use contributions received for political purposes to influence federal elections through "express-advocacy expenditures" or, in some cases, by "making contributions to candidates or parties or to finance express-advocacy expenditures." *See Bluman*, 800 F. Supp. 2d at 284 (discussing forms

---

[37]     The Supreme Court cites these disclosure requirements for reporting not-political committees twice: once in a portion of the opinion that five justices signed, *MCFL*, 479 U.S. at 262 (Part III-B), and once in a portion only signed by four justices, *id.* at 252 (Part III-A). Justice O'Connor, who joined Part III-B, but not Part III-A, made no mention of the specific requirements under the provision then-codified at 2 U.S.C. § 434(c) in explaining why she wrote separately. *See id.* at 266 (O'Connor, J., concurring in part and concurring in the judgment) ("In my view, the significant burden on MCFL in this case comes not from the disclosure requirements that it must satisfy, but from the additional organizational restraints imposed upon it by the [FECA].").

of contributions that donors may make to "outside groups," such as not-political committees). Thus, subsection (c)(2)(C) is properly read to cover contributions used by the not-political committee for express advocacy for or against the election of a federal candidate, whereas subsection (c)(1) covers contributions used for other political purposes in support or opposition to federal candidates by the organization for contributions directly to candidates, candidate committees, political party committees, or super PACs.[38]

To avoid the Supreme Court's plain reading of the very statutory provision at issue here, the defendants counter that the "few sentences" about disclosure in *MCFL* were "peripheral to the decision in *MCFL*, were not contested by the parties there, and do not appear to have made a significant difference in the case's outcome." FEC's Reply at 28; *see also id.* at 27 (noting that "neither the parties nor the Court paid much attention to what MCFL's disclosure requirements would look like if it were permitted to make such expenditures," and "[n]either the FEC's initial brief in that case nor any of the four amicus briefs even mentioned the provision at issue in this case"); CGPS's Opp'n at 50 ("[N]on-essential portions of *MCFL* are dicta."). The defendants' point that construction of the provision then-codified at 2 U.S.C. § 434(c) was not the principal legal issue in *MCFL* is true enough.[39] Yet, without legal wrangling over the meaning of this text,

---

[38] Donations to not-political committees may also be used to engage in issue advocacy, as opposed to express advocacy. Donors for issue advocacy may not need to be disclosed. *See FEC v. Wisconsin Right To Life, Inc.* ("*WRTL*"), 551 U.S. 449, 457 (2007) ("Our development of the law in this area requires us . . . to draw . . . a line, because we have recognized that the interests held to justify the regulation of campaign speech and its 'functional equivalent' 'might not apply' to the regulation of issue advocacy." (quoting *McConnell v. FEC*, 540 U.S. 93, 206 & n.88 (2003)). *But see Citizens United*, 558 U.S. at 368–69 ("The principal opinion in *WRTL* limited . . . restrictions on independent expenditures to express advocacy and its functional equivalent. . . . Citizens United seeks to import a similar distinction into BCRA's disclosure requirements. We reject this contention."). Here, the line-drawing is not relevant to determining whether the challenged regulation is valid.

[39] Crossroads GPS digs in on this argument to disregard as "*dicta*" the Supreme Court's reading of the statutory provision at issue, citing Justice Rehnquist's dissent and a case from another district, CGPS's Opp'n at 50 (citing *MCFL*, 479 U.S. at 271 (Rehnquist, J., concurring and dissenting); *Vote Choice, Inc. v. Di Stefano*, 814 F. Supp. 186, 191 n.12 (D.R.I. 1992)), but the cited "*dicta*" references are to something else entirely. Justice Rehnquist's reference to "[t]he three-part test gratuitously announced in today's dicta," *MCFL*, 479 U.S. at 271 (Rehnquist, J., concurring and dissenting), was targeted at the majority's observation that "MCFL has three features essential to our holding that it may not constitutionally be bound by [the statute's] restriction on independent

the Supreme Court's unequivocal description of this statutory section is probative of what that plain text says, namely: subsections (c)(1) as (c)(2) are separate and complementary reporting requirements.

In a last gasp effort to avoid the Supreme Court's plain reading of the statutory disclosure requirements on not-political committees, the defendants also argue that "*MCFL* is not controlling authority on this issue" because the "language from a 32-year-old case . . . has not been followed or definitively explained in the intervening time." FEC's Reply at 14; *see also* CGPS's Opp'n at 50. As support, the defendants point to *FEC v. Furgatch*, 807 F.2d 857, 859 n.2 (9th Cir. 1987), which the defendants highlight, was decided shortly after after *MCFL*. FEC's Reply at 39; CGPS's Reply at 12 (same). The defendants omit, however, the fact that the *Furgatch* Court seems unaware of the Supreme Court decision and cites only the lower appellate court's decision, *FEC v. MCFL*, 769 F.2d 13 (1st Cir. 1985), in its discussion of what advertisements constitute "express advocacy." 807 F.2d at 861. In any event, *Furgatch* simply does not compel the defendants' preferred construction of the statutory provision at issue. Unlike the Supreme Court's *MCFL* decision, which detailed the full scope of the disclosure obligations imposed by the provision now codified at 52 U.S.C. § 30104(c) on reporting not-political committees, the *Furgatch* Court briefly summarizes this provision only in a footnote. 807 F.2d at 859 n.2 (noting that subsection (c)(1) "requires that any person making an 'independent expenditure' greater than $250 file a statement with the FEC," and that "[t]he contents of the statement are specified in [§ 30104](c)(2)," and then quoting portions of

---

spending"—rather than the majority's description of the disclosure requirements under the provision then-codified at 2 U.S.C. § 434(c), *MCFL*, 479 U.S. at 263–64. *See also Vote Choice*, 814 F. Supp. at 191 & n.12 (similarly referring to the "three considerations with respect to non-profit MCFL that [Justice Brennan] believed were essential to the Court's decision," as "technically *dicta*").

subsection (c)(2)(A)–(C)).  As the brevity of the statutory reference indicates, this provision was simply not at issue in *Furgatch*.  Instead, the legal issue in *Furgatch* was whether the defendant had made an independent expenditure by publishing an advertisement in the *New York Times* and thereby triggered any disclosure obligation under the statute; having concluded he did and was "obligated to file the statement and make the disclosures required for any 'independent expenditure' under the [FECA]," *id.* at 865, the court simply did not further address what disclosures were in fact required.

Crossroads GPS also discounts *MCLF's* description of subsections (c)(1) and (c)(2)(C) disclosure requirements by pointing to *SpeechNow.org v. FEC*, where the D.C. Circuit stated, in a parenthetical, that subsection (c)(2)(C) "requir[es] only the reporting of contributions 'made for the purpose of furthering an independent expenditure.'"  CGPS's Reply at 12 (quoting *SpeechNow.org*, 599 F.3d at 698).  Nowhere does *SpeechNow.org* discuss or even refer to *MCFL*'s description of the text of this statutory provision, however, and the D.C. Circuit had no occasion to elaborate on the details of the reporting requirements under all subsections in § 30104(c).

In any event, in context, the D.C. Circuit's parenthetical reference to subsection (c)(2)(C) served to contrast the FECA disclosure requirements applicable to political committees, noting that "[i]f SpeechNow were not a political committee, it would not have to report contributions made exclusively for administrative expenses," *SpeechNow.org*, 599 F.3d at 698, but as a political committee, the organization was subject to "additional reporting requirements," which were "minimal" in difference to those imposed on reporting not-political committees, *id*. at 697. The D.C. Circuit then elaborated on the reasons that political committees organized in order to advocate expressly for federal candidates must disclose a broader category of donors than just

those donors funding the organization's independent expenditure activities. These same reasons and "important governmental interests," *id*. at 698, served by such broader disclosure apply equally to not-political committees making independent expenditures and undercut the defendants' effort here to restrict disclosure to the narrow category of donors who provide funds to not-political committees for independent expenditures solely in the specific form reported by a not-political committee. Specifically, the D.C. Circuit explained that "the public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made towards administrative expenses or independent expenditures. Further, requiring disclosure of such information deters and helps expose violations of other campaign finance restrictions, such as those barring contributions from foreign corporations or individuals." *Id*.

By contrast to the statutory disclosure requirements in 52 U.S.C. § 30104(c), the challenged regulation mandates disclosure by not-political committees only of contributors "in excess of $200," whose "contribution was made for the purpose of furthering *the reported* independent expenditure." 11 C.F.R. § 109.10(e)(1)(vi) (emphasis added). The plaintiffs' argument that the challenged regulation "inexplicably narrow[s]" the statute "to the point of nullification" is a stretch, Pls.' Mem. at 1, since the regulation does require disclosure of those donors of over $200 who earmarked the contribution for an independent expenditure in the specific manner reported. As the FEC explains its construction, the purpose clause in the regulation triggers disclosure of a donor only when that individual makes "a contribution to further a specific independent expenditure" being reported and thereby "appears to require an express link between the receipt and the independent expenditure." AR 173 (FGCR at 10) (quoting earlier matter, for which identifying information was redacted).

The FEC's construction requires significantly less disclosure than the statutory subsections at issue in 52 U.S.C. § 30104(c)(1) and (c)(2)(C), by not requiring reporting not-political committee to identify non-trivial donors whose contributions were (1) for political purposes or requested or authorized by a candidate or the candidate's agent, in connection with federal elections, 52 U.S.C. § 30104(c)(1), which funds may be used by the not-political committee to make contributions to candidates, parties, or political committees; or (2) to finance "an independent expenditure," *id.* § 30104(c)(2)(C), expressly advocating the election or defeat of a specific federal candidate or its "functional equivalent," *see FEC v. Wisconsin Right To Life, Inc.* ("*WRTL*"), 551 U.S. 449, 456 (2007), absent a direct link or specific intent by the donor to spend the contribution in the precise manner reported.

Thus, the regulation's implementation of the FECA Amendments of 1979 clearly ignores the requirement in subsection (c)(1) and substantially narrows subsection (c)(2).[40] As such, the challenged regulation simply does not implement the statute in a manner "so that effect is given to all its provisions." *Rubin*, 138 S. Ct. at 824 (quoting *Corley*, 556 U.S. at 314).

## 2. The Defendants' Alternative Construction of § 30104(c) Is Unsupported

The defendants dispute the plain meaning of 52 U.S.C. § 30104(c). "To 'avoid a literal interpretation at *Chevron* step one,' a party 'must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it.'" *Del. Dep't of Nat. Res. & Envtl. Control*, 2018 WL 3352894, at *6 (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir.

---

[40] Furthermore, the plaintiffs raise legitimate concern that, if the FEC and Crossroads GPS's view of the "direct link" is what they say it is, Pls.' Mem. at 35, then the donor may not have sufficiently "relinquish[ed] control" over the use of the donated funds to qualify as a "contributor" under the relevant FECA regulation, *id.* at 36–37 (citing 11 C.F.R. § 110.1(b)(6) ("[A] contribution shall be considered to be made when the contributor relinquishes control over the contribution.")).

1996)).  Here, the defendants support their alternative construction by manufacturing ambiguity in the text of both subsections, including discounting any disclosure requirement in (c)(1) and focusing on use of the indefinite article "an" in subsection (c)(2).  Their efforts, however, fail to "overcome th[e] plain meaning presumption" that is applied at *Chevron* step one.  *Va. Dep't of Med. Assistance Servs. v. U.S. Dep't of Health & Human Servs.*, 678 F.3d 918, 922–23 (D.C. Cir. 2012) ("This is what the Congress said and this is therefore what we presume the Congress meant.").  As explained below, the defendants' myriad arguments defending the challenged regulation are unpersuasive.

a)      *§ 30104(c)(1) Imposes Separate Disclosure Requirement*

The defendants make four arguments to support their view that subsection (c)(1) does not require reporting not-political committees to disclose their non-trivial donors annually whose contributions are earmarked for political purposes to influence any election for federal elections, *see* 52 U.S.C. § 30101(8)(A)(i), based on (i) the heading to the statutory section, (ii) the cross-reference in this subsection, (iii) the reference to "a statement" in this subsection, and, finally, (iv) the over-regulation of not-political committees that would result from this construction of the subsection.  Each argument is addressed *seriatim*.

*(i) Heading for § 30104(c)*

The defendants contend that subsection (c)(1) is "an ambiguous statutory provision that can be read in multiple ways," including "as a description of who should file independent expenditure statements rather than an independent requirement about the content of those statements."  FEC's Reply at 33; *see also* CGPS's Opp'n at 7–8.  As support for this preferred reading, the defendants look outside the actual text of the two subsections at issue to the heading of § 30104(c), which describes the section as follows: "Statements by other than political

committees; filing; contents; indices of expenditures." 52 U.S.C. § 30104(c). The defendants urge that this single heading for the entire section be broken down and parceled out to each of the section's three parts so that "(c)(1) is about filing statements, (c)(2) is about the content of those statements, and (c)(3)," which is not at issue here, "is about indices." FEC's Reply at 34; *see also* CGPS's Opp'n at 7–8 (referring to "section 30104(c)(1) . . . [as] the 'Coverage Provision'—defin[ing] the scope of <u>who</u> is covered by the IE reporting requirement," while describing "section 30104(c)(2)(C) . . . [as] the 'Content Provision'—defin[ing], with respect to contributor information, the content of <u>what</u> is required to be reported) (emphases in original).

Certainly, headings of statutory provisions may be a helpful interpretive tool, but, as the FEC acknowledges, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." FEC's Reply at 34 (citing Pls.' Reply at 26 (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947))). Where, as here, the text is clear, the general heading of the section with multiple subparts simply cannot limit the statutory obligations imposed by each of the subsections. *See Bhd. of R.R. Trainmen*, 331 U.S. at 529 (explaining titles and headings "are but tools available for the resolution of a doubt," "[b]ut they cannot undo or limit that which the text makes plain"); *see also Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) ("[S]ection headings cannot limit the plain meaning of a statutory text . . . ."); *Fla. Dep't of Revenue v. Picadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[A] subchapter heading cannot substitute for the operative text of the statute."); *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 822 (D.C. Cir. 2001) (noting "customary reluctance to give great weight to statutory headings"); *Nat'l Ctr. for Mfg. Scis. v. Dep't of Defense*, 199 F.3d 507, 511 (D.C. Cir. 2000) ("The plain meaning of a statute cannot be limited by its title, . . . and provisions in a statute do not always align with its title.").

Here, the defendants' effort to squeeze the scope of each subsection of § 30104(c) into only part of a general heading falls flat since the wording of the heading actually describes an aspect of more than a single subsection. Thus, three of the four parts of § 30104(c)'s heading, with each separated by semicolons, regarding "Statements by other than political committees," "filings" and "contents" are referenced in both subsections (c)(1) (including ". . . shall *file* a *statement contain*ing"), and (c)(2) ("*Statements* required to be *filed* by this subsection . . . shall *include* . . . ."). 52 U.S.C. § 30104(c) (emphases added). Further, although the FEC asserts that subsection (c)(1) addresses "filing," FEC's Reply at 34, subsection (c)(2), as the plaintiffs emphasize, also provides the "the manner of filing such statements," Pls.' Reply at 27 n.13 (citing 52 U.S.C. § 30104(c)(2)(A) (providing statements "shall be filed in accordance with subsection (a)(2)")). This may explain why, unlike other FECA provisions, which have descriptive headings for each subsection, § 30104(c) only has a general heading with no subsection headings at all. *Cf., e.g.*, 52 U.S.C. § 30104(e) (providing section header "Political committees" and descriptive headings for each subsection (1) through (4)). In short, the defendants' reliance on the heading of § 30104(c) is entirely unpersuasive.

### (ii) Cross-reference in § 30104(c)(1)

Next, the FEC contends that "the cross-reference in 52 U.S.C. § 30104(c)(1) to subsection (b)(3)(a) [sic]" causes "confusion" because the latter "includes terms that are solely applicable to political committees, despite the fact that subsection 30104(c)(1) only applies to persons that are *not* political committees.'" FEC's Reply at 35 (emphasis in original). In particular, the FEC points to the phrase "to the reporting committee during the reporting period" in subsection (b)(3)(A) as inapplicable to not-political committees, because such entities "are often not 'committees,'" but "may be individuals, corporations, or labor unions," and, as such,

"they are not 'reporting' under the statute" but instead filing, and "have no 'reporting period.'"
FEC's Opp'n at 26.

The FEC's focus on this phrase containing the word "reporting" in subsection (b)(3)(A) loses sight of the forest for the trees. The gist of subsection (b)(3)(A)—requiring identification by the reporting committee of any donor who makes contributions "in excess of $200 within the calendar year . . . or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution"— appears easily applicable to not-political committees, even if those entities "file a statement," 52 U.S.C. § 30104(c)(1), rather than report. Furthermore, even if reporting not-political committees do not have the same "reporting period" as a political committee, the former are provided statutory timelines for filing disclosure statements, which timelines amount to a "reporting period." *See, e.g.*, *id.* § 30104(c)(2) (requiring statements to be filed "in accordance with subsection (a)(2)"). Thus, contrary to the predicate for the FEC's interpretation of subsection (c)(1), the cross-reference to subsection (b)(3)(A) is viable and the disclosure requirement is transferable to not-political committees.[41]

The FEC further argues that if "Congress [had] been solely interested in providing the public with the greatest amount of information about the sources of funding used by [not-political committees], it could have drafted the statute in a manner similar to the requirement that political committees identify all their contributors on a regular basis," which "[i]t did not do."

---

[41]     The FEC also disputes the plaintiffs' construction of subsection (c)(1), stating that "[i]f Congress's intent was to make subsection (c)(1) a reporting requirement to identify all persons who made over $200 in contributions, it is not clear why it would do so by cross-referencing a provision that contains inapplicable language instead of by simply describing the requirements directly." FEC's Reply at 35; *see also* Pls.' Reply at 28 (asserting that "[b]y explicitly incorporating those same reporting requirements for non-political committees, the statute clearly mandates those making independent expenditures to disclose the 'information . . . for all contributions' that political committees are to report under subsection (b)(3)(A): *i.e.*, their identities, with the date and amount of the contributions" (second alteration in original)); *id.* (emphasizing that "the identities of those giving more than $200 annually" to not-political committees are required). As explained above, the Court agrees up to a point with the FEC that the plain language of this subsection, through the definition of "contribution," with the *Buckley* gloss, imposes a more limited disclosure obligation than that posited by the plaintiffs.

FEC's Opp'n at 42. Yet, just because Congress did not treat not-political committees exactly the same way as political committees proves little. Instead, the statutory regime provides for significant parallel disclosure obligations between political and not-political committees, as reflected in the multiple cross-references contained in § 30104(c) that incorporate and apply some—not all—of the same reporting requirements applicable to political committees to not-political committees. The cross-reference in subsection (c)(1) to subsection (b)(3)(A) does not create "confusion" but merely detracts from the defendants' preferred construction that this subsection imposes no disclosure obligation at all. To the contrary, the plain text of this subsection imposes similar disclosure requirements as those imposed on political committees "under subsection (b)(3)(A) for all contributions received" by the reporting not-political committee, which must identify contributors of funds for political purposes to influence elections for federal office. 52 U.S.C. § 30104(c)(1).

### (iii) Filing "A Statement" Under § 30104(c)(1)

The FEC argues that construing subsection (c)(1) as written and as imposing a separate reporting obligation from subsection (c)(2), "would result in multiple statements being filed, containing different but overlapping information," FEC's Reply at 35, "because every contribution that is reported under section 30104(c)(2)(C) would also need to be reported pursuant to plaintiffs' interpretation of section 30104(c)(1)," with "one reporting provision . . . simply a subset of the other reporting provision," *id*. at 36–37. In the FEC's view, this construction raises two problems.

First, if this were the intent, the FEC raises the rhetorical question, asking why Congress did not "draft[] a single statutory provision stating clearly that all contributions should be reported and those made for the purpose of furthering an independent expenditure should be

separately designated."  *Id*. at 37; *id* at 35–36 (posing question "why Congress would draft the provision in this manner when there are simpler ways to accomplish what plaintiffs claim was the Congressional intent.").  While the FEC may have legitimate policy questions about why Congress would require reporting not-political committees to identify donors of over $200 "for all contributions received" for influencing federal elections, with "duplicative" or "overlapping" obligations to also identify donors of over $200 "for the purpose of furthering an independent expenditure," FEC's Opp'n at 36–37, that argument misses the point.  The question here is not whether Congress could have drafted the disclosure requirements for not-political committees differently or even better, but what the statutory language provides.  *See SAS Inst.*, 138 S. Ct. at 1355 ("Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." (citing *Soc. Sec. Bd.* v. *Nierotko*, 327 U. S. 358, 369 (1946))).

Moreover, the manner in which Congress crafted § 30104(c), with multiple cross-references to disclosure requirements applicable to political committees, makes the point clearly that not-political committees engaged in making independent expenditures are subject to a disclosure regime that is parallel, but not identical, to the obligations imposed on political committees with respect to contributions for political purposes.  The differences in disclosure requirements for not-political committees, as reflected in subsections (c)(1) and (c)(2)(C), stems from a recognition that such entities, unlike political committees, may have non-political goals or missions, and therefore attract a broader group of donors than political committees, with the required disclosure targeted only at those donors who want to fund political activities to influence federal elections or independent expenditures.

Second, the FEC raises the practical concern that reading subsection (c)(1) and subsection (c)(2) as complementary, separate reporting requirements would lead to "multiple statements." FEC's Reply at 35. This concern is overblown. The two subsections (c)(1) and (c)(2)(C), together, merely mandate the disclosures required to be made without dictating the number of statements to be filed. Indeed, the disclosures under these two subsections are meant to be read together since subsection (c)(1) requires "the identification" of non-trivial donors for political purposes in influencing any federal election, with "the date and amount of any such contribution," *id.* § 30104(b)(3)(A), while subsection (c)(2)(C) requires only "identification" of a subset of those donors who contribute to further independent expenditure activities of the reporting organization, *id.* § 30104(c)(2)(C).

Both defendants further contend that the plaintiffs' "reading of the statute would frustrate congressional intent by decreasing the information reported" based on a construction that subsection (c)(1) "contains an affirmative reporting obligation—*i.e.*, 'Every person . . . shall file a statement,'" while (c)(2) "does not actually contain an affirmative statement that the IE maker do anything." CGPS's Opp'n at 49 (emphasis added); *see* FEC Reply at 35–36 (reasoning that subsection (c)(1)'s requirement of "a statement with the content described in subsection (b)(3)(a) [sic]" would mean "there is no provision in the law that requires the filing of a statement with the contents described in subsection (c)(2)"). Crossroads GPS explains that "[w]ithout linking the two provisions together, there would be no requirement that an IE maker file a certification that the IE was independent of a candidate's campaign, for example." *Id.* Contrary to this strained reading of § 30104(c), subsection (c)(2) explicitly requires the filing of statements containing the information enumerated in (c)(2)(A)–(C), and even sets out the schedule for submitting such statements with a cross-reference to "subsection (a)(2)," which governs the timing of reporting

for political committees.  52 U.S.C. § 30104(c)(2) (directing "[s]tatements *required to be filed* by this subsection *shall be filed* in accordance with subsection (a)(2)" (emphases added)).[42]  While the language requiring the filing of statements is slightly different in subsection (c)(1) ("shall file") and subsection (c)(2) ("shall be filed in accordance with subsection (a)(2)"), the meaning is the same: reporting not-political committees are required to file "statements" "containing" or "includ[ing]" the disclosures detailed in both subsections (c)(1) and (c)(2).

This reading of the two subsections as complementary is supported by the structure of § 30104(c).  Comparison of the reporting requirement of § 30104(c), with that of neighboring provisions confirms that Congress meant what it said in subsections (c)(1) and (c)(2)(C).  *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (explaining *expressio unius* canon applying "when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded'" (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002))).

For example, the disclosure requirements imposed on persons engaged in "electioneering communications," 52 U.S.C. § 30104(f), are crafted differently than those set out in subsections § 30104(c)(1) and (c)(2)(C).  Subsection 30104(f)(1), captioned "Statement required," obligates "[e]very person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year . . . [to] file with the Commission a statement *containing the information described in paragraph (2)*."  *Id.* § 30104(f)(1) (emphasis added).  This italicized language makes clear that the mandate set out in that paragraph is satisfied by the information required to be included "*in*

---

42  Subsection (a)(2) provides, in relevant part, that "[i]f the political committee is the principal campaign committee of a candidate for the House of Representatives or for the Senate . . . in any calendar year during which there is [a] regularly scheduled election for which such candidate is seeking election, or nomination for election, the treasurer shall file" three types of enumerated reports: "a pre-election report," "a post-general election report," and "additional quarterly reports," 52 U.S.C. § 30104(a)(2)(A)," and, "in any other calendar year the treasurer shall file quarterly reports," *id.* § 30104(a)(2)(B).

*paragraph (2)*." *Id.* Subsection 30104(f)(2), captioned "Contents of statement," provides that "[e]ach statement required to be filed under this subsection . . . shall contain the following information," as detailed in the subsequent paragraphs (A) through (F). *Id.* § 30104(f)(2). By contrast to subsection (f), subsection (c)(1) includes no language to suggest that *only* (c)(2) spells out the contents that must be reported in disclosure statements and thus *only* (c)(2)(C) describes the contributors who must be identified. The non-parallel structures of subsections (c)(1)–(2) and (f)(1)–(2) demonstrate that Congress knows how to limit the contents of filed statements to the FEC when that is the intention, and § 30104(c) does not limit the information required to be disclosed by not-political committees to subsection (c)(2)(C). *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (explaining "[h]ad Congress intended to limit [the statute's] reach as petitioner contends, it easily could have written" the statute to reflect that intent). Instead, § 30104(c) requires certain disclosures under both subsections (c)(1) and (c)(2)(C).

### *(iv) Unwarranted Regulation of Not-Political Committees*

Notwithstanding the plain text and structure of § 30104(c), the defendants strongly dispute interpreting subsection (c)(1) as imposing a separate, complementary disclosure requirement on not-political committees, and present several policy arguments against such a construction.

First, the defendants raise somewhat different concerns about the comparative disclosure obligations of not-political committees and political committees if subsection (c)(1) is construed as written. For its part, the FEC asserts that a "problem with plaintiffs' preferred interpretation of 52 U.S.C. § 30104(c)(1) is that it would cause political committees to have *fewer* disclosure requirements than persons that are not political committees." FEC's Reply at 41 (emphasis in original) (citing FEC's Opp'n at 27–28). The FEC reasons that construing subsection (c)(1) to

impose a separate disclosure requirement along the lines of the plaintiffs' proffered scope of requiring not-political committees "to file statements disclosing all contributors, just like political committees, but also to file statements about which contributions were for the purpose of an independent expenditure," then political committees would be subject to less disclosure since they "are not required to" specify contributions for independent expenditures. *Id.*

The FEC's comparison of the disclosure requirements imposed on political versus not-political committees has several flaws. First, this argument embraces as a predicate the plaintiffs' erroneous view of the scope of subsection (c)(1) as requiring identification of *all* contributors over $200 to a not-political committee, when only those donors contributing over that threshold amount for political purposes to influence any federal election are covered, requiring less disclosure than that imposed on political committees. Further, the FEC's argument ignores the fact that political committees are subject to more administrative, operational, and record-keeping requirements, beyond any disclosure requirements. Finally, more importantly, interpreting subsection (c)(1) as including a separate disclosure requirement for non-trivial donors seeking to influence federal elections comports with the plain text of the statute and the levels of disclosure contemplated by the 1979 FECA Amendments—and this interpretation makes sense. While political committees have, by definition, clear political agendas, reporting not-political committees, which may include social welfare organizations making annual independent expenditures over $250, may have non-political primary missions. Thus, donors to not-political committees, who want to fund only the organization's administrative expenses or not-political activities, may do so without being identified. On the other hand, those donors funding the not-political committee's political activities to influence a federal election—by, for example, making contributions to candidates, political committees, or political parties or by

financing independent expenditures expressly advocating for or against the election of a candidate—must be identified to inform the electorate on the sources of funding of participants in the electoral process.

For its part, Crossroads GPS complains about not-political committees being subject to the same (as opposed to more, as the FEC contends) disclosure obligations as political committees because "not all donors to such entities may be presumed to have given for a purpose justifying their inclusion on IE reports." CGPS's Reply at 36. Reflected in this argument is Crossroads GPS's contention that 52 U.S.C. § 30104(c)(1)'s reference to "contribution[s]" is "laden with 'ambiguity'" and, thus, to avoid the constitutional issues raised in *Buckley*, CGPS's Reply at 34 (quoting *Buckley*, 424 U.S. at 77); *see supra* Part III.A.1.a (discussing Supreme Court's construction of "contribution" to avoid vagueness), subsection (c)(1) must be construed "as requiring only the identification" by not-political committees "of those who give for the purpose of furthering the IE being reported," CGPS's Reply at 34. Yet, this reading misconstrues *Buckley's* discussion of "contributions" that must be reported under the provision then-codified at 2 U.S.C. § 434(e) (1974). The Supreme Court did not restrict the definition of "contribution" to the kind of independent expenditures. 424 U.S. at 78; *see also Jacobus v. Alaska*, 338 F.3d 1095, 1118 (9th Cir. 2003) (noting that the Supreme "Court construed the terms differently, reserving the express advocacy test for the regulation of *expenditures*, while interpreting the regulated *contributions* more expansively, to include donations 'made directly or indirectly to a candidate, political party, or campaign committee, . . . made to other organizations or individuals but earmarked for political purposes[, and] also all [coordinated] expenditures'" (alterations and emphasis in original) (quoting *Buckley*, 424 U.S. at 78)).[43] The fact that not-

---

[43]     Crossroads GPS also relies on *FEC v. Survival Educ. Fund*, 65 F.3d 285, 295 (2d Cir. 1995), to argue that "contribution" must be construed "as requiring only the identification of those who give for the purpose of

political committees may receive contributions intended to support its own independent expenditure activities, and other contributions not specifically intended for this use, but nonetheless to influence elections including at the request or authorization of a candidate or candidate's agent, only lends further support to construing subsections (c)(1) and (c)(2) as separate, complementary disclosure obligations to fulfill the broad disclosure goals of Congress.

Second, the defendants contend that construing subsection (c)(1) as written contravenes the purposes of the 1979 FECA Amendments because Congress did not intend for not-political committees to be regulated in the same way as political committees, or to make "maximum disclosure." FEC's Opp'n at 42 ("Congress did not intend to pursue maximum disclosure at the expense of all other interests."); CGPS's Opp'n at 46 (rejecting the plaintiffs' "dogmatic voyeurism" in "attempt[ing] to convert the 1979 FECA amendments into a 'disclosure at all costs' directive"). The defendants are correct that not-political committees are not regulated the same as political committees with respect, for example, to organizational structure, record-keeping, or even disclosure requirements. At the same time, the statutory disclosure requirements applicable to both types of entities are closely aligned, as reflected by the multiple cross-references in the FECA provisions requiring disclosures by not-political committees to statutory provisions applicable to political committees. *See*, *e.g.*, 52 U.S.C. § 30104(c)(1) (cross-

---

furthering the IE being reported." CGPS's Reply at 34. Yet, *Survival Education Fund* does not require the term to be as narrowly construed as Crossroads GPS contends. In *Survival Education Fund*, the Second Circuit considered the meaning of "solicits any contribution," in a FECA provision then-codified at 2 U.S.C. § 441d(a)(3), requiring certain disclosures on direct mailings. 65 F.3d at 293–94. The court initially noted the potential "uncertainty" in *Buckley's* use of the phrase "earmarked for political purposes" to define "contribution," but then explained that, based on *Buckley*, "independent expenditures that are properly within the purview of FECA provides a limiting principle," which the court in turn applied to the term "solicits" to determine when disclosure obligations were triggered under 2 U.S.C. § 441d(a)(3). *Survival Education Fund*, 65 F.3d at 295. Although the court's analysis was largely based on *Buckley's* discussion of 2 U.S.C. § 434(e) (1974), the court also noted that § 434(e) was more "far-reaching" than § 441(d)(a)(3) and triggered "broad disclosure obligations." *Id.* at 295, 296. Nowhere did the Second Circuit hold that a "contribution" under *Buckley* has to be tied to a specific independent expenditure or that the use of "contribution" in 52 U.S.C. § 30104(c)(1) must be construed to target only independent expenditure activity.

reference to subsection (b)(3)(A)); *id.* § 30104(c)(2) (cross-reference to subsection (a)(2)); *id.* § 30104(c)(2)(A) (cross-reference to subsection (b)(6)(B)(iii)); *id.* § 30104(c)(3) (cross-reference to subsection (b)(6)(B)(iii)).

Finally, the FEC contends that construing subsection (c)(1) as written "to require disclosure of all those who contribute over a certain threshold" would mean that the 1979 FECA Amendments "made a very significant change—one reporting requirement was replaced with two reporting requirements of different and overlapping information." FEC's Reply at 36 n.12. Alternatively, "if (c)(1) is not read as a separate reporting requirement, then the overall change to reporting is far less significant because in that event it merely clarified the type of contributions that persons other than political committees need to report." *Id.* Again, subsection (c)(1) does not require disclosure of every non-trivial donor to a not-political committee but only those who contribute for political purposes to influence any federal election. In this way, the "overall change to reporting" required by subsection (c)(1) is more limited than the argument presumes.

The more significant flaw in this particular argument is that the alternative reading of § 30104(c) urged by the defendants would essentially read out of § 30104(c) the portion of subsection (c)(1) imposing the disclosure requirement by construing it as entirely subsumed by, as opposed to supplemented with, the disclosure required in subsection (c)(2)(C). As already explained, had Congress intended such a reading, subsections (c)(1) and (2) could have been crafted to express that intent, as Congress accomplished in § 30104(f)(1) and (2), but this is not how these statutory provisions are written.

b)      *§ 30104(c)(2)(C) Is Not Ambiguous*

The parties spill significant ink regarding the proper scope of subsection (c)(2)(C). At the outset, before addressing those arguments, it bears noting that even if the defendants'

78

preferred interpretation of subsection (c)(2)(C) were accepted, the challenged regulation would still be deficient by not capturing the disclosures required under subsection (c)(1). In other words, the complementary disclosure mandates of both subsections require greater disclosure than called for by the challenged regulation, no matter how subsection (c)(2)(C) is construed.

The parties' dispute about the scope of subsection (c)(2)(C) focuses on whether the phrase "for the purpose of furthering *an* independent expenditure," 52 U.S.C. § 30104(c)(2)(C) (emphasis added), requires identification of any donor contributing to support any reported independent expenditure by the not-political committee on behalf of a particular party or candidate, without regard to the precise form the expenditure takes. The challenged regulation requires more limited disclosure, identifying only those donors contributing to support a specific expenditure in the actual form reported. The defendants, in support of reading subsection (c)(2)(C) as ambiguous enough to permit the latter interpretation reflected in the challenged regulation, raise three arguments, stemming from (i) the use of the indefinite article "an" in subsection (c)(2)(C), (ii) the use of other articles in subsection (c)(2), and (iii) the event-driven nature of independent expenditure reports. None of these arguments pass muster.

*(i) The Indefinite Article "An"*

The defendants argue that the use of the indefinite article "an" in subsection (c)(2)(C) renders the provision ambiguous. In their view, "the requirement in the statute that a specific report filed with the FEC identify contributions 'made for the purpose of furthering an independent expenditure' is inherently ambiguous because the *scope* of independent expenditures contemplated by the word 'an' is undefined." FEC's Reply at 23–24 (emphasis in original) (quoting 52 U.S.C. § 30104(c)(2)(C)); CGPS's Reply at 26 ("[T]he statute's requirement that an IE report identify donors whose contributions were 'made for the purpose of

furthing <u>an</u> independent expenditure' begs the question: <u>which</u> IE?" (emphasis in original)). Due to this asserted ambiguity in the article "an" in subsection (c)(2)(C), the defendants contend this subsection "only requires reporting of those contributors who gave for the purpose of furthering *the* reported independent expenditure." CGPS's Opp'n at 40 (emphasis added); *see also* FEC's Opp'n at 37.

As support for their preferred interpretation, first, the FEC contends that the use of the word "an" in subsection (c)(2)(C) is ambiguous because "an indefinite article . . . only indicates '[s]ome undetermined or unspecified particular.'" FEC's Opp'n at 36 (second alteration in original) (quoting *McFadden v. United States*, 135 S. Ct. 2298, 2304 (2015) (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 1 (2d ed. 1954))). So far, so good, but this definition actually undercuts the FEC's position. The defendants attempt to limit the meaning of "an independent expenditure" to only "any one of the independent expenditures reported in a particular filing with the FEC," *id.* at 36–37, and even more precisely to the exact form of the reported expenditure, *see* CGPS's Opp'n at 41. This interpretation flounders for the simple reason that the phrase "for the purpose of furthering an independent expenditure" in subsection (c)(2)(C) is not limited to describing donors who earmarked contributions for specific expenditures in the precise form set out in a particular report. *See* 52 U.S.C. § 30104(c)(2)(C). A donor generally funding independent expenditures supporting or opposing a federal office candidate, without specifying the particular form the express advocacy takes or is reported, falls within the plain meaning of subsection (c)(2)(C).

The FEC relies on the definition of "an" discussed by the Supreme Court in *McFadden*, but this case actually counsels against the FEC's preferred reading of subsection (c)(2)(C). In *McFadden,* the Supreme Court interpreted the Controlled Substance Act's provision "mak[ing] it

'unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance,'" *McFadden*, 135 S. Ct. at 2303–04 (second alteration in original) (quoting 21 U.S.C. § 841(a)(1)), to require that a defendant "know only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules," *id.* at 2304. In reaching this conclusion, the Supreme Court explained that the "knowledge requirement may be met by showing that the defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was." *Id.* Similarly, in the instant matter, subsection (c)(2)(C) requires not-political committees to report the identity of donors who contributed to the entity's independent expenditure activity, even if the donors did not specify the precise form of the independent expenditures that the contribution would ultimately fund.

For its part, Crossroads GPS argues that subsection (c)(2)(C) can be interpreted to "only require[] reporting of those contributors who gave for the purpose of furthering *the* reported independent expenditure," CGPS's Opp'n at 40 (emphasis added), because "the term 'an' means 'one,'" *id.* (quoting *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006) (quoting MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 40, 53 (10th ed. 2001))), "which is the 'normal' reading of such an indefinite article," *id.* (quoting *Abbott GmbH & Co. KG v. Yeda Research & Dev. Co.*, 516 F. Supp. 2d 1, 6 n.10 (D.D.C. 2007)). As Crossroads GPS acknowledges, however, "in determining the meaning of 'an,' 'context matters.'" *Id.* (quoting *Caraco Pharm. Labs*, 566 U.S. at 413–14 (interpreting "not an" language to mean "not a particular one")).[44]

---

[44]     The cases cited by Crossroads GPS addressing the definition of "an" merely underscore the importance of context. CGPS'S Reply at 25–26 (citing, *e.g.*, *N.H. Motor Transp. Ass'n*, 448 F.3d at 72 (determining, "'an' means 'one,'" in the statute at issue because "[s]uch a reading accords with one of the [statute's] central purposes"); *Foo v. Tillerson*, 244 F. Supp. 3d 17, 23 (D.D.C. 2017) (finding "[n]either party's reading of this statutory section satisfies the court" because "[w]hile Plaintiff is correct that Congress did not define the term 'an individual,' nothing in the statute suggests that Congress intended this term to be so broad as to include *any* individual or entity, including an estate." (emphasis in original)); *Abbott GmbH & Co. KG*, 516 F. Supp. 2d at 6 n.10 ("While the court could read the

For instance, in *Caraco*, at issue was the proper construction of a provision authorizing a counterclaim in a patent infringement suit "on the ground that the patent does not claim . . . an approved method of using the drug," 566 U.S. at 404 (quoting 21 U.S.C. § 355(j)(5)(C)(ii)(I)) (alteration in original).  The Supreme Court considered whether "*not an*" should be construed to mean "*not any*" (such that a counterclaim would be available only if the listed patent does not claim *any* or *no* approved method of using the drug), or to mean "*not a particular one*" (such that a counterclaim would be available whenever the patent does not claim a method of use for which the applicant seeks to market the drug).  *Id.* at 413–14 (emphasis added).  The Supreme Court determined that the latter meaning of "not an" applied such that the counterclaim was allowed, citing the importance of context and the overall statutory framework, which supported reading "not an" to mean "not a particular one."  *Id*. at 415.  Thus, this case actually undercuts the defendants preferred reading of "an" in subsection (c)(2)(C) to bolster the plain meaning of this provision as requiring identification of donors contributing with the purpose of funding "an independent expenditure," not a particular or specified reported form of one.

The unambiguous disclosure obligation in subsection (c)(2)(C) requires "identification of each" donor of over $200 when the contribution was made for the purpose of furthering an independent expenditure that expressly advocated for or against the election of a particular candidate, without any further requirement that the donor had to know precisely the form the expenditure would take or the manner the expenditure would be described in the filed statement. *See Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 37 (D.D.C. 2000) (rejecting approach to *Chevron* analysis that "confuses generality for ambiguity" in determining that "[t]he natural

_____

indefinite article 'a' [in the phrase at issue] as 'one or many,' there is no indication in the patent specification that the inventors here intended it to have other than its normal singular meaning." (internal quotation marks and citations omitted))).

inclusiveness of the phrase 'a decision of a court' sweeps in district court decisions"). Had Congress sought to limit identification of donors to only those who approved the specific form of the reported independent expenditure, the words used could have mimicked the challenged regulation's use of "the reported independent expenditure." 11 C.F.R. § 109.10(e)(1)(vi). This is simply not what the statutory provision says.

Crossroads GPS presses its point about ambiguity in the article "an," arguing that, if "Congress intended a broader level of contributor-related reporting for IEs, it easily could have said so, beginning with a reference to giving 'for the purpose of furthering **any** independent expenditure**s**.'" CGPS's Opp'n at 40–41 (emphases in original). This argument misconstrues the meaning of subsection (c)(2) to set up a proverbial "straw man," and demonstrates, again, the importance of context. Identifying the names of donors funding "any independent expenditures" by a reporting not-political committee, in Crossroads GPS's obfuscation, would not serve the purpose of disclosure to inform voters about the source of funds for a particular candidate. This provision therefore requires identification of "each person" contributing "for the purpose of furthering an independent expenditure," thereby associating each donor to an expenditure and revealing the source of funds for or against a particular candidate, without also requiring the donor to have the additional specific purpose of funding the expenditure in "the reported" form.

*(ii) Articles Used in Subsection (c)(2)*

The defendants point to the use of other articles in 52 U.S.C. § 30104(c)(2) to support their interpretation of "an" to mean "the reported" independent expenditure in subsection (c)(2)(C), but the use of the article "the" and the term "such" before "independent expenditures" in other paragraphs in this same subsection relate solely to the meaning of those paragraphs. Again, context matters. For example, they cite, first, subsection (c)(2)(A), which requires

statements by not-political committees to include "the information required by subsection (b)(6)(B)(iii), indicating whether **the independent expenditure** is in support of, or in opposition to, the candidate involved." CGPS's Opp'n at 39–40 (citing 52 U.S.C. § 30104(c)(2)(A) (emphasis in original)); *see also* FEC's Reply at 25. The use of the definite article "the" in this paragraph to modify "independent expenditure," makes clear that reporting not-political committees need only identify coordination in connection with *the* independent expenditure that is being reported. 52 U.S.C. § 30104(c)(2)(A). Second, the defendants cite the requirement in subsection (c)(2)(B) for "a certification whether or not **such independent expenditure** is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such candidate." CGPS's Opp'n at 39–40 (citing 52 U.S.C. § 30104(c)(2)(B) (emphasis in original)); *see also* FEC's Reply at 25. This paragraph's reference to "*such* independent expenditure," 52 U.S.C. § 30104(c)(2)(B) (emphasis added), confirms that the certification obligation pertains to a specified independent expenditure made in coordination with a candidate or political committee.

These two paragraphs, (A) and (B), which use the definite article, "the," or the term "such," to modify "independent expenditure" stand in stark contrast to the third paragraph (C), which uses the indefinite article "an" to modify independent expenditures. *Compare*, *e.g.*, MERRIAM-WEBSTER.COM (n.d., Aug. 2018), https://www.merriam-webster.com/dictionary/indefinite%20article (all Internet materials as last visited Aug. 3, 2018) (defining "indefinite article" as "the word *a* or *an* used in English to refer to a person or thing that is not identified or specified") (emphasis in original), *with* MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/definite%20article (defining "definite article" as "the word *the* used in English to refer to a person or thing that is identified or specified")

(emphasis in original), *and* MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/such (defining "such" as "of the character, quality, or extent previously indicated or implied").  Had Congress intended subsection (c)(2)(C) to refer to a specified independent expenditure, as Congress intended with (c)(2)(A) and (B), Congress would have used the definite article or another more specific term.  *See Pillsbury v. United Eng'g Co.*, 342 U.S. 197, 199 (1952) (finding "Congress knew the difference between" two words at issue "and used the words advisedly").  This only confirms that the challenged regulation's substitution of "the reported" for "an" is not in accord with the statutory text.[45]

The defendants, nonetheless, argue that, because "the statute at issue . . . contains both definite and indefinite articles," "[i]t is therefore reasonable to interpret 'an independent expenditure' in subsection 30104(c)(2)(C) to be constrained by 'the independent expenditure' in 30104(c)(2)(A) and 'such independent expenditure' in 30104(c)(2)(B)."  FEC's Reply at 25; *see* CGPS's Opp'n at 40 (arguing that "where 'the rest of the statute is written using definite articles,' it indicates specificity of the modified item" (quoting *United States v. Hagler*, 700 F.3d 1091, 1097 (7th Cir. 2012))).  The defendants' reliance on *Hagler*, *see* FEC's Reply at 24–25; CGPS's Opp'n at 40, for this argument is misplaced.  There, the Seventh Circuit considered "when the limitations clock starts ticking under [18 U.S.C.] § 3297," which statute provides "[i]n a case in which DNA testing implicates *an* identified person in the commission of a felony, no statute of limitations that would otherwise preclude prosecution of the offense shall preclude

---

[45]    Crossroads GPS cites to language from the legislative history to argue that "the Senate Committee's report confirm[s] that the statute targets reporting of contributions received for 'the independent expenditure,'" *see, e.g.*, CGPS's Opp'n at 40 (emphasis in original) (citing *S. Comm. Hearing* 1979, at 139 (STAFF OF S. COMM. ON RULES & ADMIN., 96TH CONG., SUMMARY OF COMMITTEE WORKING DRAFT NO. 2—FECA AMENDMENTS), but the same report discussed Congress's intent to "[s]implif[y] reporting without affecting meaningful disclosure," and, to the extent the cited legislative history used the term "the" to modify "independent expenditure," the context was in discussing the elimination of contributor reporting—not to go against Congress's stated goal, *see S. Comm. Hearing* 1979, at 139.

such prosecution until a period of time following *the* implication of the person by DNA testing has elapsed . . . ." 700 F. 3d at 1096–97 (emphasis added) (quoting 18 U.S.C. § 3297). Concluding that this statute was not "vague," the court held that it operated to toll the otherwise applicable limitations period for criminal prosecutions until DNA testing "implicate[s] someone of a crime" by "strongly [tying] that person to wrongdoing." *Id.* at 1097. As pertinent here, the *Hagler* court discussed the use of "the indefinite article 'an,'" stating that this article "generally implies the possibility of a larger number than just one," but, as used in § 3297, "[t]he term 'identified person' is singular, suggesting one person," which is confirmed by the use elsewhere in the statute of "definite articles; it refers to 'a' case and 'a' period of time following 'the' implication of 'the' person." *Id.* At the same time, the court rejected the government's preferred construction requiring the limitation period to begin to run "only when . . . [the DNA evidence] matches to a single, identified person," explaining that in "unusual cases [] DNA evidence might be said to 'implicate' more than one person," *id.* at 1098, even if "more than just a one-in-forty chance" is required, *id.* at 1097. In other words, the court gave weight to the common meaning of "an" as possibly "'implicat[ing]' more than one person," *id.*, but, since "[b]eing implicated in a crime is a serious thing," adopted a more narrow reading of the statute to trigger the running of the limitation period only when DNA testing produces a clear, not just any possible, match. *Id.* Thus, *Hagler* only narrowed the import of the article "an" due to the statutory context. Just as the *Hagler* court rejected "a single, identified person" interpretation of the statute at issue there, this opinion supports a reading of subsection (c)(2)(C)'s use of "an independent expenditure" to indicate more than a single, particular, as reported, form of expenditure.

*(iii) Timing of Independent Expenditure Reports*

The FEC also argues that "interpret[ing] the statutory term 'an' to envision a match between the independent expenditure(s) reported in a filed statement and the contributors listed on that statement" is "reasonable" based on the "event-driven" nature of the reports that not-political committees making independent expenditures must file. FEC's Opp'n at 38–39. According to the FEC, "while Congress intended the regular reports filed by a political committee to display all of that committee's activities during a certain period, the event-driven independent expenditure reports filed by [not-political committees] are intended to provide information only about the reported expenditure, not a wider range of activity." *Id.* at 38. Even assuming the FEC is correct about the event-driven nature of independent expenditure statements, this does not compel the defendants' preferred reading of subsection (c)(2)(C).

To bolster the defendants' position, the FEC relies on the "contrasting structures" of the statutory reporting requirements for political committees and not-political committees, FEC's Opp'n at 36, explaining that, while political committees are obligated to file "regular reports at specific times, either monthly or quarterly, with additional pre-election and post-election reports," *id.* at 34–35 (citing 52 U.S.C. § 30104(a)), the "statutory provision governing [not-political committees] . . . engaged in independent expenditures" "does not contain any specific reporting schedule or periods," *id.* at 35 (citing 52 U.S.C. § 30104(c)). At the outset, the FEC's discounting of any statutory requirement for scheduled reports by reporting not-political committees is difficult to reconcile with the cross-reference in subsection (c)(2), requiring disclosure by the not-political committee in accordance with the schedule for political committees in subsection (a)(2). *See* 52 U.S.C. § 30104(c)(2) (cross-referencing *id.* § 30104(a)(2)). Even if "Congress wanted regular, comprehensive disclosure from political

committees, but believed that event-driven disclosure was sufficient for the independent expenditures of groups that are not political committees," FEC's Opp'n at 36, the "contrasting structures" do not preclude comprehensive disclosure by not-political committees in their reports to the FEC. In fact, Congress expressly intended broad disclosure for not-political committees making independent expenditures in excess of $250, regardless of when and how often such entities file statements.

The FEC persists that, based on the language and event-driven nature of statements required under 52 U.S.C. § 30104(c)(2)(C), "it is unclear where and when [contributor] information should be reported under plaintiffs' interpretation" of the provision. *Id.* at 37. In the FEC's view, the language of subsection (c)(2)(C), which requires "identification of *each* person who made a contribution," *id.* (emphasis in original), if "[t]aken literally," "would create the odd result that an organization like Crossroads GPS, which filed more than 100 different independent expenditure reports in the two-year 2012 election cycle, would need to include on each report a recitation of all the contributors that had ever contributed to it for the purpose of furthering independent expenditures, possibly for its entire existence," *id.* The FEC goes on to describe "[f]urther problems" as to when to report individuals, such as those who attended the Tampa fundraiser and allegedly contributed to Crossroads GPS's independent expenditure activity after watching thirteen "'example' videos of independent expenditure ads," which "had already been broadcast and fully paid for before the fundraiser took place," and one "advertisement shown at the fundraiser [which] was apparently never broadcast." *Id.* at 38 (quoting AR 78 (CGPS's Admin. Resp. at 6)). The thrust of the FEC's argument—that the timing of filing the requisite disclosure statements to fulfill statutory disclosure obligations may be complex—reveals only that regulatory guidance from the FEC on this timing issue would be helpful, not, as the FEC

seems to contend, that the agency could simply ignore, narrow or misconstrue a statute in order to save reporting entities from a statutory disclosure regime viewed by the FEC as "cumbersome and confusing," or "duplicative." FEC's Opp'n at 37.[46]

Finally, the FEC relies on *Ctr. for Individual Freedom v. Van Hollen* ("*Van Hollen I*"), 694 F.3d 108 (D.C. Cir. 2012) (per curiam), to contend that the event-driven nature of reporting under 52 U.S.C. § 30104(c) favors interpreting subsection (c)(2)(C) to be sufficiently ambiguous to permit the defendants' preferred reading of the statute. FEC's Reply at 25–26; *see also* FEC's Opp'n at 39–40. That case, however, is distinguishable and does not compel that conclusion. In *Van Hollen I*, the D.C. Circuit considered a FECA provision, which was enacted as part of BCRA and is now codified at 52 U.S.C. § 30104(f), governing "electioneering communications." *Van Hollen I,* 694 F.3d at 108–09. At issue was the proper interpretation of § 30104(f)(2)(F), which provides that statements filed under subsection (f) include, under specified circumstances not relevant here, "the names and addresses of all *contributors who contributed* an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date." *Id.* (quoting § 30104(f)(2)(F)) (emphasis added). The FEC implemented § 30104(f) in 2007 by promulgating 11 C.F.R. § 104.20(c)(9), which requires disclosure, in relevant part, of "the name and address of each person who made a donation aggregating $1,000 or more to the corporation or labor organization, aggregating since the first day of the preceding calendar year, which was made *for*

---

46      The plaintiffs note that, when implementing 52 U.S.C. § 30104(f), the FEC "modeled" the regulation "on the language contained in subsection (c)(2)(C)," Pls.' Reply at 14 (citing *Van Hollen, Jr. v. FEC* ("*Van Hollen II*"), 811 F.3d 486, 493 (D.C. Cir. 2016)), and thus "[c]learly, the FEC did not then believe subsection (c)(2)(C)'s formulation was hopelessly obtuse when it decided to use it as the model for its clarification of subsection (f)(2)," *id.*

*the purpose of furthering electioneering communications.*"  11 C.F.R. § 104.20(c)(9) (emphasis

added).  Thus, the regulation added a purpose requirement not extant in the statutory provision.

The D.C. Circuit found that the regulation survived *Chevron* step one because Congress

did not speak plainly in enacting subsection (f), and thus "regulatory construction of the statute

by the FEC" was not foreclosed.  *Van Hollen I*, 694 F.3d at 109–10.  This conclusion rested on,

first, "the absence of plain meaning in the statute," particularly "following the partial

invalidation of the speech prohibition imposed on corporations and labor unions in the context of

'electioneering communications,'" *id.* at 111 (citing *WRTL*, 551 U.S. 449); *id.* at 110 ("The

statute is anything but clear, especially when viewed in the light of the Supreme Court's

decisions in [*Citizens United*] and [*WRTL*]."), and, second, the fact that, contrary to the two

dictionary definitions of "contribute" relied upon by the district court as "not includ[ing] a

purpose or intent element," the D.C. Circuit located "other, respected dictionaries [that] define

'contribute' in a way that is consistent with the regulation," *id.* at 110–11.

As noted, *supra* Part III.C.2.b.i, context is crucial in interpreting a statute and subsection

(c)(2)(C) has critical differences from subsection (f).  First, unlike the competing dictionary

definitions of "contribute" highlighted by the D.C. Circuit in *Van Hollen I*, dictionaries

consistently and uniformly define "an"—the word at issue in subsection (c)(2)(C)—as an

indefinite article used when referring to one of a group or type of a thing rather than a specific,

when the article "the" is usually used.  *See supra* Part III.C.1 (collecting definitions).  This is a

far cry from the differing definitions leading to the ambiguity about a purposive requirement

found by the D.C. Circuit in the statutory words used in subsection (f).

Second, the D.C. Circuit in *Van Hollen I*, found that Congress, in enacting BCRA, did

not have an intention as to the precise issue presented because "it is doubtful that . . . Congress

even anticipated the circumstances that the FEC faced when it promulgated 11 C.F.R. § 104.20(c)(9)." 694 F.3d at 111. Indeed, Congress could not have known in 2002 that, when the FEC, in 2007, was promulgating a regulation to implement 52 U.S.C. § 30104(f), the Supreme Court would have "deliver[ed] a heavy blow to BCRA's attempt to regulate electioneering communications" in *WRTL*. *Van Hollen, Jr. v. FEC* ("*Van Hollen II*"), 811 F.3d 486, 490 (D.C. Cir. 2016) (elaborating on the context of the regulation). For that reason, the FEC had "a gap" to fill when promulgating 11 C.F.R. § 104.20(c)(9), *Van Hollen I*, 694 F.3d at 111 (quoting *Chevron*, 467 U.S. at 843–44). By contrast, here, the FEC confronted no such "gap" in 1979 when it promulgated 11 C.F.R. § 109.10(e)(1)(vi), to implement a statutory disclosure regime for reporting not-political committees, which regime was intended to shift reporting burdens, "without diminishing public disclosure." *See* S. REP. NO. 319, 96th Cong., 1st Sess. at 3.[47]

\*\*\*

---

[47]     Crossroads GPS argues that "Congress's longstanding acquiescence in the FEC's 1980 rulemaking" shows "ratifi[cation]" of the interpretation of 52 U.S.C. § 30104(c) in the challenged regulation. CGPS's Reply at 37–38; *see also* CGPS's Opp'n at 44–45 & n.27 (arguing Congress "has ratified the regulation" based on (1) "not object[ing] to the IE reporting regulation" prior to promulgation, (2) amending the disclosure obligations of the FECA without "revis[ing] or reject[ing] the FEC's IE contributor reporting requirements," and (3) declining to enact bills "that would establish new reporting requirements for 501(c) organizations making IEs" (emphasis in original)). The Supreme Court, however, has rightly expressed significant "skepticism toward reading the tea leaves of congressional inaction." *Rapanos v. United States*, 547 U.S. 715, 749 (2006). Generally, "[n]on-action by Congress is not often a useful guide" to statutory interpretation, *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983), because "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others," *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs* ("*SWANCC*"), 531 U.S. 159, 169 (2001); *see also Zuber v. Allen*, 396 U.S. 168, 185–86 n.21 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis."). Thus, what may appear to be "Congress'[s] deliberate acquiescence should more appropriately be called Congress's failure to express any opinion." *Rapanos*, 547 U.S. at 749 (internal quotation marks omitted). Absent "*overwhelming evidence*" that Congress rejected the "*precise* issue" presented before the Court, *id.* at 750 (quoting *Bob Jones Univ.*, 461 U.S. at 600) (emphasis in original)—and no such overwhelming evidence is presented here—courts "are loath to replace the plain text and original understanding of a statute with an amended agency interpretation," *id.* (quoting *SWANCC*, 531 U.S. at 169–170 n. 5). As the D.C. Circuit has likewise explained, although "[i]n a *Chevron* step two analysis, where the issue is whether the agency's interpretation of the statute is reasonable, congressional inaction might be minimally enlightening[, *s]ee, e.g., Bob Jones Univ. v. United States*, 461 U.S. [at] 599 . . ., [t]his is a *Chevron* step one analysis [and] the silence of a later Congress says nothing about the intent of the earlier Congress that spoke directly to the question here at issue." *First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525, 530 (D.C. Cir. 1996); *see also SWANCC*, 531 U.S. at 170 (observing that "[t]he relationship between the actions and inactions of the 95th Congress and the intent of the 92d Congress in passing [the statute at issue] is also considerably attenuated" such that "respondents face a difficult task in overcoming the plain text and import of" the statute).

In sum, 52 U.S.C. §§ 30104 (c)(1) and (c)(2)(C) unambiguously require separate and complementary requirements to identify donors of over $200 to reporting not-political committees and mandate significantly more disclosure than that required by the challenged regulation, 11 C.F.R. § 109.10(e)(1)(vi). Thus, the challenge to the regulation may be disposed of at *Chevron* step one, and proceeding to *Chevron* step two to evaluate whether the FEC's interpretation of the statutory disclosure requirements is entitled to any deference is unnecessary. *See SAS Inst.*, 138 S. Ct. at 1358; *Pereira*, 138 S. Ct. at 2113; *see also Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 53 (D.C. Cir. 2005) ("We do not reach step two . . . if the court, 'employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue[;] that intention is the law and must be given effect.'" (alteration in original) (quoting *Chevron*, 467 U.S. at 843 n. 9)); *see also id.* ("Of the traditional tools of statutory construction, the 'cardinal canon' is the first: We 'must presume that a legislature says in a statute what it means and means in a statute what it says . . . . When the words of a statute are unambiguous . . . this first canon is also the last: judicial inquiry is complete.'" (alterations in original) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).[48]

---

[48] The challenged regulation is also defective under the overlapping "arbitrary and capricious" inquiry to determine "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *ALDF,* 872 F.3d at 611 (alteration in original) (quoting *State Farm,* 463 U.S. at 43). The single sentence explanation provided by the FEC in 1979 for promulgating the challenged regulation wholly fails to explain how subsection (c)(1) is implemented or provide justification for narrowing the disclosure requirement of subsection (c)(2)(C). *See* AR 1503 (45 Fed. Reg. at 15087). The defendants counter that, to the extent the explanation is considered, this Court "should reject plaintiffs' challenge because the Commission's explanation was adequate given the circumstances," despite its short length, FEC's Reply at 23; *see also* CGPS's Reply at 23–24, especially in light of the FEC's "integral role" in the enactment of the 1979 FECA Amendment, *see* CGPS's Reply at 24, and the ambiguity in the statute, FEC's Reply at 23. While "ideal clarity is not the standard," *Van Hollen II*, 811 F.3d at 497, the agency must provide some explanation for alteration of a clear statutory mandate. The FEC has failed to do so, and, thus, its analytical path cannot be discerned. *Cf., e.g., id.* (finding that "FEC's analytical path" for promulgating electioneering communication regulation, based on an ambiguous statute, with "purpose requirement" could be "reasonably discern[ed]" because the FEC "advanced three explanations for its purpose requirement, . . . the 'support,' 'burden,' and 'privacy' rationales").

### 3.        *Vacatur Is Appropriate Remedy for Invalid Regulation*

As detailed above, the deficiencies in the challenged regulation are such that this regulation is invalid and must be vacated.  This remedy comports with precedent in this Circuit, which has announced that "[a] common remedy when we find a rule is invalid is to vacate." *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) (citing *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Normally when an Agency clearly violates the APA we would vacate its action . . . .")); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (explaining "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated" (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir.1989))).

Although vacatur is a "common remedy" for an invalid regulation, remedies short of complete vacatur may be appropriate in certain circumstances.  The D.C. Circuit has provided a well-established framework for analyzing parties' disputes over whether an invalid regulation should be vacated or remain effective pending agency review on remand.  *See Allied–Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).[49]  Two principal factors, announced in *Allied-Signal*, are considered in deciding "whether to vacate a flawed agency action": "(1) 'the seriousness of the . . . deficiencies' of the action, that is, how likely it is 'the [agency] will be able to justify' its decision on remand; and (2) 'the disruptive consequences of vacatur.'"  *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009)

---

[49]        The FEC contends that vacatur is an "unusual remedy," FEC's Opp'n at 50; *see also* CGPS's Reply at 43 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quoting *Banner Health v. Price*, 867 F.3d 1323, 1356 (D.C. Cir. 2017))); FEC's Reply at 42 ("The general rule when courts review agency decision-making is, 'except in rare circumstances,' to give the agency an opportunity to fix any problems on its own." (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985))).  Without debating the frequency of the use of vacatur to deal with an invalid regulation, the parties all agree that the *Allied-Signal* factors control.  Pls.' Reply at 39–40; CGPS's Reply at 43–45; FEC's Reply at 42–43.

(alterations in original) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048–49 (D.C. Cir. 2002), *modified on reh'g on other grounds*, 293 F.3d 537, 541 (D.C. Cir. 2002)); *see also Allied–Signal*, 988 F.2d at 150–51. The Court's discretion in fashioning a remedy depends on "the seriousness of the [challenged] order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990).

In this case, application of these factors militates strongly in favor of vacatur, as requested by the plaintiffs. The defendants argue otherwise, but their efforts are unavailing. First, the defects in the challenged regulation, 11 C.F.R. 109.10(e)(1)(vi), go far beyond a mere failure in explanation. *Cf. Heartland Reg'l Med. Ctr.*, 566 F.3d at 198 ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied– Signal* counsels remand without vacatur." (citing *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003))). The regulation conflicts with 52 U.S.C. § 30104(c) by wholly ignoring subsection (c)(1) and impermissibly narrowing the mandate of subsection (c)(2). *See supra* Part III.C.1.

Furthermore, as explained above, the regulation reflects an interpretation of the FECA Amendments of 1979 that is contrary to the statute's purposes of ample disclosure. *Id.* As a result, the FEC will not be able "easily" to fix any defect in the rule if the rule is remanded without vacatur. *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1989) ("This is not a case in which the court is easily able to find a lawful basis for the regulations but unable to uphold the regulations because the agency itself has rested on other, unreasonable, grounds."). Indeed, in cases such as this one, where the Court finds "the need for

wholesale revision on remand," the D.C. Circuit has concluded that "the appropriate course is to vacate the Rules in their entirety." *NRDC v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007).[50]

The second *Allied–Signal* factor, the "disruptive consequences," 988 F.2d at 150–51, also weighs in favor of vacatur. As an initial matter, the burdens on the reporting not-political committees to comply with the statutory disclosure mandates should not be insurmountable or even significant. Not-political committees likely keep close track of their donors, the donors' articulated funding interests, if any, and their contribution history. Indeed, much of the required donor identification information was, at least until July 16, 2018, required to be reported to the Internal Revenue Service ("IRS") by tax-exempt not-political committees, and, even now, the IRS requires that such identification information be retained.[51] The defendants nowhere argue that the donor information would be unavailable or in any way difficult to access for purposes of disclosure. Thus, the burden of accessing and compiling information necessary for compliance with the statutory disclosure requirements is achievable.

---

[50] Vacatur of a rule may, in some circumstances, result in a predecessor rule regaining effectiveness, *see Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect . . . ." (citing *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987))); *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) ("Little confusion or inefficiency will result from reinstating a regulatory regime that was in place from 1978 to 2007."), but here no prior regulatory regime implementing the current statute is available. In this circumstance, the D.C. Circuit has nonetheless vacated an invalid rule and, "[t]o remedy the resulting lack of standards," suggested that "any party 'may file a motion to delay issuance of the mandate to request either that the current standards remain in place or that [the agency] be allowed reasonable time to develop interim standards.'" *NRDC v. EPA*, 489 F.3d at 1262 (quoting *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001)).

[51] Prior to July 16, 2018, IRS regulations required tax-exempt organizations, other than entities organized under 501(c)(3), to report "the names and addresses of all persons who contributed . . . $5,000 or more . . . during the taxable year." 26 C.F.R. § 1.6033-2(a)(2)(ii)(f) (2017). On July 16, 2018, the IRS released guidance relieving tax-exempt organizations, other than entities organized under 501(c)(3), of the requirement to report the names and addresses of contributors. INTERNAL REVENUE SERVS., RETURNS BY EXEMPT ORGANIZATIONS AND RETURNS BY CERTAIN NONEXEMPT ORGANIZATIONS at 3–5, https://www.irs.gov/pub/irs-drop/rp-18-38.pdf (citing 26 C.F.R. § 1.6033-2(g)(6) ("The Commissioner may relieve any organization or class of organizations . . . from filing, in whole or in part the annual return required by this section where he determines that such returns are not necessary for the efficient administration of the internal revenue laws.")). "Organizations relieved of the obligation to report contributors' names and addresses," however, "must continue to keep this information in their books and records in order to permit the IRS to efficiently administer the internal revenue laws through examinations of specific taxpayers." *Id.* at 6.

The defendants urge that, if the challenged regulation is invalid, rather than vacatur, the case should be merely remanded.  FEC's Opp'n at 50; FEC's Reply at 42–43; CGPS's Reply at 43–45.  As support for a remand-only remedy, Crossroads GPS warns that vacating the regulation would "open up a Pandora's Box" of problems, noting that "a Republican who donated to the Sierra Club or a Democrat who donated to the National Rifle Association ["NRA"] for those organizations' general programs will suddenly find themselves involuntarily identified on public campaign finance reports" and "the political and non-profit worlds would be thrown into chaos the moment a vacatur takes effect" because they "could immediately find itself the subject of an FEC complaint."  CGPS's Reply at 44–45.  This argument is predicated on the plaintiffs' erroneous construction of 52 U.S.C. § 30104(c)(1) as covering all non-trivial donors to reporting not-political committees, when it does not.  Thus, the identities of contributors to both the NRA and the Sierra Club for "those organizations' general programs" need not be identified; only those non-trivial donors contributing to fund those organization's political efforts in federal campaign and independent expenditure activities are required to be disclosed under 52 U.S.C. § 30104(c).

Moreover, the fact that not-political committees have been permitted to under-disclose by virtue of the flawed challenged regulation and may now have to increase their contributor disclosures to meet statutory requirements is not a consequence that, in the Court's view, is so disruptive or chaotic that vacatur should be avoided.  To the contrary, by failing to implement congressional mandates, the challenged regulation has deprived the electorate of donor information that was intended and supposed to be disclosed.  Unlike some circumstances where vacatur of an agency rule would come too late for any effective remedy, where, as here, the remedy is simply adequate disclosures in compliance with the law, vacatur is a clearly viable

option.  *Cf. Sugar Cane Growers Co-op. of Fla.*, 289 F.3d at 97 (finding vacatur would be

"invitation to chaos" where regulatory program at issue "was launched and crops were plowed

under," and thus "[t]he egg has been scrambled and there is no apparent way to restore the status

quo ante").  The defects in the current challenged regulation may be promptly and readily

remedied by the FEC promulgating a new rule in accordance with the statute that provides

members of the public with the information that they need to participate as an informed

electorate, as well as to deter corruption and undue influence, and enforcing limitations on

foreign funds being funneled into domestic political campaigns—and the fast approach of the

2018 election provides all the more reason to do so promptly.

        To the extent that non-trivial donors to reporting not-political committees, such as the

NRA and the Sierra Club mentioned by Crossroads GPS, contributed for purposes requiring

disclosure of their identities, are concerned about such disclosure, this concern is generally

trumped by the congressional policy choice.  As the Supreme Court has long recognized, "public

disclosure of contributions to candidates and political parties will deter some individuals who

otherwise might contribute [and i]n some instances . . . may even expose contributors to

harassment or retaliation," but nonetheless "appear[s] to be the least restrictive means of curbing

the evils of campaign ignorance and corruption that Congress found to exist."  *Buckley,* 424 U.S.

at 68; *see also Citizens United v. FEC*, 558 U.S. at 369–371 (explaining "that disclosure is a less

restrictive alternative to more comprehensive regulations of speech," and rejecting argument

"that disclosure requirements can chill donations to an organization by exposing donors to

retaliation," absent showing of "a reasonable probability that the group's members would face

threats, harassment, or reprisals if their names were disclosed."); *Doe v. Reed*, 561 U.S. 186, 199

(2010) (rejecting claim that disclosure of state referendum petitions containing the names and

addresses of signers will subject signers to reprisals, absent a showing of reasonable probability of such harm, and holding that compelled disclosure of petitions is generally constitutional under the First Amendment since such disclosure "promotes transparency and accountability in the electoral process to an extent other measures cannot," and "is substantially related to the important interest of preserving the integrity of the electoral process").  The congressional goal with enactment of the predecessor statute to 52 U.S.C. § 30104(c) was "to achieve 'total disclosure' by reaching 'every kind of political activity' in order to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible."  *Buckley,* 424 U.S. at 76.

Similarly to Crossroads GPS, the FEC recommends the remand-only remedy, stating that "[t]he 2018 elections are approaching and, if there were no regulation for any significant time, entities engaged in independent expenditures might have inadequate guidance."  FEC's Opp'n at 50.  This is not a trivial concern.  Yet, as one Judge on the D.C. Circuit has observed, "[a] remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such," and, consequently, "[w]hen the case is simply remanded, and the agency drags its feet, the winning party's only recourse is to bring a mandamus petition and clear all the hurdles such actions entail."  *NRDC v. EPA*, 489 F.3d at 1264 (Randolph, J., concurring); *see also id.* at 1266 ("Remanding leaves the agency's initial approach in effect, and may suggest there is no urgency to act . . . .  Even if an agency does not welcome mandamus-driven agency action, the possibility of mandamus may serve as an incentive not to delay unduly regardless of whether the court vacates or remands.") (Rogers, J., concurring).[52]

---

[52]     The concern about an agency "dragging its feet" is singularly apropos here.  The FEC, despite acknowledging the discrepancies between the challenged regulation and the plaintiffs' version of the statutory

Given the length of time this invalid regulation has persisted, particularly in the face of internal acknowledgement by OGC of potential shortfalls, inaction by the FEC to address its flaws is inevitably a significant concern with a remand-only remedy.  At the same time, to ensure that not-political committees benefit from regulatory guidance and that the flaws in the challenged regulation are promptly addressed, the Court will stay the vacatur for 45 days to provide time for the FEC to issue interim regulations that comport with the statutory disclosure requirement of 52 U.S.C. § 30104(c), consistent with this Memorandum Opinion.  *See NRDC v. EPA*, 489 F.3d at 1264 ("The existence of a stay with time limits, rather than an open-ended remand without vacating, will give the agency an incentive to act in a reasonable time, given the other constraints on its resources. When we simply remand the agency has no such incentive.") (Randolph, J., concurring).

### D.    FEC'S DISMISSAL OF THE PLAINTIFFS' AMENDED ADMINISTRATIVE COMPLAINT WAS CONTRARY TO LAW AND WARRANTS REMAND

The parties dispute whether the FEC's dismissal decision must be set aside as "contrary to law."  The plaintiffs argue that, because the FEC's dismissal of their amended administrative complaint "rests on impermissible constructions of law and arbitrary and capricious analyses of facts, the dismissal of each and every claim raised in [the plaintiffs' administrative] complaint is contrary to law and warrants reversal."  Pls.' Reply at 41; *see also* Pls.' Mem. at 38–45.  The defendants counter that, even if the challenged regulation is invalid, the decision deserves a "highly deferential standard of review," FEC's Reply at 1–5; *see also* CGPS's Opp'n at 1–2, and should be upheld because: (1) Crossroads GPS was entitled to rely on the challenged regulation and did so in good faith under the FECA's safe harbor provision, FEC's Opp'n at 20 (citing 52

disclosure regime, has been unable to remedy the situation, frequently due to deadlocked decisions, as in this case. *See* Part I.B; *see also* Certification in Draft Rulemaking Dec. 16, 2011.

U.S.C. § 30111(e)); CGPS's Reply at 6 (same), and (2) with respect to the FEC's decision not to prosecute an alleged violation of 52 U.S.C. § 30104(c)(1), the FEC's exercise of prosecutorial discretion, based on equitable concerns, is entitled to "even greater deference," FEC's Opp'n at 14–16, 28; *see also* CGPS's Opp'n 37–38; CGPS's Reply at 41–42.

To recap, the FEC dismissed the plaintiffs' amended administrative complaint after the six members deadlocked three-to-three on OGC's two recommendations: first, to "[f]ind no reason to believe that Crossroads [GPS] violated 52 U.S.C. § 30104(c)(2) and 11 C.F.R. § 109.10(e)(1)(vi)"; and, second, to "[d]ismiss in the exercise of prosecutorial discretion the allegation that Crossroads [GPS] violated 52 U.S.C. § 30104(c)(1)."  AR 193 (Certification of FEC votes in MUR 6696 (dated Nov. 19, 2015)); *see also* AR 176 (FGCR at 13).  The first finding is the subject of the plaintiffs' FECA claims in Counts I and II that the FEC's dismissal decision was "contrary to law," Compl. ¶¶ 110–16 (Count I); 117–24 (Count II), and the second action is the basis for the plaintiffs' claim in Count III that the decision was "contrary to law," *id.* ¶¶ 125–31.  Following a brief summary of the legal standard applicable to review of FEC enforcement decisions, the reasoning underlying each OGC recommendation is analyzed for whether it is contrary to law, as claimed by plaintiffs.

**1.**     ***Legal Standard Applicable to Review of FEC Enforcement Actions***

Under 52 U.S.C. § 30109(a)(8)(C), a court considering the dismissal of an administrative complaint by the FEC, "may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint."  52 U.S.C. § 30109(a)(8)(C).  One of two conditions must be met to find an FEC dismissal is "contrary to law": "(1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act, . . . or (2) if the

FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski*, 795 F.2d at 161 (citing, *e.g.*, *DSCC*, 454 U.S. at 31, 37; *In re Carter-Mondale Reelection Comm.*, 642 F.2d at 542).

When evaluating whether an FEC dismissal decision is "contrary to law," the court considers, under the *Chevron* framework, whether the dismissal was "arbitrary or capricious, or an abuse of discretion." *Orloski*, 795 F.2d at 161–62; *see also CREW*, 892 F.3d at 437 n.3 (explaining that the Court in *Orloski* repeated APA language, "stating that the [FEC] would have acted 'contrary to law' if its dismissal of a complaint 'was arbitrary or capricious, or an abuse of discretion'"). The arbitrary and capricious standard, which is "'[h]ighly deferential, . . . presumes the validity of agency action' and permits reversal 'only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment.'" *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005) (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000)). In conducting such a review of "a determination or judgment which an administrative agency alone is authorized to make," the court "must judge the propriety of such action solely by the grounds invoked by the agency," *Common Cause v. FEC*, 906 F.2d 705, 706 (D.C. Cir. 1990) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), but will "uphold an agency decision 'of less than ideal clarity if the agency's path may reasonably be discerned,'" *id.* (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys.*, 419 U.S. 281, 286 (1974)); *see also Nader v. FEC*, 823 F. Supp. 2d 53, 58 (D.D.C. 2011) ("Alongside its decisions to prosecute and conduct investigations, the FEC's decisions to dismiss complaints are entitled to great deference as long as it supplies reasonable grounds.").

The FEC, when considering whether to commence enforcement proceedings based on an administrative complaint, must dismiss the administrative complaint when the members

deadlock three-to-three because "under FECA, the [FEC] may pursue enforcement only upon 'an affirmative vote of 4 of its members.'" *CREW*, 892 F.3d at 437 (citing 52 U.S.C. § 30109(a)(2), (a)(4)(A)(i), (a)(6)(A)).  The controlling Commissioners must provide a statement of their reasons for their vote in cases of deadlock; if they do not provide such a statement, but rely on an OGC Report, the OGC Report serves as the basis for judicial review.  *NRSC*, 966 F.2d at 1476; *DSCC*, 454 U.S. at 38 n.19.  In this case, the Commissioners who declined to proceed provided no statement of reasons, and, thus, the reasoning in the OGC Report for its recommendations is the only rationale offered for the FEC's decision that is subject to judicial review here.  FEC's Opp'n at 11–12; CGPS's Opp'n at 21; Pls.' Mem. at 27–28.  The sufficiency of the reasoning underlying both OGC recommendations is addressed next.

### 2. *OGC's First Recommendation at Issue in Counts I and II*

OGC's first recommendation—to find no reason to believe that Crossroads GPS violated 11 C.F.R. § 109.10(e)(1)(vi) and 52 US.C. § 30104(c)(2)—relied entirely on the invalid challenged regulation and offered the following explanation: "a donor's general purpose to support an organization in its efforts to further the election of a particular federal candidate does not itself indicate that the donor's purpose was to further 'the reported independent expenditure'—the requisite regulatory test."  AR 174 (FGCR at 11).  Despite noting that the challenged regulation differs from the mandate of 52 U.S.C. § 30104(c), AR 175–76 & n.57 (FGCR at 12–13 & n.57), and that the administrative record indicated that Crossroads GPS was receiving unreported contributions intended to influence elections, *see* AR 174 (FGCR at 11) (finding discussion between Rove and the anonymous donor "was at least specific enough that Rove understood that the donor proposed to make a contribution to Crossroads for it to use to support the election of Josh Mandel" (citing Rove Aff. ¶ 10)), OGC recommended finding no violation of "the regulatory standard," AR 175 n.57 (FGCR at 12 n.57).

For the reasons amply detailed above, *see supra* Part III.C, 52 U.S.C. § 30104(c)(2) requires what the FEC concedes is "an arguably more expansive approach," AR 175 n.57 (FGCR at 12 n.57), than the significantly narrowed disclosure required under 11 C.F.R. § 109.10(e)(1)(vi), thereby conflicting with the statute. Thus, the FEC's reliance on the invalid challenged regulation for this first recommendation is inherently contrary to law. *See Akins v. FEC*, 101 F.3d 731, 740–41 (D.C. Cir. 1996), *vacated on other grounds*, 524 U.S. 11 (1998) (finding "FEC's plea for deference" in case reviewing dismissal decision based on interpretation of the FECA was "doctrinally misconceived" where "it is not, and cannot be, contended that the statutory language itself is ambiguous, and the asserted 'ambiguity' only arises because of the Supreme Court's narrowing opinions"); *see also CREW v. FEC*, 299 F. Supp. 3d 83, 93 (D.D.C. 2018) (finding FEC dismissal decision "contrary to law" where FEC's approach to analyzing a party's status as a political committee "violates the unambiguous directive of Congress" in the FECA and BCRA, "that electioneering communications *presumptively* have an election-related purpose" (emphasis in original)).

The defendants defend OGC's first recommendation to find "no reason to believe" that Crossroads GPS violated 11 C.F.R. § 109.10(e)(1)(vi) and 52 U.S.C. § 30104(c)(2)(C), arguing this decision was not predicated solely on the validity of the challenged regulation but also on the plaintiffs' failure to satisfy "the 'reason to believe' standard." FEC's Reply at 6; CGPS's Reply at 5. In particular, they cite a 2000 decision in MUR 4960, in which the FEC stated that "'[u]nwarranted legal conclusions from asserted facts . . ., or mere speculation, . . . will not be accepted as true' and '[s]uch purely speculative charges, especially when accompanied by a direct refutation, do not form an adequate basis to find reason to believe that a violation of the FECA has occurred.'" FEC's Reply at 6 (alterations in original) (internal citation omitted); *see*

*also* CGPS's Reply at 5. Here, the defendants assert that the plaintiffs' reliance on newspaper reports of the 2012 Tampa event and the conversations recounted as occurring at the event are merely speculative as to whether any particular individual had the requisite donative intent necessary to find a violation of 52 U.S.C. § 30104(c)(2)(C) and 11 C.F.R. § 109.10(e)(1)(vi). FEC's Opp'n at 15–16; *see also* CGPS's Reply at 1. Even if the defendants correctly criticize the nature of the proof supporting the administrative complaint, the focus in this lawsuit is on the sufficiency of the FEC's reasoning.

The OGC Report reviewed the facts presented in both the amended administrative complaint and other record evidence, such as the Rove Declaration, through the prism of the regulatory test requiring "an express link between the receipt and the independent expenditure," AR 173 (FGCR at 10), rather than just "a donor's general purpose to support an organization in its efforts to further the election of a particular federal candidate . . . ," AR 174 (FCGR at 11). Application of this regulatory test to the factual record was contrary to law and clearly conflicts with the FEC's statutory mandate. *See Orloski*, 795 F.2d at 161. Consequently, OGC's first finding of no "reason to believe" violations of 52 U.S.C. § 30104(c)(2)(C) and 11 C.F.R. § 109.10(e)(1)(vi) occurred is likewise contrary to law and must be remanded for reconsideration by the agency.[53]

### 3. *OGC's Second Recommendation at Issue in Count III*

OGC's second recommendation—that the FEC "[d]ismiss in the exercise of prosecutorial discretion the allegation that Crossroads [GPS] violated [52 U.S.C. § 30104(c)(l)]," AR 176

---

[53] Whether 52 U.S.C. § 30104(c)(2)(C) requires disclosure of the identity of any of the following donors is an issue to be addressed on remand: (1) the anonymous donor who initiated the alleged "matching challenge" and "ended up making a donation 'that was not in any way earmarked for any particular use'—even for use in Ohio," CGPS's Opp'n at 24 (quoting AR 95 ( Rove Aff. ¶ 14)); (2) any individuals who gave to "the $1.3 million raised in matching donations [that] 'were not solicited for a particular purpose other than for general use in Ohio' and were not 'for the purposes of aiding the election of Josh Mandel,'" *id.* (citing AR 95 (Rove Aff. ¶ 13)); and (3) any of the individuals who gave money after watching the advertisements at the Tampa event in 2012, *id.*

(FCGR at 13)—was made following acknowledgement that subsection (c)(1) "may impose additional reporting obligations for certain contributions made for the purpose of influencing a federal election generally," but "11 C.F.R. § 109.10(e) is silent concerning any such additional reporting requirement." AR 175–76 (FCGR at 12–13); *see also* AR 176 n.59 (FCGR at 13 n.59) (further noting that "certain disclosures appear to be required by the [FECA] and *MCFL*"). Notwithstanding the apparent deficiencies in the challenged regulation, OGC reasoned that Crossroads GPS "could raise equitable concerns about whether a filer has fair notice of the requisite level of disclosure required by law if the Commission attempted to impose liability under [subsection (c)(1)]." AR 176 (FGCR at 13).

Both echoing and substantially supplementing OGC's reasoning for not finding any violation by Crossroads GPS of subsection (c)(1), the defendants argue that, even if the FEC's dismissal decision was based on an invalid regulation, the decision should not be set aside because (1) Crossroads GPS was "entitled to rely" on the regulation under the FECA's safe harbor provision, 52 U.S.C. § 30111(e), CGPS's Opp'n at 25–26; *see also* FEC's Opp'n at 19–23; (2) due to other "equitable concerns" stemming from a lack of "fair notice," FEC's Opp'n at 19–23; FEC's Reply at 12; *see also* CGPS's Opp'n at 27–31; and (3) to the extent the dismissal of allegations that Crossroads GPS violated subsection (c)(1) was done "in the exercise of [] prosecutorial discretion," AR 176 (FGCR at 13), the decision is "subject to even greater deference," FEC's Reply at 2, such that this decision is "presumptively unreviewable," CGPS's Reply at 42; *see also* FEC's Not. Suppl. Authorities ("FEC's Not."), ECF No. 40.[54]  The

---

[54]     Crossroads GPS contends that the plaintiffs cannot argue "unreasonable reliance" on the regulation because CREW submitted a comment to the FEC in 2015 "espousing [Crossroads GPS's] position regarding the regulation at issue well after the conduct giving rise to this case" and actually "conceded . . . that the regulation purports to implement both statutory provisions."  CGPS's Reply at 7 & n.2 (citing *Comments in Response to Advance Notice of Proposed Rulemaking on Earmarking, Affiliation, Joint Fundraising, Disclosure, and Other Issues* (Jan. 15, 2015) ("CREW's Comment, Jan. 15, 2015") at 3, *available at* http://sers.fec.gov/fosers/showpdf.htm?docid=312990); *see also* CGPS's Opp'n at 28–29.  The CREW comment targeted by Crossroads GPS is that, under 11 C.F.R. §

combined weight of the defendants' arguments present a close call, but given the pervading reliance in OGC's reasoning on the invalid regulation, compounded by the complete absence in OGC's Report of any reference to critical predicates for these arguments, remand of this aspect of the plaintiffs' claim is necessary for the FEC to consider these arguments in the first instance.

FECA's safe harbor provision, on which the defendants rely, provides that "any person who relies upon any rule or regulation prescribed by the Commission . . . and who acts in good faith in accordance with such rule or regulation shall not, as a result of such act, be subject to any sanction provided by this Act . . . ." 52 U.S.C. § 30111(e). This provision, enacted as part of the FECA Amendments in 1979, without substantive change since then, was designed to allow "[a] person who relies upon [FEC regulations] in good faith" not to "be subject to subsequent enforcement action." H. R. REP. NO. 422, 96th Cong., 1st Sess. at 24 (1979). In "removing certain conduct from any risk of enforcement," the safe harbor provision "establish[es] 'legal rights' to engage in that conduct.'" *Shays I*, 414 F.3d at 95 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)). That the safe harbor "affords a defense," *id.*, does not mean this provision operates as the absolute bar urged by defendants.

Mention of the FECA's safe harbor provision made its first appearance in this litigation, since it was not "specifically cite[d]" in the OGC Report. FEC's Reply at 12. Nevertheless, the FEC contends this provision is "based on the same rationale" as the "equitable concerns" actually referenced in the OGC Report. *Id.*; *see* AR 176 (FGCR at 13) (describing "equitable

---

109.10(e)(l)(vi), "[o]nly if the contributor makes a contribution with the purpose of furthering a *specific* advertisement or other independent expenditure must the organization identify the contributor," CGPS's Reply at 7 (quoting CREW's Comment, Jan. 15, 2015 at 4 (emphasis in original)), which comment was offered as evidence that the challenged regulation failed to encompass the full disclosure obligations set out in 52 U.S.C. § 30104(c). *See* CREW's Comment, Jan. 15, 2015 at 3 (arguing "[c]ontrary to [the] clear language" of 52 U.S.C. § 30104(c)(1) and (c)(2), the FEC's regulations, including 11 C.F.R. § 109.10(e)(l)(vi), "wrongly limit required disclosure of contributors to organizations making independent expenditures"). The plaintiffs' acknowledgment of the limited scope of the challenged regulation may be relevant to the FEC's consideration of Crossroads GPS's reasonable reliance on the challenged regulation on remand.

concerns" as "whether a filer has fair notice of the requisite level of disclosure required by law if the Commission attempted to impose liability under [52 U.S.C. § 30104(c)(l)]."). OGC explicitly cited both the FECA and *MCFL* as potential forms of "notice," AR 176 n.59 (FGCR at 13 n.59), however, without providing any further analysis of why the statutory plain text, together with the Supreme Court's construction of that very text, somehow fell short of sufficient or "fair notice" of the requisite donor disclosures to be made by a reporting not-political committee. Moreover, while OGC mentioned multiple RFAIs received by Crossroads GPS about deficient reporting, *see* AR 170–71 (FGCR at 7–8), and the inadequacies of the challenged regulation identified through then-Congressman Van Hollen's rulemaking petition in 2011, AR 172 n.48 (FGCR at 9 n.48), OGC made no attempt to connect these observations to any concerns about a lack of fair notice. For these reasons, to the extent the FEC finds on remand that the safe harbor or other equitable concerns support a non-enforcement decision in this matter, the FEC may explain so, in light of the potential forms of notice available.[55]

The defendants also contend that OGC's reference to "prosecutorial discretion" for recommending no enforcement action against Crossroads GPS for allegedly violating subsection (c)(1), renders the administrative decision unreviewable under *Heckler v. Chaney*, 470 U.S. 821,

---

[55] The parties devote significant space to debating whether these potential forms of "notice" demonstrate a lack of "good faith" on the part of Crossroads GPS, such that the safe harbor provision cannot apply. *See* Pls.' Reply at 36–38 ("'[G]ood faith' is a factual question, and there are significant reasons to believe Crossroads GPS's reliance is not in good faith."); CGPS's Reply at 6–9 ("[The plaintiffs'] attacks on [Crossroads GPS's] good faith ring hollow because [Crossroads GPS] complied with the regulation as it was universally understood."); FEC's Reply at 12–14 (arguing, "the FEC has never interpreted 52 U.S.C. § 30104(c)(1) as a stand-alone reporting requirement in the 38 years of the provision's existence," and, thus, the plaintiffs' "claim that Crossroads [GPS] failed to act in good faith is thus completely unsupported"). The parties also debate, to the extent that the safe harbor is applicable, what "sanctions" are precluded. Pls.' Reply at 38 ("[E]ven if Crossroads GPS could prove good faith reliance, that would not bar all relief against the organization."); *see also* CGPS's Reply at 9–11 ("[T]he FECA's protections for reliance on FEC regulations are unequivocally expansive."); FEC's Opp'n at 19–21 ("The Commission can reasonably decline to proceed with an understanding that 'sanction' is not just limited to monetary sanctions, but also extends to the injunctive and declaratory relief sought by plaintiffs here."). As noted, these issues were not specifically addressed by the FEC and may be considered at remand.

831 (1985). FEC's Opp'n at 28–31; CGPS's Opp'n at 37–38; CGPS's Reply at 42. In *Chaney,* the Supreme Court held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under [5 U.S.C.] § 701(a)(2)." *Chaney*, 470 U.S. at 832. The *Chaney* Court stressed, however, that this immunity was only presumptive, not absolute, such that "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33. Thus, "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833.

Without question, *Chaney* has been applied to afford FEC dismissal decisions great deference and even to preclude judicial review of such dismissal decisions under the FECA. *See, e.g.*, *CREW*, 892 F.3d at 438–49 (citing *Chaney*, 470 U.S. at 830, and holding that FEC's decision not to proceed with an enforcement action against an "unincorporated association" for allegedly violating federal election laws in 2010, was immune from judicial review); *Combat Veterans for Cong. Political Action Comm. v. FEC*, 983 F. Supp. 2d 1, 10 (D.D.C. 2013), *aff'd*, 795 F.3d 151 (D.C. Cir. 2015) ("[T]he FEC enjoys 'considerable prosecutorial discretion' and 'its decisions to dismiss complaints are entitled to great deference.'" (citing *Nader*, 823 F. Supp. 2d at 65)); *La Botz v. FEC*, 61 F. Supp. 3d 21, 33–34 (D.D.C. 2014) ("An agency decision not to pursue a potential violation involves a complicated balancing of factors which are appropriately within its expertise, including whether agency resources are better spent elsewhere, whether its action would result in success, and whether there are sufficient resources to undertake the action at all.").

The D.C. Circuit, however, has identified two instances where the "presumptively unreviewable" expression of prosecutorial discretion may be rebutted under *Chaney*. First, "*Chaney* left open the possibility that an agency nonenforcement decision may be reviewed if 'the agency has "consciously and expressly adopted a general policy" that is so extreme as to amount to an abdication of its statutory responsibilities.'" *CREW*, 892 F.3d at 440 n.9 (quoting *Chaney*, 470 U.S. at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc))). Second, since "[t]he interpretation an agency gives to a statute is not committed to the agency's unreviewable discretion," *id.* at 441 n.11 (citing *Chaney*, 470 U.S. at 833 n.4; *Akins*, 524 U.S. at 26), "if the Commission declines to bring an enforcement action on the basis of its interpretation of FECA, the Commission's decision is subject to judicial review to determine whether it is 'contrary to law,'" *id.* (citing *DSCC*, 454 U.S. at 27)). In the D.C. Circuit's recent *CREW* opinion, neither exception applied. *See id.* at 440 n.9 (explaining the plaintiff had cited *Chaney's* footnote regarding abdication of statutory responsibilities, but that the plaintiff's "own submissions show that the Commission routinely enforces the election law violations alleged in [the plaintiff's] administrative complaint"); *id.* at 441 & n.11 (explaining, in announcing that agency interpretation of statute generally "is not committed to the agency's unreviewable discretion," but not considering this situation in a case).[56] Here, both exceptions to *Chaney* may be applicable to overcome the presumption generally accorded the FEC's enforcement decisions explained as a matter of prosecutorial discretion.

---

[56] The D.C. Circuit's *CREW* opinion affirmed a grant of summary judgment to the FEC after the FEC deadlocked three-to-three and consequently voted not to begin an enforcement proceeding, based on, as noted, the plaintiff's allegations that an unincorporated association had violated the FECA. *CREW*, 892 F.3d at 438. The controlling Commissioners in that case issued a statement of reasons for their decision not to initiate proceedings, which statement included, *inter alia*, that the "defunct" association in the complaint "no longer existed," "had filed termination papers with the IRS," "had no money . . . [or] counsel . . . [or] agents who could legally bind it," "and that any agency action against the association would raise novel legal issues that the Commission had no briefing or time to decide." *Id.* (internal quotation marks omitted).

109

As to the first exception, the FEC deadlocked on taking any enforcement action in the face of the OGC Report pointing out discrepancies between the challenged regulation compared to the statutory disclosure obligations imposed on reporting not-political committees. These discrepancies had been acknowledged without remedial action by the FEC for years prior to dismissal of the plaintiffs' amended administrative complaint, raising the issue whether the FEC had intentionally "abdicat[ed] . . . its statutory responsibilities." *See CREW*, 892 F.3d at 440 n.9 (quoting *Chaney*, 470 U.S. at 833 n.4). The FEC has provided no explanation to overcome this exception. Similarly, as to the second exception to *Chaney*, here the FEC declined to bring an enforcement action primarily on the basis of the "regulatory test" set out by the challenged regulation, which reflected a deeply flawed interpretation of the statutory disclosure obligations the regulation purported to implement. Again, the FEC has provided no explanation to overcome this exception.[57]

On remand, the FEC will have the opportunity to explain, in light of these considerations, whether a non-enforcement decision would be entitled to deference.

## IV. CONCLUSION

The challenged regulation at issue in this case, 11 C.F.R. § 109.10(e)(1)(vi), has permitted reporting not-political committees to evade the statutory disclosure requirements in

---

[57]     After briefing on the pending cross-motions for summary judgment concluded, the FEC filed a supplemental notice regarding *CREW*, 892 F.3d 434, and *Campaign Legal Center v. FEC* ("*CLC*"), Civ No. 16-752 (TNM), 2018 WL 2739920 (D.D.C. June 7, 2018), contending that both cases "support positions the Commission previously took for why the Court should not overturn the Commission's dismissal of plaintiffs' administrative complaint in this case." FEC's Not. at 1, 3. In response, the plaintiffs contend that the two cases "are of very limited value on the questions before this Court." Pls.' Resp. FEC's Not. Suppl. Authorities, ECF No. 41. The plaintiffs are correct. Neither supplemental case involved review, as here, of an FEC dismissal decision predicated on an invalid regulation, with only brief mention of "prosecutorial discretion" and "fair notice" concerns. *See supra* note 56 (discussing *CREW*, 892 F.3d 434); *CLC*, 2018 WL 2739920 at *3 (explaining the "Commission stated that it declined to find reason to believe a violation occurred as 'an exercise of the Commission's prosecutorial discretion,' because the Supreme Court's decision in *Citizens United* . . . created a sea change in campaign finance law, overturning the ban on corporate political speech and making it necessary to examine as 'an issue of first impression' how Section 30122's straw donor ban applied to corporate contributions.").

significant ways.  This regulation requires reporting not-political committees to identify donors of over $200 annually, a non-trivial amount, who contributed funds for "the purpose of furthering the reported independent expenditure" in the precise form set out in the FEC filings. As this regulation is construed and applied by the FEC, a donor contributing over $200 during a calendar year to a not-political committee for the express purpose of advocating for or against the election of a candidate for federal office, would nonetheless not be identified, absent the donor's express agreement that the funds be used for the specific expenditures reported to the FEC, even though the donor may otherwise support and in fact contribute for the purpose of funding those expenditures.

In contravention of the broad disclosure that Congress intended when enacting the 1979 FECA Amendments, this regulation falls short in two distinct ways.  First, the challenged regulation wholly fails to implement another disclosure requirement, mandated in 52 U.S.C. § 30104(c)(1), requiring reporting not-political committees to identify non-trivial donors, as well as the date and amount of their contributions, when the contributions were made for political purposes to influence any election for federal office, or at the request or authorization of a candidate or the candidate's agent.  Such contributions may, in fact, be intended to fund the not-political committee's own contributions and be routed to candidates, political parties, or political committees, such as super PACs.  Second, the challenged regulation impermissibly narrows the mandated disclosure in 52 U.S.C. § 30104(c)(2)(C), which requires the identification of such donors contributing for the purpose of furthering the not-political committee's own express advocacy for or against the election of a federal candidate, even when the donor has not expressly directed that the funds be used in the precise manner reported.

The Supreme Court presciently stated over forty years ago, during part of which period the challenged regulation has been in effect, that the predecessor to the statutory disclosure provision at issue "is responsive to the legitimate fear that efforts would be made, as they [have] been in the past, to avoid the disclosure requirements by routing financial support of candidates through avenues not explicitly covered by the general provisions of the Act." *Buckley*, 424 U.S. at 76. The challenged regulation facilitates such financial "routing," blatantly undercuts the congressional goal of fully disclosing the sources of money flowing into federal political campaigns, and thereby suppresses the benefits intended to accrue from disclosure, including informing the electorate, deterring corruption, and enforcing bans on foreign contributions being used to buy access and influence to American political officials.

Accordingly, the plaintiffs' Motion for Summary Judgment, ECF No. 27, is **GRANTED**. In particular, the FEC regulation, 11 C.F.R. § 109.10(e)(1)(vi), is declared invalid and is vacated, with vacatur stayed for 45 days to provide time for the FEC to issue interim regulations that comport with the statutory disclosure requirement of 52 U.S.C. § 30104(c), consistent with this Memorandum Opinion. The FEC's dismissal of the plaintiffs' amended administrative complaint is declared "contrary to law" and remanded to the FEC for reconsideration, consistent with this Memorandum Opinion. The FEC is directed to reconsider the administrative complaint, in conformity with this Memorandum Opinion, within 30 days, "failing which the complainant[s] may bring . . . a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C).

Crossroads GPS's Cross-Motion for Summary Judgment, ECF No. 28, and the FEC's Cross-Motion for Summary Judgment, ECF No. 30, are **DENIED**.

A separate Order consistent with this Memorandum Opinion is filed contemporaneously.

Date: August 3, 2018

_____
BERYL A. HOWELL
Chief Judge